Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Jason A. Enright – State Bar No. 24087475
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 745-5400
Facsimile:   (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jenright@winstead.com
achiarello@winstead.com

Brian P. Shaw – State Bar No. 24053473
**ROGGE DUNN GROUP, PC**
500 N. Akard St., Suite 1900
Dallas, Texas 75201
Telephone: (214) 888-5000
Facsimile:   (214) 220-3833
shaw@roggedunngroup.com

**COUNSEL FOR ACIS CAPITAL MANAGEMENT, L.P.
AND ACIS CAPITAL MANAGEMENT GP, LLC,
PLAINTIFFS AND REORGANIZED DEBTORS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | **(Jointly Administered Under Case No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |

| | | |
|---|---|---|
| **ACIS CAPITAL MANAGEMENT, L.P., ACIS CAPITAL MANAGEMENT GP, LLC, Reorganized Debtors,** | § | |
| Plaintiffs, | § | **Adversary No. _____** |
| vs. | § | |
| **JAMES DONDERO,  FRANK WATERHOUSE, SCOTT ELLINGTON, HUNTER COVITZ, ISAAC LEVENTON, JEAN PAUL SEVILLA, THOMAS SURGENT, GRANT SCOTT, HEATHER BESTWICK, WILLIAM SCOTT, AND CLO HOLDCO, LTD.,** | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT

Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP" together with Acis LP, the "Reorganized Debtors," "Acis," or "Plaintiffs")[1] the reorganized debtors in the above-styled and jointly administered bankruptcy cases (the "Bankruptcy Cases"), and Plaintiffs in the above-styled adversary proceeding (the "Adversary Proceeding"), file this *Original Complaint* (this "Complaint"), against James Dondero, Frank Waterhouse, Scott Ellington, Hunter Covitz, Isaac Leventon, Jean Paul Sevilla, Thomas Surgent, Grant Scott, Heather Bestwick, William Scott, and CLO HoldCo, Ltd. (collectively, the "Defendants") and respectfully state as follows:

## I.   INTRODUCTION[2]

1.      The Court is all-too familiar with the background here. In order to ensure that Josh Terry would collect nothing for his hard-fought Arbitration Award of close to $8 million against Acis, James Dondero ("Dondero"), through Highland Capital and many of its affiliates, orchestrated a massive scheme to fraudulently transfer Acis's assets, including its portfolio management rights that constituted the core of Acis's revenue stream, worth tens of millions of dollars (at a minimum), to the Highlands (defined below). These actions by Dondero—even during the Bankruptcy Cases—were flagrant breaches of his fiduciary duties to Acis, as he was also an officer and member of Acis GP.

2.      But Dondero could not do this alone. To perpetrate this fraud, the other Defendants knowingly colluded and coordinated with Dondero, aiding and abetting his breaches of fiduciary duty. Dondero's accomplices had a choice—they could have done the right thing

---

[1] Prior to February 15, 2019, the date upon which the Plan (defined below) became effective, Acis may be referred to as the "Debtors."

[2] Any capitalized term not otherwise defined in this Introduction shall have the meaning ascribed to such term later in this Complaint.

and refused to participate in what they all knew was wrongdoing, but they decided otherwise. As he orchestrated this brazen scheme, like a puppet master, Dondero completely controlled Highland Capital, its affiliates, and those that did his dirty work. Dondero is Highland Capital, and through Highland Capital he pulls the strings for the rest of the Highlands. He is their alter ego.

3. Accordingly, pursuant to the Plan and Confirmation Order, which preserved the causes of action pleaded herein against the Defendants, Acis brings this Adversary Proceeding against Dondero and Waterhouse for breaching their fiduciary duties to Acis, as its officers, and against the other individual Defendants for aiding and abetting Dondero's and Waterhouse's breaches of fiduciary duties to Acis. Acis also pleads that Dondero, Covitz, Leventon, William Scott, and Bestwick willfully violated of the automatic stay by attempting to force optional redemptions of the CLOs, as part of the attempted stealth liquidation of Acis, and to facilitate Highland Capital's own issuance of CLOs, after the filing of the Bankruptcy Cases. Further, Acis pleads turnover and money had and received against CLO Holdco, another Dondero-controlled Highland Capital affiliate, for amounts due Acis for investment management services provided to CLO Value Fund, and which amounts Dondero diverted to CLO Holdco. Finally, Acis pleads that Dondero is the alter ego of the Highlands, and Acis should be able to pierce the corporate veil to recover against Dondero for all damages flowing from the actions of the Highlands.

## II. JURISDICTION, VENUE, AND STATUTORY PREDICATE

4. This Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334. *See U.S. Brass Corp. v. Travelers Ins. Group (In re U.S. Brass Corp.)*, 301 F.3d 296, 303-06 (5th Cir. 2002) (holding that proceedings within the contemplation of "11 U.S.C. § 1142(b), which authorizes post-confirmation bankruptcy orders 'necessary for the consummation of the plan,'" are "arising in" a case under title 11, and therefore

within the jurisdictional grant of section 1334); *Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.)*, 309 B.R. 217, 220-21 (Bankr. N.D. Tex. 2004) (citing *U.S. Brass* and finding post-confirmation jurisdiction when the claims at issue in the adversary proceeding arose pre-petition between the debtor and defendants, the plan contemplated the prosecution of such claims and distribution of any recovery to creditors under the plan, and the prosecution of such claims would impact compliance with the plan). Venue is proper in this district pursuant to 28 U.S.C. § 1409.

5.      This matter is core within the meaning of 28 U.S.C. § 157(b), *see U.S. Brass*, 301 F.3d at 305-06, or is a proceeding related to a case under title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"). To the extent it is determined that the Court may not finally adjudicate any claim(s) herein, Plaintiffs consent to the entry of final orders or judgments by the Court.

6.      This matter arises under the laws of the United States of America and state common law. The statutory predicates for the relief sought herein are pursuant to sections 105, 108, 362, 542, 1123(b)(3), 1141(b), and 1142 of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7001.

### III.     PARTIES & PERSONAL JURISDICTION

7.      Acis LP is a limited partnership and Acis GP is a limited liability company, both of which are organized under the laws of the State of Delaware, and both of which may be served with pleadings and process in this Adversary Proceeding through the undersigned counsel.

8.      Dondero is an individual who resides at 3807 Miramar Avenue, Dallas, Texas 75205-3125 and regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. At times relevant to the facts pleaded in this Complaint, on information and belief,

Dondero has served in numerous officer/partnership positions for Acis, Highland Capital Management, L.P. ("Highland Capital"), and affiliates of Highland Capital, including but not limited to the following: President of Acis GP until May 7, 2018; Sole Member of Acis GP from October 14, 2015 until December 19, 2017; President and/or Chief Executive of Highland Capital; President of Highland HCF Advisor, Ltd. ("Highland Advisor"); President of Strand Advisors Inc. ("Strand"); and President & Principal Executive Officer of NexPoint Strategic Opportunities Fund.

9.     Frank Waterhouse ("Waterhouse") is an individual who resides at 2604 Dublin Park Drive, Parker, Texas, 75094 and regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. At times relevant to the facts pleaded in this Complaint, on information and belief, Waterhouse has served in a number of officer positions for Acis, Highland Capital, and affiliates of Highland Capital, including but not limited to the following: Treasurer of Acis GP until May 7, 2018; Treasurer and/or Chief Financial Officer of Highland Capital; Treasurer of Stand; Treasurer, Principal Accounting Officer & Principal Financial Officer of NexPoint Strategic Opportunities Fund.

10.     Scott Ellington ("Ellington") is an individual who resides at 2525 N. Pearl Street, #1202, Dallas, Texas 75201-2235 and regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. At times relevant to the facts pleaded in this Complaint, on information and belief, Ellington has served in a number of officer positions for Highland Capital and its affiliates, including but not limited to the following: Secretary and/or General Counsel & Chief Legal Officer of Highland Capital; Secretary of Strand.

11.     Hunter Covitz ("Covitz") is an individual who resides at 6612 Sondra Drive, Dallas, Texas 75214-3403 and regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. At times relevant to the facts pleaded in this Complaint, on information and

belief, Covitz has served (at least) as Managing Director and Head of Structured Products at Highland Capital.

12.     Isaac Leventon ("Leventon") is an individual who resides at 409 Pleasant Valley Lane, Richardson, Texas 75080 and regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. At times relevant to the facts pleaded in this Complaint, Leventon has served (at least) as Assistant General Counsel of Highland Capital.

13.     Jean Paul Sevilla ("Sevilla") is an individual who resides at 7155 Shook Avenue, Dallas, Texas 75214-3827 and regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. At times relevant to the facts pleaded in this Complaint, Sevilla has served (at least) as Assistant General Counsel of Highland Capital.

14.     Thomas Surgent ("Surgent") is an individual who resides at 4441 Beverly Drive, Dallas, Texas 75205-3001 and regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. At times relevant to the facts pleaded in this Complaint, on information and belief, Surgent has served (at least) as Chief Compliance Officer and Deputy General Counsel of Highland Capital.

15.     Grant Scott is an individual who resides at 5311 Tannat Court, Apartment 204, Raleigh, North Carolina 27612-4689 and/or regularly conducts business at 4140 Parklake Avenue, Suite 600 Raleigh, North Carolina 27612-2730. At times relevant to the facts pleaded in this Complaint, Grant Scott has served (at least) as Director of CLO HoldCo, Ltd. ("CLO Holdco"), an affiliate of Highland Capital.

16.     Heather Bestwick ("Bestwick") is an individual who, on information and belief, resides at Two Harbour Reach, La Rue 10 De Carteret, St. Helier, Jersey and regularly conducts business at First Floor, Dorey Court, Admiral Park St Peter Port, Guernsey, GY1 6HJ. At times

relevant to the facts pleaded in this Complaint, Bestwick has served (at least) as a Director of Highland CLO Funding, Ltd. ("Highland Funding").

17. William Scott is an individual who, on information and belief, regularly conducts business at First Floor, Dorey Court, Admiral Park St Peter Port, Guernsey, GY1 6HJ. At times relevant to the facts pleaded in this Complaint, William Scott has served (at least) as a Director of Highland Funding.

18. CLO Holdco is a company organized under the laws of the Cayman Islands, with its principal place of business at 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands; however, in its most recent Schedule 13-D filed with the SEC on June 8, 2018, CLO Holdco listed its principal place of business at 300 Crescent Court, Suite 700 Dallas, Texas 75201. CLO Holdco may also be served through its director, Grant Scott, at 4140 Parklake Avenue, Suite 600 Raleigh, North Carolina 27612-2730. Acis reserves the right to serve CLO Holdco by any method that is reasonably calculated to give notice including, but not limited to applicable treaties and conventions between the United States and the Cayman Islands, a British overseas territory.

19. Acis submits that the Court has personal jurisdiction over each of the Defendants named herein. The Fifth Circuit recently explained:

> Unlike Rule 4, Bankruptcy Rule 7004 permits nationwide service of process without limitation to the reach of the forum state's courts. There remains the requirement of a "constitutionally sufficient relationship" with the forum. With nationwide service, the forum is the United States. So minimum contacts with the United States (Fifth Amendment due process) suffice; minimum contacts with a particular state (Fourteenth Amendment due process) are beside the point. And residents of the United States—which Defendants undisputedly are—have enough contact with the United States that hailing them into federal court "does not offend traditional notions of fair play and substantial justice."

*Double Eagle Energy Servs., L.L.C. v. Markwest Utica Emg, L.L.C.*, 936 F.3d 260, 264 (5th Cir. 2019) (internal citations omitted); *see also In re Correra*, 589 B.R. 76, 118 (Bankr. N.D. Tex.

2018) (explaining that Bankruptcy Rule 7004 "extends personal jurisdiction over any person who has sufficient minimum contacts with the United States," and discussing the various considerations related to bankruptcy court personal jurisdiction).

20. With respect to the individual Defendants who, on information and belief, are not residents of the United States—William Scott and Bestwick—each of whom have testified in the Bankruptcy Cases, each has sufficient minimum contacts with the United States in connection with the actions pleaded herein (e.g., by actively participating in Acis's bankruptcy case, demanding Acis carry out multiple optional redemptions, and authorizing the filing of an adversary proceeding in the Bankruptcy Cases)[3] so that exercise of jurisdiction over them does not offend traditional notions of fair play and substantial justice. *See Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945).

## IV.    PROCEDURAL BACKGROUND

21. On January 30, 2018 (the "Petition Date"), Joshua N. Terry ("Terry"), as petitioning creditor, filed involuntary petitions under section 303 of the Bankruptcy Code against both Acis LP and Acis GP, thereby initiating the Bankruptcy Cases. *See* Case No. 18-30264, Docket No. 1 & Case No. 18-30265, Docket No. 1.

22. On April 13, 2018, this Court entered its *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Involuntary Bankruptcy Petition* [Case No. 18-30264, Docket No. 118 & Case No. 18-30265, Docket No. 113] (the "Involuntary Opinion") and *Order for Relief in an Involuntary Case* in each of the Bankruptcy Cases [Case

---

[3] Notices of appearance for Highland Funding, of which Bestwick and William Scott, as purported independent directors of Highland Funding, authorized filing, are attached hereto as **Exhibit A**; the Optional Redemption Notices (defined below), which William Scott and/or Bestwick signed, as purported independent directors of Highland Funding, and caused to be transmitted to Acis, are attached hereto as **Exhibit B**; the complaint initiating Adversary No. 18-03078, which Bestwick and William Scott, as purported independent directors of Highland Funding, authorized filing, is attached hereto as **Exhibit C**.

No. 18-30264, Docket No. 119 & Case No. 18-30265, Docket No. 114] (the "Orders for Relief"). The Involuntary Opinion is hereby incorporated by reference as if fully set forth herein.

23.     On May 14, 2018, Robin Phelan (the "Trustee") was appointed chapter 11 trustee of the Debtors' bankruptcy estates in the Bankruptcy Cases. *See* Case No. 18-30264, Docket No. 213.

24.     On January 31, 2019, this Court entered its *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified* (the "Confirmation Order") [Case No. 18-30264, Docket Nos. 829 & 830], which approves the *Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "Plan") and is supplemented by the *Court's Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint* Plan (the "Confirmation Opinion") [Case No. 18-30264, Docket No. 827]. The Confirmation Opinion is hereby incorporated by reference as if fully set forth herein.

25.     On February 15, 2019 (the "Effective Date"), the Trustee filed the *Notice of February 15, 2019 Effective Date for the Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Case No. 18-30264, Docket No. 863].

26.     On June 20, 2019, Acis filed its *Second Amended Complaint (Including Claim Objections and Objections to Administrative Expense Claim)* (the "Second Amended Complaint") in Adversary No. 18-03078 (the "Highland Adversary"), in which Acis asserted numerous claims, counterclaims, and third-party claims against Highland Capital, Highland Funding, Highland Advisor, Highland CLO Management, Ltd. ("Highland Management"), and Highland CLO Holdings, Ltd. ("Highland Holdings", and collectively, with Highland Capital,

Highland Funding, Highland Advisor, and Highland Management, the "Highlands") in connection with, *inter alia*, the Highlands' scheme, at the direction of Dondero (as both President of Acis GP and President of Highland Capital) and in coordination with the other Defendants, to fraudulently transfer Acis LP's assets to the Highlands and otherwise appropriate the business of Acis LP.[4] *See* Adv. No. 18-03078, Docket No. 157.

27.     On October 16, 2019, Highland Capital filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, which effectively stayed the Highland Adversary. *See* Case No. 19-12239, Docket No. 1. On December 4, 2019, Highland Capital's chapter 11 case was transferred to the Northern District of Texas, before this Court. *See* Case No. 19-34054, Docket No. 1.

## V.     STANDING & TOLLING OF LIMITATIONS

28.     As of the Effective Date, pursuant to the Plan, Acis (as the Reorganized Debtors) substituted for the Trustee in the Bankruptcy Cases and any related adversary proceedings and gained exclusive standing and authority to pursue estate claims:

> Upon the Effective Date, the Reorganized Debtor (a) shall automatically be substituted in place of the Chapter 11 Trustee as the party representing the Estate in respect of any pending lawsuit, motion or other pleading pending before the Bankruptcy Court or any other tribunal, and (b) is authorized to file a notice on the docket of each adversary proceeding or the Chapter 11 Cases regarding such substitution. The Reorganized Debtor shall have exclusive standing and authority to prosecute, settle or compromise Estate Claims for the benefit of the Estate in the manner set forth in this Plan.

---

[4] Prior to filing the Second Amended Complaint, on March 11, 2019, the Court consolidated Adversary Nos. 18-03078 (initiated by Highland Capital and Highland Funding against the Trustee) and 18-03212 (initiated by the Trustee against Highland Capital, Highland Funding, and their affiliates) and directed the Clerk to caption the case as *Robin Phelan, Chapter 11 Trustee v. Highland Capital Management, L.P., et al. See* Adv. No. 18-03078, Docket No. 127; Adv. No. 18-03212, Docket No. 63. Later, on June 10, 2019, the Court ordered Adversary No. 19-03103 (comprising Highland Capital's application for administrative expense claim) consolidated with Adversary 18-03078 and directed Acis to file the Second Amended Complaint, consolidating all claims, counterclaims, third-party claims against Highland Capital and its affiliates, as well as any objections to Highland Capital's proofs of claim and purported administrative claim.

Plan § 7.03; *see also id.* § 15.01 (providing for the Bankruptcy Court's retention of jurisdiction of all matter or disputes relating to the Estate Claims and Estate Defenses).

29.     Further, the Confirmation Order provides that upon the Effective Date, "all Estate Claims and Estate Defenses, including without limitation all Estate Claims and Estate Defenses identified in Exhibit A to the Plan [were] fully, completely and irrevocably transferred to, and vested in, the Reorganized Debtor." Confirmation Order at 31; *see also id*. at 39-40.

30.     Additionally, pursuant to section 108(a) of the Bankruptcy Code:

If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

11 U.S.C. § 108(a).

31.     For each of claim or causes of action pleaded herein, the relevant limitations period had not expired before the Petition Date.  Accordingly, the limitations period for each such claim or cause of action expires on the later of April 13, 2020 (two years after the Orders for Relief were entered), or when applicable limitations period naturally expires. *See id*. Plaintiffs assert that, as of the filing of this Complaint, the applicable limitations period for each claim or cause of action pleaded herein, subject to the discovery rule, has not yet expired or has been tolled pursuant to section 108 of the Bankruptcy Code.

32.     During the course of this proceeding, Acis may learn (through discovery or otherwise) of: other breaches of fiduciary duty, other acts of aiding and abetting breaches of fiduciary duty, and other aspects of Highlands' scheme, at the direction of Dondero (as both President of Acis GP and President of Highland Capital) and in coordination with the other

Defendants, to fraudulently transfer Acis LP's assets to the Highlands and otherwise appropriate the business of Acis LP. It is Acis's intention to avoid and recover all transfers made of an interest of Acis in property, or obligation incurred, to or for the benefit of the Highlands or the Defendants or any other transferee. Acis reserves its right to amend this Complaint to include: (i) further information regarding the claims and causes of action set forth herein; (ii) additional transfers; (iii) modifications of and/or revisions to Defendants' names; (iv) additional defendants; and/or (v) additional causes of action authorized by the Plan, if applicable (collectively, the "Amendments"), that may become known to Acis at any time during this Adversary Proceeding, through formal discovery or otherwise, and which Amendments relate back to this Complaint.

## VI. FACTUAL BACKGROUND

### A. The Debtors' Business

33. Dondero, Mark Okada ("Okada"), and Terry formed Acis LP in 2011 as a registered investment advisor to raise money from third-party investors to invest in certain collateralized loan obligation funds (the "CLOs").[5] The CLOs are governed by certain indentures (the "Indentures").[6] Acis LP is the portfolio manager for the CLOs and generates revenue primarily through the management of the CLOs via certain portfolio management agreements ("PMAs").[7] *See* Involuntary Opinion ¶¶ 22-28. Dondero made and approved the higher-level

---

[5] The Acis CLOs include: (i) Acis CLO 2013-1 Ltd. ("CLO-1"), (ii) Acis CLO 2014-3 Ltd. ("CLO-3"), (iii) Acis CLO 2014-4 Ltd. ("CLO-4"), (iv) Acis CLO 2014-5 Ltd. ("CLO-5"), and (v) Acis CLO 2015-6 Ltd. ("CLO-6").

[6] The Indentures include: (i) that certain Indenture, dated as of March 18, 2013, issued by CLO-1, as issuer, Acis CLO 2013-1 LLC, as co-issuer, and U.S. Bank, as trustee (the "CLO-1 Indenture"); (ii) that certain Indenture, dated as of February 25, 2014, issued by CLO-3, as issuer, Acis CLO 2014-3 LLC, as co-issuer, and U.S. Bank, as trustee (the "CLO-3 Indenture"); (iii) that certain Indenture, dated as of June 5, 2014, issued by CLO-4, as issuer, Acis CLO 2014-4 LLC, as co-issuer, and U.S. Bank, as trustee (the "CLO-4 Indenture"); (iv) that certain Indenture, dated as of November 18, 2014, issued by CLO-5, as issuer, Acis CLO 2014-5 LLC, as co-issuer, and U.S. Bank, as trustee (the "CLO-5 Indenture"); and (v) that certain Indenture, dated as of April 16, 2015, issued by CLO-6, as issuer, Acis CLO 2015-6 LLC, as co-issuer and U.S. Bank, as trustee (the "CLO-6 Indenture").

[7] The PMAs include: (i) that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013 (the "CLO-1 PMA"); (ii) that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014 (the "CLO-3 PMA"); (iii) that certain Portfolio Management Agreement by

---

financial strategies and decisions of Acis, and Terry was responsible for the day-to-day management of Acis.

34.     Acis LP's business as portfolio manager for the CLOs was incredibly successful. Between 2011 and 2017, Acis LP distributed profits of $11,037,445.00 to Dondero, $4,598,935.00 to Terry, and $2,759,361.00 to Okada, its partners. Further, on August 31, 2017, Acis LP also boasted millions of dollars in investment assets and total shareholder equity of roughly $3.4 million. Without question, Acis LP's business as portfolio manager for the CLOs and others was very valuable and lucrative.

35.     As is common with numerous Highland Capital affiliates, Acis LP contracted out certain of its administrative functions and portfolio management responsibilities to Highland Capital pursuant to that certain *Sub-Advisory Agreement,* originally dated January 1, 2011 (as amended, the "Sub-Advisory Agreement") and that certain *Shared Services Agreement*, originally dated January 1, 2011 (as amended, the "Shared Services Agreement," and together with the "Sub Agreements").  The Sub-Advisory Agreement and Shared Services Agreement have each been amended multiple times.

36.     As the Court explained in the Involuntary Opinion:

> Acis LP and Acis GP/LLC have never had any employees. Rather, all employees that work for any of the Highland family of companies (including Mr. Terry) have, almost without exception, been employees of Highland itself. Highland has approximately 150 employees in the United States. Highland provides employees to entities in the organizational structure, such as Acis LP and Acis GP/LLC, through both the mechanism of: (a) a Shared Services Agreement (herein so called), which provides "back office'" personnel—such as human resources, accounting, legal and information technology to the Highland family of companies; and (b) a Sub-Advisory Agreement (herein so called), which provides "front office" personnel to entities—such as the managers of investments like Mr.

---

and between Acis LP and CLO-4, dated June 5, 2014 (the "CLO-4 PMA"); (iv) that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014 (the "CLO-5 PMA"); and (v) that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015 (the "CLO-6 PMA").

> Terry. The evidence indicated that this is typical in the CLO industry to have such agreements.

Involuntary Opinion at 14 (footnotes omitted).

37.     Prior to entry of the Orders for Relief, Dondero directed, either himself or through Highland Capital employees, all actions taken by Acis. *See* Involuntary Opinion ¶ 30.

> Mr. Dondero [the Chief Executive of Highland Capital] testified that he has decision making authority for the Alleged Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington (General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant General Counsel of Highland) . . . . Mr. Leventon is designated to be the representative for the Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-trial discovery)—he explained that this representative-authority derives from the Shared Services Agreement. Mr. Leventon testified that he takes his instructions generally through his direct supervisor, Mr. Ellington.

*Id.*

38.     Highland Funding, formerly known as Acis Loan Funding, Ltd. ("<u>ALF</u>"),[8] holds most of the subordinated notes issued by the CLOs and receives the "very last cash flow from the CLOs." Involuntary Opinion at pp. 12-13. "It, in certain ways, controls the CLO vehicle . . . [and] was essentially the equity owner in the CLO special purpose entities." *Id.* Until the ALF PMA Transfer in the Fall of 2017 (described below), Acis LP had considerable control over ALF, now known as Highland Funding, and its valuable subordinated note rights to further enhance its successful portfolio management business.

## B.     Section 3.10(a) of the Limited Partnership Agreement

39.     In order to form Acis LP, Acis GP, the general partner, and limited partners The Dugaboy Investment Trust[9] (the "<u>Trust</u>"), Okada, and Terry entered into that certain *Amended and Restated Agreement of Limited Partnership of Acis Capital Management, L.P.* (the "<u>LPA</u>"),

---

[8] On October 30, 2017, Acis Loan Funding, Ltd. changed its name to Highland CLO Funding, Ltd. The defined term "ALF" used herein denotes Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. before October 30, 2017.

[9] Dondero was the trustee and the beneficial owner of the Trust, and he was President of Acis GP.

dated to be effective as of January 21, 2011.[10] The LPA is governed by Delaware Law. LPA § 6.11.

40.     Until May 7, 2018, the officers of Acis GP were Dondero, as President, and Waterhouse, as Treasurer. Further, at least between October 14, 2015, and December 19, 2017, Dondero was the sole member of Acis GP. *See* Case No. 18-30265, Docket No. 152.  While Dondero and Waterhouse were officers of Acis GP, Dondero also served as President and/or Chief Executive Officer of Highland Capital, and Waterhouse also served as Treasurer and/or Chief Financial Officer of Highland Capital.

41.     Pursuant to the Sub Agreements, Highland Capital received compensation for providing services to Acis LP, but amounts of compensation were subject to certain terms of the LPA. Section 3.10 of the LPA directs compensation and reimbursement of the General Partner and contains subpart (a), which limits compensation and reimbursement of expenses payable to the General Partner and any Affiliate of the General Partner without proper consent:

> Compensation.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that the aggregate annual expenses of the Partnership, inclusive of such compensation, ***may not exceed 20% of Revenues without the consent of all of the members of the Founding Partner Group***.

LPA § 3.10(a) (emphasis added).

42.     An Affiliate under the LPA is defined as:

> [A]ny [entity] that directly or indirectly controls, is controlled by, or is under common control with the [entity] in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of [an entity], whether through ownership of voting Securities, by contract, or otherwise.

*Id.* § 2.01.

---

[10] The partnership interests of Acis LP were as follows: Acis GP owned .1%; the Trust owned 59.9%; Okada owned 15%; and Terry owned 25%.

43.     Highland Capital was at all times relevant to this Complaint, an Affiliate of Acis GP and Acis LP.  Further, Highland Capital was at all times relevant to this Complaint, an insider of Acis GP and Acis LP.

## C.     ACIS CLO Value Fund

44.     In addition to acting as portfolio manager of the CLOs, Acis LP also acted as investment manager for Acis CLO Value Fund II, L.P. (the "Domestic Fund"), Acis CLO Value Fund II (Cayman), L.P. (the "Offshore Fund"), and Acis CLO Value Master Fund II, L.P. (the "Master Fund," and collectively with the Domestic Fund and the Offshore Fund, "CLO Value Fund"). In its role as investment manager for CLO Value Fund, was entitled to a "Performance Allocation" pursuant to that certain Amended and Restated Investment Management Agreement, dated May 1, 2016, and the limited partnership agreements for CLO Value Fund.

45.     Dondero had exclusive control over CLO Value Fund.

46.     While he was also employed at Highland Capital, Terry and his wife, Jennifer Terry, invested in CLO Value Fund.  At the time of Terry's termination, the cumulative value of Mr. and Mrs. Terry's investment in CLO Value Fund was $353,919.38.

47.     As discussed below, upon the wind-up of CLO Value Fund, Acis LP was owed at least $678,159 for its Performance Allocation; however, of that amount, Acis LP did not receive at least $332,284. Dondero wrongfully caused such amount to be diverted from the Master Fund to CLO Holdco.

## D.     State Court Litigation and Arbitration

48.     In June 2016, at Dondero's direction, Highland Capital advised Terry that he had been terminated. One consequence of Terry's termination was that his partnership interest in Acis was forfeited, leaving Okada and Dondero (beneficially) as the only equity owners of Acis. Okada and Dondero were also the only equity owners of Highland Capital.

49.     In September 2016, Terry filed an arbitration against Highland Capital, Acis and others for various claims, including that Acis owed him compensation for his forfeited partnership interest pursuant to the partnership agreement. Highland Capital also sued Terry the same month in the 162nd Judicial District Court of Dallas County, Texas (the "State Court") under a variety of legal theories and causes of action, including breach of fiduciary duty/self-dealing, disparagement, and breach of contract. Terry requested the State Court to stay the litigation in favor of the arbitration already filed by Terry. Involuntary Opinion ¶ 8.

50.     On September 28, 2016, the State Court stayed the litigation and ordered the parties to arbitrate. *Id.* The parties then participated in a ten-day arbitration proceeding before JAMS, styled as *Terry v. Highland*, JAMS Arbitration No. 1310022713.

### E.     The Arbitration Award

51.     On October 20, 2017, Terry obtained an arbitration award (the "Arbitration Award") jointly and severally against the Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate. The Arbitration Award found in favor of Terry under theories of breach of contract and breach of fiduciary duties, all ultimately committed by Dondero and his cronies.

#### 1.     *Findings Regarding the Expense Overpayments in Violation of the LPA*

52.     In the Arbitration Award, the arbitration panel found that Terry's termination by Dondero/Highland Capital was without cause and that, among other things, Acis breached the LPA and breached fiduciary duties owed to Terry as Acis's limited partner. Importantly, the arbitration panel found that Highland Capital had been paid more than 20% of Revenues (as such term is understood under the LPA), without Terry's consent, in violation of Section 3.10(a) of the LPA:

It is undisputed that ACIS habitually paid more than 20% of Revenues to Highland for providing ACIS with overhead and administration. Respondents' evidence and arguments that Terry waived or consented to ACIS's payment of excess expenses is not persuasive. At most, Terry accepted his ACIS distributions without regard to the expenses paid to Highland. This is not consent contemplated by the ACIS LPA.

. . . .

The evidence establishes that Terry did not consent to ACIS payments of expenses in excess of 20% of Revenue and Terry has not waived his right to claim damages directly resulting from ACIS's and ACIS GP's breach of contract and breach of fiduciary duty. Clearly, ACIS and ACIS GP ignored Terry's contractual rights and ACIS GP as a general partner has a fiduciary duty not to benefit itself or another at the expense of its limited partner, as they ignore and breach the terms of the partnership agreement and diminish Terry's distributions.

Arbitration Award at pp. 15-16.

53.     Additionally, in the analysis of Terry's damages, the arbitration panel stated:

The evidence establishes that ACIS and ACIS GP paid excess expenses to Highland during the years of 2013, 2014, 2015 and January through May 2016. These expenses paid exceeded the 20% of Revenues cap stated in Section 3.10(a) of the ACIS LPA. The payment of these excess expenses reduced Terry's ACIS partnership distributions during this period. Had excess expenses not been paid and only the contractually capped expenses had been paid, Terry would have received additional ACIS profits distributions of $1,755,481.00 for his 25% partnership interest in ACIS.

Arbitration Award at 20.

54.     In its findings and conclusions, the arbitration panel stated: "ACIS [LP] and ACIS GP paid Highland Capital expenses in excess of the contractual limit imposed by Section 3.10(a) of the ACIS LPA." Arbitration Award at 22, ¶ 7.

55.     The Arbitration Award makes clear that Highland Capital wrongly received at least $7,021,924.00 (collectively, the "Expense Overpayments") in excess of the contractual cap under Section 3.10(a) of the LPA.[11] On information and belief, pursuant to Dondero's direction and control, Highland Capital wrongfully received the Expense Overpayments and other

---

[11] If $1,755,481.00 represents 25% of the amount overpaid to Highland Capital, then the total amount paid to Highland Capital in excess of the 20% cap would be at least $7,021,924.00.

overpayments of expenses for many years in excess of the express limitations contained in the LPA. Such Expense Overpayments to Highland Capital and any agreements supporting such overpayments were *ultra vires* and, thus, void or voidable. Accordingly such Expense Overpayments rightfully belong to Acis LP.

### 2. *Findings Regarding CLO Value Fund*

56. Additionally, the arbitration panel found after his termination, Mr. and Mrs. Terry requested the redemption, i.e. withdrawal, of their investment in CLO Value Fund. Highland's outside counsel told Mr. and Mrs. Terry's counsel that their accounts had no value, without further explanation. Mr. and Mrs. Terrys' retirement savings were gone, according to Highland Capital.

57. The arbitration panel found that Dondero and Surgent, with the help of others at Highland Capital, concocted a pretext for why they could take approximately $350,000.00 of Mr. and Mrs. Terry's retirement savings. They made up a story about alleged wrongdoing committed by Terry and manufactured imaginary damages to outside investors that they claimed warranted "sweeping" Mr. and Mrs. Terry's retirement funds. The arbitrators flatly rejected such allegations against Terry.

58. Acis was ultimately harmed by Dondero and Surgent's concocted efforts to justify taking Mr. and Mrs. Terry's retirement savings. Indeed, as part of the wind-up of CLO Value Fund in furtherance of their pre-textual cover story, Dondero and Surgent directed part of the Performance Allocation due Acis in the amount of $332,284, *that should have been paid to Acis* as part of the wind-up, to CLO Holdco to compensate it for phantom damages it did not incur, in

connection with Dondero and Surgent's pretext. Thus, Acis was harmed because it did not receive $332,284 of its Performance Allocation.[12]

59.     On December 18, 2017, the 44th Judicial District Court of Dallas County, Texas, entered a final judgment confirming the Arbitration Award. Involuntary Opinion ¶ 10. The judgment was abstracted in the Official Public Records of Dallas County, Texas, as Instrument No. 201800008611, and writs of garnishment were issued and served pursuant to the judgment.

**F.     Dondero Modifies the Sub-Advisory Agreement and Shared Services Agreement**

60.     At Dondero's direction, the Sub-Advisory Agreement has been amended from time to time. The first iteration of the Sub-Advisory Agreement by and between Acis LP and Highland Capital dated January 1, 2011 (the "Original Sub-Advisory Agreement") provided that Acis LP was to pay Highland Capital certain amounts for assisting Acis LP with the advisory services required by the PMAs. Under the Original Sub-Advisory Agreement, Acis LP paid Highland Capital 5 bps of the management fees received by Acis LP pursuant to the various PMAs for the sub-advisory services provided to Acis LP by Highland Capital.

61.     On July 29, 2016—a little over a month after Terry was wrongfully terminated and two days after Mr. and Mrs. Terry were told that approximately $350,000 of their retirement assets were magically gone—Highland Capital and Acis (through Dondero, aided by certain other Defendants) modified the Sub-Advisory Agreement to increase the sub-advisory fee from 5 basis points to 20 basis points (the "Second Amended Sub-Advisory Agreement"). The effective date of the Second Amended Sub-Advisory Agreement was also back-dated to January 1, 2016. The fourfold increase in the sub-advisory fees via the Second Amended Sub-Advisory Agreement siphons off the funds of Acis LP and effectively gifts the additional

---

[12] This amount is distinctly separate and apart from the Terry family's retirement savings, and any claims the Terry's may have related thereto.

amounts to Highland Capital.[13] Highland Capital was already contractually obligated to provide the sub-advisory services for the lower 5 basis points fee and no legitimate justification for this fourfold increase was ever presented. But as described above, after Terry's termination, the equity ownership of Acis and Highland Capital were now the same (Dondero and Okada), so to them, it did not matter how much Highland Capital charged Acis—it was "left pocket/right pocket."

62.     For every amended iteration of the Sub-Advisory Agreement, Dondero signed the agreements for *both parties*—as President of Highland Capital's general partner, Strand Advisors, Inc., and as President of Acis GP, the general partner of Acis LP.

63.     The Shared Services Agreement has also been amended from time to time at Dondero's direction.  The first iteration of the shared services agreement, the Shared Services Agreement by and between Acis LP and Highland Capital, dated January 1, 2011 (the "Original Shared Services Agreement"), provided that Acis LP was to pay Highland Capital certain amounts for providing Acis LP with the back-office services such as book keeping, compliance, human resources and marketing. Under the Original Shared Services Agreement, Acis LP reimbursed Highland Capital for amounts directly attributable to Acis LP for these services.  The Shared Services Agreement was later amended to provide compensation to Highland Capital of 15 to 20 basis points, depending on the nature of the fund for which services were provided. Thus, shortly after Terry was terminated by Acis in June 2016, Acis was paying Highland Capital a total of 35 to 40 basis points for the sub-advisory and shared services it provided.

---

[13] Indeed, as reflected in Acis LP's July 2016 bank statement with NexBank (another Highland Capital affiliate), this amendment immediately siphoned off $3,580,193.22 from Acis.

64.     Again, for every amended iteration of the Shared Services Agreement, Dondero signed the agreements for *both parties*--as President of Highland Capital's general partner, Strand Advisors, Inc., and as President of Acis GP, the general partner of Acis LP.

65.     As described above, Dondero sought to substantially increase fees paid to Highland Capital under the Sub-Advisory Agreement, as reflected in the modifications on or about July 29, 2016—a little over a month after Terry was wrongfully terminated—by increasing the sub-advisory fee from 5 basis points to 20 basis points without any legitimate business justification and to the significant detriment of Acis. The fees charged under the Sub-Advisory Agreement and the Shared Services Agreement were also in clear violation of the LPA, as later determined in the Arbitration Award, resulting in a judgment for breach of fiduciary duty and breach of contract against Acis.

66.     Finally, as the Court has previously found, and as described in more detail below, Dondero, in coordination with the other Defendants, directed the Highlands to enter into numerous other transactions through the Fall of 2017 in an attempt to transfer and take control of Acis's assets and effectively take over Acis's business. The combination of all of these actions evidence a clear pattern of behavior by the Highlands, directed by Dondero, in coordination with the other Defendants,[14] to hinder, delay or defraud Terry as a creditor and appropriate the going-concern business of Acis LP for the Highlands. *See* Involuntary Opinion, Section 1.C. (pp. 16-23).

---

[14] The Debtors were also under Dondero's control at this time and were active participants in Dondero's schemes to denude the Debtors and make them "judgment proof" as the Debtors' own counsel, Jamie Welton, later boasted. In fact, Highland Funding has admitted that the Debtors were "no more than shell entities" in pleadings recently filed with the Court. Highland Funding's *Motion to Dissolve Preliminary Injunction and Lift the Automatic Stay* [Case No. 18-30264, Docket No, 639] at 21.

**G. Dondero Directs Highland Capital's Mismanagement of the CLOs and the Trustee Engages Brigade Capital Management, L.P. to Replace Highland Capital**

67. During the pendency of these Bankruptcy Cases, while acting as sub-advisor, Highland Capital, directed and controlled by Dondero, grossly mismanaged the CLOs. Following the Trustee's appointment in these Bankruptcy Cases, in disregard of its duties under the Sub-Advisory Agreement, Highland Capital failed to purchase a single loan for the CLOs, while a considerable percentage of available loans were eligible for purchase. At the same time, in an apparent tactical move to accumulate cash in the CLOs (prior to an attempted liquidation), Leventon (in coordination with Covitz) directed the Trustee sell numerous loans—even when, on information and belief, the Trustee expressed his concerns to Covitz, Sevilla, and other Highland Capital employees about the accumulation of cash in the CLOs and Highland Capital's failure to recommend purchases of eligible collateral in the CLOs.

68. Highland Capital's mismanagement of the CLOs caused significant damage to Acis and its CLOs. Among other things, because so much cash had been built up during their management of the CLOs, CLO-3 failed its interest coverage test on the November 1, 2018 payment date (which, on information and belief, was the only interest coverage test failure by a post-financial crisis CLO in the market at that time). This CLO-3 test failure forced an automatic pay-down (i.e. partial liquidation) of $11 million of senior notes, depriving CLO-3 of its cheapest financing and depriving Acis of management fees, all in violation of the injunctions in place at various times during the Bankruptcy Cases. Upon information and belief, some of the many loans sold by Highland Capital went into Highland Capital's total return swap ("TRS") warehouse facility in an attempt to facilitate their future issuance of CLOs managed by Covitz and Highland Capital or its affiliates.

69.     In July 2018, considering Highland Capital's mismanagement of the CLOs and the exorbitant amounts attempted to be charged to Acis for its services under the Sub Agreements, the Trustee solicited potential third parties to provide shared services and sub-advisory services to the Debtors and the CLOs. Ultimately, the Trustee located Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland") to provide such services for the CLOs at a rate far less than that charged by Highland Capital. Brigade agreed to sub-advise the CLOs for 15 basis points, and Cortland agreed to provide middle and back office CLO outsourcing (previously provided by Highland Capital under the Shared Services Agreement) for $30,000 per month, $250-$350 per trade, and a one-time fee of $75,000. Cortland's fee equates to roughly 3 basis points per month.[15]

70.     On August 1, 2018, with Court approval, Brigade and Cortland began performing the services previously provided by Highland Capital under the Sub Agreements. *See* Case No. 18-30264, Docket No. 464. Notably, on the record at the hearing on July 6, 2018, Highland Capital, through Sevilla, offered to provide the same services it was providing Acis for 17.5 basis points less than it previously charged, a tacit acknowledgement that Highland Capital had grossly overcharged Acis. *See* Case No. 18-30264, Docket No. 369 at 243-44.

71.     From approximately August 2, 2018 through December 11, 2018, Brigade directed the purchase of approximately $300 million in conforming loans for the CLOs. *See* Case No. 18-30264, Docket No.790 at 100-01 & 134.

---

[15] Thus, the Trustee was paying roughly 18 basis points, instead of the 35 to 40 basis points charged by Highland Capital starting shortly after Terry was terminated by Acis in June 2016, for the work previously performed by Highland Capital under the Sub Agreements. The definitive agreement between the Reorganized Debtors and Brigade removes Cortland and the Reorganized Debtors pay roughly 15 basis points to Brigade for essentially the same services previously provided by Highland Capital.

**H.      Dondero, in Coordination with the Other Defendants, Directs the Highlands' Fraudulent Scheme to Take Over Acis's Business and Dismantle Acis's Assets.**

72.      After Terry received the Arbitration Award on October 20, 2017, Dondero and the other Defendants immediately began work to systematically transfer the assets of Acis LP to the Highlands. This was done to denude Acis LP of value and make the Debtors "judgment proof." This was also done to ensure that Acis LP's very valuable business as portfolio manager was taken over by other Highlands and remained under Dondero's control.

73.      Prior to the filing of the Bankruptcy Cases, a large portion of the Highlands' scheme was accomplished through, *inter alia*, the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, and the transfer of the 2017-7 Equity and the 2017-7 Agreements (as each is defined below), which all occurred in the three months between October 23 and December 19, 2017.  Each of these transfers followed the same pattern: At Dondero's direction, Highland Capital caused Acis LP to fraudulently convey valuable economic rights away from Acis LP to offshore (often newly created) affiliates of Highland Capital that were not subject to Terry's Arbitration Award and judgment, thus, safely remaining under the control of Highland Capital and Dondero. Further, the only alleged consideration for these transfers, to the extent there was any, was the satisfaction of purported debts owed to other Highlands or their representatives.

74.      Notably, in order to accomplish Dondero's scheme, Sevilla was Dondero's point person to form several of the offshore Highland affiliates, including Highland Advisor and Highland Management, which would act as the welcome transferees of Acis's assets.

75.      The amount of value destruction and asset concealment caused by Defendants' brazen fraud in just the few months immediately after the Arbitration Award is staggering. Based on Acis LP's balance sheet from August 31, 2017 (on information and belief, created by David Klos, Highland Capital's Controller, who reports to Waterhouse), roughly 45 days before

the Arbitration Award, Acis LP boasted $15,441,551 in total assets—including nearly $4 million in valuable portfolio management investments and the $9.5 million note, as well as $3,372,851 in total equity value. After the Arbitration Award and the judgment enforcing it, Acis presented the declaration of David Klos to the State Court in furtherance of Highland Capital's efforts to get a pathetically small bond for Terry's judgment. Based on Klos's declaration, as of February 1, 2018 (the day after the Involuntary Petitions were filed), Acis LP was left with only $2,855,050 in total assets, no investment assets or notes, and a paltry $35,709 in total equity value.

76.     Even the filing of the Bankruptcy Cases did not deter Dondero and the other Defendants from attempting to complete their goal of denuding Acis. During the Bankruptcy Cases, in disregard of the automatic stay, on multiple occasions, Bestwick and William Scott, on behalf of Highland Funding—in coordination with Covitz and Dondero, as President of Highland Advisor, the newly formed Caymans entity created by Dondero to replace Acis LP as Highland Funding's portfolio manager—directed the Trustee to effectuate optional redemptions, which would result in the liquidation of the CLOs and render Acis incapable of reorganizing and paying its creditors.

## 1.     *The ALF PMA Transfer and the ALF Share Transfer*

77.     Prior to October 27, 2017, Acis LP—not ALF (or Highland Funding as it is currently named)—had authority to direct and effectuate an optional redemption and otherwise pervasively control ALF's assets. Acis LP had this authority pursuant to that certain Portfolio Services Agreement by and between Acis LP and ALF, dated August 10, 2015 (the "First ALF PMA") and that certain Portfolio Management Agreement by and between Acis LP and ALF, dated December 22, 2016 (the "Second ALF PMA").

78.     The Second ALF PMA granted Acis LP, as the portfolio manager of ALF, extensive rights and discretion to control and manage ALF's assets, including its interests in the

Acis CLOs. Section 5 of the Second ALF PMA set out Acis LP's authority, which included authority for and in the name of ALF to:

> (a) invest, directly or indirectly . . . in all types of securities and other financial instruments of United States and non-U.S. entities . . . including without limitation . . . notes representing tranches of debt ('CLO Notes') issued by a special purpose vehicle which issues notes backed by a pool of collateral consisting primarily of loans (which may be represented by a debt or equity security) (a 'CLO') . . . (each of such items, '_Financial Instruments_'), (c) provide credit and market research and analysis in connection with the investments and ongoing management of [ALF] and direct the formulation of investment policies and strategies for [ALF] . . . ; (g) possess, transfer, mortgage, pledge or otherwise deal in, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by [ALF] …; (n) cause [ALF] to engage in . . . agency, agency cross, related party principal transactions with affiliates of [Acis LP] . . . ; and (q) vote Financial Instruments, participate in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

Second ALF PMA § 5(a)-(q) (emphasis added).

79.     While ALF did not have authority to terminate the Second ALF PMA, Acis LP could terminate the Second ALF PMA without cause upon at least ninety (90) days' notice. _See_ Second ALF PMA § 13(a)-(c). The Second ALF PMA provided that Acis LP could be removed as portfolio manager only "for cause." _See_ ALF PMA § 14(a)-(e).

80.     On October 27, 2017, just seven days after Terry's Arbitration Award, Acis LP ostensibly terminated its own portfolio management rights under the Second ALF PMA and transferred its authority and its valuable portfolio management rights—for no value—to Highland Advisor, of which Dondero was President, and which was ultimately owned by Highland Capital.[16]

---

[16] Although purportedly a Cayman Islands entity, Highland Funding's 2017 Annual Report and Audited Financials lists Highland Advisor's address as Highland Capital's address in Dallas, Texas. This same document also discloses that Highland Capital is the sub-advisor for Highland Advisor, and thus is the party actually in control of Highland Funding's assets. This same document further shows that all of Highland Funding's subordinated notes issued by the CLOs (the primary assets managed by Highland Advisor) are physically held at and are pledged to NexBank, a Dallas bank that is also an affiliate of Highland Capital. Notably, Covitz also testified, ". . . HCF Advisor is Highland. . . . That's the distinction between Highland HCF Advisor could be well capitalized, the substance of

81.     This transfer of Acis LP's portfolio management rights to Highland Advisor was accomplished by way of a new Portfolio Management Agreement entered into by ALF and Highland Advisor on October 27, 2017 (the "October 2017 PMA"), which empowered Highland Advisor with the same broad authority to direct the management of ALF as was previously held by Acis LP under the ALF PMA (the "ALF PMA Transfer"). *See* October 2017 PMA §§ 1 & 5(a)-(q).

82.     The Court has explained:

On October 27, 2017 (seven days after the Arbitration Award), ALF—having purchased back the ownership interest that Acis LP had in it, just three days earlier—decided that it would no longer use Acis LP as its portfolio manager and entered into a new portfolio management agreement to supersede and replace the ALF Portfolio Management Agreement. Specifically, on October 27, 2017, ALF entered into a new Portfolio Management Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd., replacing Acis LP in its role with ALF. This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017.

Involuntary Opinion at 19 (footnotes omitted).

83.     Dondero consented and signed the October 2017 PMA on behalf of Acis, William Scott signed the October 2017 PMA on behalf of ALF, and John Cullinane, for Summit Management Limited, signed the October 2017 PMA on behalf of Highland Advisor, of which Dondero is President, and which is ultimately owned by Highland Capital.

84.     Under the prior ALF PMA, Acis LP's consent to the termination of the ALF PMA was required in order to effectuate the ALF PMA Transfer. So, Dondero, on behalf of Acis LP, simply signed the October 2017 PMA, consenting and agreeing to its removal and replacement, and transferring all authority and management rights as portfolio manager of ALF to Highland Advisor (of which Dondero is President, and which is ultimately owned by Highland Capital)

---

Highland Capital, its office space, employees, balance sheet, back office, legal, what [have] you, would all be incorporated with HCF Advisor[.] . . . [T]here's really no differentiation between HCF Advisor and Highland." Dec. 18, 2018 Hr'g Tr. at 61, ll. 5, 11-15; 62, ll. 21-23.

under the October 2017 PMA. On information and belief, William Scott (as a purported independent director of ALF) simply followed Dondero's direction in carrying out the transfer, and Acis received no consideration for the transfer.

85.     Without this ALF PMA Transfer, which transferred Acis LP's valuable rights under the ALF PMA to Highland Advisor (again, from the right pocket to the left pocket), Highland Funding could not have attempted to liquidate the CLOs, by directing optional redemptions, and further deplete Acis's assets.[17]

86.     On October 24, 2017, a mere four days after the Arbitration Award was entered, Waterhouse, on behalf of Acis LP, and Grant Scott, for CLO Holdco (another Highland Capital affiliate), entered into that certain special resolution whereby Highland Funding, then known as ALF, acquired back Acis's equity interest in ALF (the "ALF Share Transfer"). Pursuant the ALF Share Transfer, ALF paid Acis LP $991,180.13 for all of its shares of ALF.

87.     Thus, by virtue of the ALF PMA Transfer and the ALF Share Transfer, by October 31, 2017, Dondero, in coordination with other Defendants, including William Scott, Waterhouse, and Grant Scott, forced Acis LP to give up all of its shares of ALF, depriving Acis LP of its voting rights and any and all control of ALF.

88.     On November 15, 2017 – only days after the ALF Share Transfer and ALF PMA Transfer were completed – Highland Funding,[18] Highland Advisor, and CLO Holdco entered into a subscription agreement whereby Highland Funding completed a private placement of its equity (including, upon information and belief, the equity acquired in the ALF Share Transfer) to third-party investors.  The Plaintiffs believe both the ALF PMA Transfer and the ALF Share

---

[17] After the ALF PMA Transfer, at Dondero's direction, Highland Funding and Highland Advisor issued at least three different optional redemption notices, in an attempt to terminate the PMAs and cut off the Debtors' primary source of cash.  All three notices were withdrawn and/or enjoined by this Court.

[18] ALF had changed its name to Highland Funding at this point.

Transfer were concocted by Dondero and other Defendants, including William Scott, to complete this private placement, which was of great value to Highland Funding (then known as Acis Loan Funding, Ltd.) and Highland Capital, but after the transfers, of no value to Acis.[19]

### 2. *The Note Transfer*

89. On November 3, 2017, at Dondero's direction, Acis LP, Highland Capital, and Highland Management (a newly created, offshore Highland Capital affiliate) entered into that certain Agreement for Assignment and Transfer of Promissory Note (the "Note Assignment and Transfer Agreement"). The Note Assignment and Transfer Agreement, among other things, transferred the $9.5 million promissory note executed by Highland Capital and payable to Acis LP (the "Note") from Acis LP to Highland Management (the "Note Transfer"). The Court noted in the Involuntary Opinion:

> The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for Acis LP and Mr. Dondero for Highland and some undecipherable name for Highland CLO Management Ltd.
>
> The document recites that (i) Highland is no longer willing to continue providing support services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into the collateral manager role if Acis LP will assign to it the Acis LP Note Receivable from Highland. One more thing: since Acis LP was expected to potentially incur future legal and accounting/administrative fees, and might not have the ability to pay them when due, Highland CLO Management Ltd. agreed to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal expenses and up to $1 million of future accounting/administrative expenses.

Involuntary Opinion at 20. As the Court notes, yet again, Dondero signed the agreement on behalf of both Acis and Highland Capital.

---

[19] Highland Funding's (then Acis Loan Funding Ltd.) board of director minutes from October 6, 2017, disclose that the private placement investment would bring $150 million in new investment in Highland Funding and that they were "confident that they could develop further interest and … bring the total capital to up to around $325 million." The Arbitration Award was issued against Acis LP exactly two weeks later. Testimony in the bankruptcy case as well as the subscription agreement demonstrate that numerous Highland Capital executives, including Covitz (either individually or via their retirement investment vehicles), as well as Highland Capital itself, received Highland Funding securities in connection with this private placement. Thus, they were highly motivated to close this transaction and also deprive the Acis LP of any value in this transaction.

90. Acis LP received no or insufficient consideration for the Note Transfer.

91. The Note Transfer was also of great benefit to Highland Capital because it transferred Highland Capital's liability under the Note away from Acis LP (and its legal woes with Terry) and allowed Highland Capital's liability under the Note, and any payments made thereunder, to stay well within the control of Dondero and the Highlands. Just as importantly to Dondero, and in furtherance of his ongoing feud with Terry, the Note Transfer took away the Note as an asset from which Terry could collect his judgment and allowed Highland Capital to argue (as repeatedly argued in the Bankruptcy Cases) that Terry got his judgment against the "wrong" entities and that Highland Capital has no liability related to Terry's claim.

92. Additionally, the Note Assignment and Transfer Agreement also purports to initiate the transfer of the PMAs between Acis and the CLOs to Highland Management.[20] Again, Acis LP was to receive no consideration for transferring its most significant assets, the PMAs. As the Court is aware, Acis LP did not in fact transfer the PMAs pursuant to the Note Assignment and Transfer Agreement, but it was clearly the plan as outlined in that agreement and further evidence of Dondero's intent to use the Highlands to steal Acis LP's valuable going-concern business.

---

[20] Highland Management was registered in the Cayman Islands on October 27, 2017, roughly a week before the Note Transfer (and on the exact day of the ALF PMA Transfer). Thus, Highland Management had no portfolio or collateral management experience whatsoever when it entered the Assignment and Transfer Agreement. To the contrary, it appears Highland Management was an entity that was created specifically to hold the Note and eventually take possession of the PMAs in an international forum that would be difficult for Terry to reach, similar to the transferees for the ALF PMA Transfer (Highland Advisor, a Cayman Island entity) the ALF Share Transfer (Highland Funding, a Guernsey entity) and the 2017-1 Assignment and Transfer Agreement (Highland Holdings, a Cayman Island entity). Thus, as part of the scheme to transfer Acis LP's assets away from it, Dondero, in coordination with the other Defendants, slyly chose entities in offshore jurisdictions that would be hard for a judgment creditor to reach.

### 3. *The Acis CLO 2017-7 Transfers*

93.     On December 19, 2017, Acis LP and Highland Holdings (another newly created, offshore Highland Capital affiliate)[21] entered into that certain Agreement for Assignment and Transfer (the "2017-7 Assignment and Transfer Agreement"). The 2017-7 Assignment and Transfer Agreement focused on Acis CLO Management, LLC ("Acis CLO Management"), which is an entity that had been formed to enter into a portfolio management agreement with Acis CLO 2017-7, Ltd. ("CLO 2017-7").  CLO 2017-7 is the last CLO the Highlands formed through Acis.  Acis CLO Management was indirectly owned by Acis LP, and Acis LP and Acis CLO Management had entered into a Master Sub-Advisory Agreement and a Staff and Services Agreement (the "2017-7 Agreements") that allowed Acis LP to manage the CLO 2017-7 portfolio and collect management fees for CLO 2017-7.

94.     As is common course for Dondero, he signed the 2017-7 Assignment and Transfer Agreement on behalf of Acis as well as on behalf of Acis CLO Management and other of its affiliates.

95.     At Dondero's direction, the 2017-7 Assignment and Transfer Agreement, among other things, transferred to Highland Holdings all of Acis LP's interest in the 2017-7 Agreements.  The 2017-7 Assignment and Transfer Agreement also transferred to Highland Holdings all of Acis LP's equity interests in various entities that constituted Acis LP's indirect equity interests in Acis CLO Management (the "2017-7 Equity").  Thus, similar to the ALF PMA Transfer and the ALF Share Transfer that occurred roughly two months before, Acis LP was divested of both its ownership in Acis CLO Management and its control of Acis CLO Management (and related management fee stream) in one fell swoop on December 19, 2017, which is the day after Terry received his judgment based on the Arbitration Award. Also,

---

[21] Like Highland Management, Highland Holdings was registered in the Cayman Islands on October 27, 2017.

importantly, the 2017-7 Assignment and Transfer Agreement rendered Acis non-compliant with relevant U.S. and European risk retention requirements.

96.    Significantly, also on December 19, 2017, Highland Capital entered into an agreement with Highland Holdings that allowed Highland Capital to sub-advise and manage CLO 2017-7 and get paid the management fees that otherwise would have flowed to Acis LP. So, like the numerous transfers before it, Dondero/Highland Capital effectuated the transfer of the 2017-7 Agreements and 2017-7 Equity to cut out Acis LP, while Dondero/Highland Capital stayed in complete control of CLO 2017-7 and its stream of management fees.

97.    As the Court noted in the Involuntary Opinion:

On December 19, 2017—just one day after the Arbitration Award was confirmed with the entry of the Final Judgment—the vehicle that can most easily be described as the Acis LP "risk retention structure" (necessitated by federal Dodd Frank law) was transferred away from Acis LP and into the ownership of Highland CLO Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017).

In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.  In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.

Involuntary Opinion at 20-21.

98.    The purported consideration for the 2017-7 Equity transferred in the 2017-7 Assignment and Transfer Agreement was the forgiveness of a $2,804,870 payable allegedly owed by Acis LP to Highland Capital and transferred to Highland Funding sometime before the agreement was entered. According to Acis LP's financial statements, this payable to Highland Capital entirely comprises amounts due under the Sub-Advisory Agreement and Shared Services

Agreement. Thus, the "consideration" provided in exchange for the 2017-7 Assignment and Transfer Agreement would suffer from the same defects as those related to the Sub Agreements; i.e., Acis only "owed" Highland Capital these amounts because Highland Capital grossly overcharged Acis. Finally, like the Note Transfer, the 2017-7 Equity transfer allowed Highland Capital to effectively collect all of the $2.8 million owed by Acis LP (assuming it is even a valid debt) through the use of an offshore intermediary.

99.    Further, the 2017-7 Assignment and Transfer Agreement itself discloses that no consideration was provided for the transfer of the 2017-7 Agreements.  Rather, the justification for the transfer of the 2017-7 Agreements is Highland Capital's self-serving refusal to continue to do business with Acis LP after the Arbitration Award and related judgment.

### 4.    *Thwarted Attempts to Transfer the Universal/BVK Agreement and Force an Optional Redemption*

100.    Dondero and certain other of the Defendants did not stop with the transfers in the Fall of 2017.  Immediately after the Involuntary Petitions were filed on January 30, 2018, Dondero/Highland Capital, in coordination with certain other Defendants, conspired with Acis LP's own bankruptcy counsel in an effort to appropriate Acis LP's valuable sub-advisor rights under the Agreement for the Outsourcing of Asset Management (the "Universal/BVK Agreement") between Acis LP and Universal–Investment-Luxembourg S.A. ("Universal"), which provided sub-advisory services for a German fund called BayVK R2 Lux S.A., SICAV-FIS ("BVK").[22]  Like the many transfers before it, Highland Capital's plan (as clearly outlined in an email from Isaac Leventon to Mike Warner) was "to transfer the BVK investment

---

[22] The Court held a lengthy hearing on the Universal/BVK Agreement and related lift stay issues on September 11, 2018.

management agreement from Acis LP to another Highland-affiliated manager."[23]  Immediately after Leventon sought (and presumably received) advice from Acis's own counsel, on information and belief, Sevilla and/or Covitz reached out to Universal and BVK to solicit their participation in Dondero's scheme.  In fact, on information and belief, BVK acknowledged in its very first email with Covitz after Acis LP's bankruptcy filing that Highland Capital's plan was to replace Acis LP.

101.    Over the several weeks leading up to this Court's ruling on the Orders for Relief, on information and belief, Covitz and Sevilla (on behalf of Highland Capital) and Universal/BVK did, in fact, frequently discuss replacing Acis LP, conducted extensive due diligence in order to replace Acis LP and even negotiated and prepared a new asset management agreement between Highland Capital and Universal that was to take effect once Acis LP and its bankruptcy were out of the way.  But even after the Orders for Relief were entered and the Debtors were under the control of a trustee, the communications did not stop.  Among other things, on information and belief, Covitz explained that Highland Capital would volunteer to pay Universal and BVK's legal costs incurred in terminating Acis LP and making Highland Capital the new sub-advisor for Universal and BVK. And even after Highland Capital was fired by the Trustee as Acis LP's sub-advisor and replaced with Brigade and Cortland, the communications did not stop. Dondero/Highland Capital's scheme to transfer the Universal/BVK Agreement to Highland Capital or its affiliate was apparently only prevented by this Court imposing 11 U.S.C. § 363, effectively taking away Acis LP's right to operate outside the ordinary course of business without Court authority under 11 U.S.C. § 303(f) and then later not immediately lifting the automatic stay as to the Universal/BVK Agreement.

---

[23] Email chain from early February 2018 between Mike Warner (Acis's counsel), Isaac Leventon (Highland Capital's in-house counsel), Timothy Cournoyer (Highland Capital's in-house counsel) and Thomas Surgent (Highland Capital's Chief Compliance Officer).

102.    Finally, Highland Advisor (controlled by Dondero, its President) and its sub-manager, Highland Capital (also controlled by Dondero), used its newly acquired management rights (by way of the ALF PMA Transfer) to attempt to destroy Acis and its CLOs, as further described below.

### 5.    *The Attempted Reset of CLO-3 and Fraudulent Transfer of Acis's Portfolio Management Rights*

103.    Prior to the Petition Date, Highland Capital, at the direction of Dondero, sought to fraudulently transfer the management of CLO-3 from Acis LP to Highland Management, on or before February 1, 2018. According to the offering circular for the reset transaction, further described below, Highland Management is an affiliate of Highland Capital, and "Portfolio Manager [Highland Management] expects to be treated as a 'majority-owned affiliate'" of Highland [Capital]."

104. In the Involuntary Opinion, after describing series of prior transfers and transactions carried out by the Highlands, at Dondero's direction, the Court summarized the attempted reset of CLO-3 as follows:

> With all of the above maneuvering having been accomplished, Highland [Capital] was posed to do a reset on Acis CLO 2014-3 in February 2018 (until Mr. Terry filed the Involuntary Petitions). The investment bank Mizuho Securities USA, LLC was engaged November 15, 2017 and a final offering circular was issued in January 2018—contemplating a reset of Acis CLO 20[]14-3 with the recently created Highland CLO Management Ltd. [i]dentified as the new portfolio manager, rather than Acis LP. The act of implementing a reset on the CLO was not in itself suspect. However, the reset would, of course, have the effect of depriving Acis LP from a valuable asset—an agreement that could realistically be expected to provide millions of dollars of future collateral management fees—coincidentally (or not) just after Mr. Terry obtained his large judgment.

Involuntary Opinion at 22-23.

105.    This attempted "reset" was initiated by a notice of optional redemption, dated January 9, 2018, sent by Highland Funding and signed by Dondero, as President of Highland

Advisor, in its capacity as Portfolio Manager of Highland Funding. The "reset" sought to change certain terms of CLO-3, but also remove Acis as portfolio manager (and thereby remove the associated income from Acis) and replace Acis with Highland Management, a different Highland Capital affiliate. Although Ellington testified at length about the purported reasons for the CLO-3 "reset" transaction, this was just another piece of Dondero's continuing scheme to strip Acis of its assets.

106.    Ultimately, the CLO-3 "reset" transaction and the transfer of the valuable CLO-3 management agreement away from Acis was halted by the filing of the involuntary petitions and this Court's imposition of section 363 of the Bankruptcy Code during the "gap period," the time after the involuntary petitions were filed, but before the order for relief. See Case No. 18-30264, Docket No. 29 & Case No. 18-30265, Docket No. 31.

### 6.    *The First Optional Redemption Notices*

107.    On April 30, 2018, without requesting relief from the automatic stay, Highland Funding sent five notices purportedly requesting optional redemption pursuant to Section 9.2 of each of the Indentures (the "First Optional Redemption Notices").[24] William Scott and Bestwick, as Directors of Highland Funding, signed the First Optional Redemptions and caused their transmittal to Acis LP. Upon information and belief, Dondero and Covitz advised and coordinated with William Scott and Bestwick with respect to demanding these optional redemptions.

108.    The First Optional Redemption Notices directed Acis LP to effectuate an Optional Redemption (as defined under each Indenture).  Under Section 9.2 of each Indenture, upon the receipt of a notice of redemption, Acis, in its discretion, is to direct the sale of the Collateral

---

[24] Nexpoint Strategic Opportunities Fund (f/k/a NexPoint Credit Strategies Fund) ("Nexpoint") and Drexel Limited ("Drexel") joined in one of the Optional Redemption Notices.  Like Highland Funding, Nexpoint is an affiliate of Highland Capital.

Obligations (as defined by each Indenture) and other Assets. *See* CLO-1 Indenture, § 9.2; CLO-3 Indenture, § 9.2(b); CLO-4 Indenture, § 9.2; CLO-5 Indenture, § 9.2; & CLO-6 Indenture, § 9.2. In the Indentures, "Assets" is defined to include the PMAs. *See* CLO-1 Indenture, p. 8; CLO-3 Indenture, p. 10; CLO-4 Indenture, p. 10; CLO-5 Indenture, p. 10; & CLO-6 Indenture p. 10. Consequently, an Optional Redemption directs Acis LP to liquidate assets of the CLOs over which Acis has certain property rights, including, effectively, the PMAs.

109.     Upon information and belief, Covitz, on behalf of Highland Capital, identified many of the Collateral Obligations (loans) to be sold into its Highland-managed TRS warehouse to facilitate its own new CLOs.

110.     Soon after Highland Funding sent the First Optional Redemption Notices, on May 7, 2018, by letter to Diane Reed, Chapter 7 Trustee (prior to the appointment of the Trustee) and Peter Huber, Director of Neutra, Ltd, as sole member of Acis GP, Dondero resigned as President of Acis GP, and Waterhouse resigned as Treasurer of Acis GP.

111.     After being appointed on May 14, 2018, the Trustee analyzed the First Optional Redemption Notices and determined there were various defects which rendered them ineffective. Therefore, on May 22, 2018, the Trustee sent his responses to the five First Optional Redemption Notices (the "Redemption Responses"). In the Redemption Responses, the Trustee also warned that the First Optional Redemption Notices violated the automatic stay under section 362(a)(3) of the Bankruptcy Code.

**7.     *The Temporary Restraining Order Against the Highlands and Their Agents***

112.     On May 30, 2018, Highland Capital and Highland Funding initiated the Highland Adversary and alleged, among other things, that the Trustee breached the PMAs by failing to effectuate an Optional Redemption pursuant to the First Optional Redemption Notices.

113. The next day, on May 31, 2018, upon the request of the Trustee, the Court held a status conference in the Bankruptcy Cases, and the Trustee explained that, almost immediately after his appointment, he began exploring plan options regarding a potential transaction that would transfer rights under the PMAs, the Sub-Advisory Agreement, the Shared Services Agreement, and the subordinated notes, with respect to CLO-3, CLO-4, CLO-5, and CLO-6, with the goal of maximizing value for all parties. The Trustee informed the Court that he was in the process of negotiating a transaction with a party that would potentially provide enough value to pay all parties, including potentially all of Acis's creditors in full.

114. On May 31, 2018, at the conclusion of the status conference, the Court, *sua sponte*, issued a temporary restraining order, which prevented all parties from taking any action in furtherance of the Optional Redemption for fourteen (14) days.

115. On June 6, 2018 the Court entered its *Temporary Restraining Order* (the "TRO"), whereby the Restrained Parties (as defined in the TRO), including Highland Capital, Highland Funding, and their officers, agents, and any other person acting on their behalf, were enjoined until 12:01 a.m. on June 15, 2018, from:

    a)    proceeding with, effectuating, or otherwise taking any action in furtherance of the Optional Redemption, call, or other liquidation of the Acis CLOs; and

    b)    sending, mailing, or otherwise distributing any notice to the holders of the Acis CLOs in connection with the Optional Redemption, call, or other liquidation of the Acis CLOs.

116. On June 11, 2018, the Trustee filed his *Motion to Extend the Temporary Restraining Order* (the "Motion to Extend the TRO"), in which the Trustee sought to extend the TRO for an additional 14 days. *See* Docket No. 275.

117. Also on June 11, 2018, Highland Funding filed its *Memorandum of Law in Opposition to the Continuance of the Temporary Restraining Order* (the "Brief in Opposition to

Extending the TRO"). *See* Case No. 18-3264, Docket. No. 271. This pleading did not mention that Highland Capital and its agents, including certain Defendants, apparently violated the TRO by initiating approximately $23 million of sales of CLO assets pursuant to the Optional Redemption after the Court issued its *sua sponte* TRO on May 31.

**8.** *The Second Optional Redemption Notices*

118.   On June 13, 2018, the day before the hearing on the Motion to Extend the TRO, Highland Funding's counsel advised the Trustee that Highland Funding would withdraw the First Optional Redemption Notices.  Thereafter, the Trustee advised the Court that Highland Funding was withdrawing the First Optional Redemption Notices, and the Trustee therefore did not intend to go forward with the Motion to Extend the TRO on June 14.

119.   On June 14, 2018, counsel for Highland Funding advised the Court that Highland Funding had withdrawn the First Optional Redemption Notices.  Counsel for Highland Funding further advised the Court that the First Optional Redemption Notices were withdrawn to bring "some sanity to this process":

> That was done obviously for multiple reasons. My client doesn't believe that this is the appropriate time to be effectuating such a redemption for its own economic reasons, setting aside the complications it's obviously caused for others in this room. But needless to say, that, too, is an effort to try to bring, as I believe the Court has requested, and others have, some sanity to this process.[25]

120.   On June 15, 2018, at 12:01 a.m., the TRO expired.

121.   Later on June 15, 2018, despite the fact that Highland Funding had just withdrawn the First Optional Redemption Notices, had advised the Court of the same, and the Trustee and the Court acted in reliance on same, (again, without requesting relief from the automatic stay) Highland Funding gave notice to the Trustee that it was again requesting an Optional Redemption pursuant to the Section 9.2 of each of the Indentures (the "Second Optional

---

[25] *See* Case No. 18-30264, Docket No. 298 at 7, ll. 16-22 (June 14, 2018 Hr'g Tr.).

Redemption Notices," and together with the First Optional Redemption Notices, the "Optional Redemption Notices"). William Scott, as a Director of Highland Funding, signed the Second Optional Redemptions and he and/or Bestwick caused their transmittal to Acis LP.[26] Upon information and belief, Dondero and Covitz again advised and coordinated with William Scott and Bestwick with respect to demanding these optional redemptions.

122. By the Second Optional Redemption Notices, Highland Funding directed the Issuers:

> to effect an Optional Redemption of all Secured Notes and the Subordinated Notes in full on July 30, 2018 for the express purpose of placement of a portion of the portfolio of assets held by the Co-Issuers into a warehouse arrangement or a total return swap or other derivative arrangement with Highland Capital Management, L.P. acting as the Sub-Advisor pursuant to a Sub-Advisory Agreement.

123. On June 20, 2018, David Owens, an employee of Highland Capital (who, on information and belief, was directed by Covitz and/or Sevilla) presented to the Trustee hundreds of millions of dollars of "proposed trades" pursuant to this second Optional Redemption. Upon information and belief, many of these loans were designated to be sold into the Highland-managed TRS warehouse to facilitate its own future CLO issuance. In its correspondence to the Trustee regarding such proposed trades, Leventon, on behalf of Highland Capital, further stated:

> **In order to effectuate the Transaction and obtain best execution, Highland requests your consent by no later than 2pm tomorrow, Thursday June 21, 2018 (the "Deadline")**. The Acis Accounts may incur losses as a result of your failure to respond by the Deadline.
> **Highland believes it has an independent fiduciary obligation to the CLOs. If you instruct Highland not to proceed to undertake the Optional Redemption, Highland reserves it rights to seek appropriate protection and redress at law or in equity.**[27]

---

[26] The optional redemption notice for CLO-1 was also signed by Dondero on behalf of NexPoint Stategic Opportunities Fund.

[27] Emphasis in original email correspondence.

## VII. CAUSES OF ACTION

### Count 1: Breach of Fiduciary Duty Against Dondero, as President of Acis GP

124. The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

125. Dondero served as President of Acis GP until May 7, 2018. He was also the sole member of Acis GP until December 19, 2017. As an officer and sole member of Acis GP, Dondero owed fiduciary duties to Acis LP, its limited partners, and its creditors. *See In re USACafes, L.P. Litigation*, 600 A.2d 43, 48-49 (Del. Ch. 1991) (holding that directors of a corporate general partner in a limited partnership owe fiduciary duties to the partnership and its limited partners); *Wallace v. Wood*, 752 A.2d 1175, 1180-82 (Del. Ch. 1999) (applying the holding in *USACafes* to the officers of the general partner in a limited partnership); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) (applying the holding in *USACafes* to the members of an LLC, where the LLC is the general partner in a limited partnership); *North Am. Catholic Educ. Programing Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) (fiduciary duties include creditors when the entity being managed is insolvent)*; In re Performance Nutrition, Inc*., 239 B.R. 93, 111-12 (Bankr. N.D. Tex. 1999) (managers of a bankruptcy debtor owe broad-ranging fiduciary duties).[28]

126. As described in detail above, while President of Acis GP and also President/Chief Executive of Highland Capital, Dondero, in coordination with the other Defendants, masterminded and directed numerous actions that were incredibly detrimental and potentially fatal to Acis, while benefitting the Highlands, including the series of fraudulent transfers and other fraudulent schemes in order to denude Acis of its assets and transfer Acis's valuable business to the Highlands. Such actions masterminded and directed by Dondero, while an officer

---

[28] To the extent Texas law applies, Texas law imposes the same fiduciary obligations on the president of a corporate general partner to the partnership, when the president is in a position of control over the partnership by virtue of his control over the partnership's general partner. *See McBeth v. Carpenter*, 565 F.3d 171, 177-78 (5th Cir. 2009).

---

of Acis GP, include: (i) payment of the *ultra vires* Expense Overpayments to Highland Capital; (ii) the various modifications to the Sub Agreements; (iii) diverting a portion of Acis's Performance Allocation to CLO Holdco upon the wind-up of CLO Value Fund; (iv) the ALF PMA Transfer; (v) the ALF Share Transfer; (vi) the Note Transfer; (vii) transfer of the 2017-7 Equity and 2017-Agreements; (viii) the thwarted Universal/BVK Agreement transfer; (xi) the attempted reset of CLO-3 in February 2018; and (x) the First Option Redemption Notices.

127.    To carry out these actions, Dondero signed the vast majority of agreements and/or documents on behalf of Acis to effectuate the foregoing transactions. And, as was his modus operandi, Dondero signed many of the same agreements on behalf of Highland Capital or one of its affiliates—demonstrating Dondero's flagrant conflict of interest and self-dealing.

128.    By the foregoing actions, Dondero specifically intended to cause harm to Acis LP by denuding it of its assets and enriching the Highlands. In doing so, Dondero, as an officer of Acis GP, breached his fiduciary duties to Acis LP.

129.    As a consequence, the Plaintiffs are entitled to an award of punitive damages against Dondero in an amount to be determined by the Court.

### Count 2:  Breach of Fiduciary Duty Against Dondero, as President of Highland Capital, Sub-Advisor to Acis

130.    The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

131.    Pursuant to the Sub-Advisory Agreement, a principal-agent relationship existed between Acis LP and Highland Capital. As its investment adviser, and pursuant to the Sub-Advisory Agreement, Highland Capital owed Acis LP fiduciary duties. *See Sec. & Exch. Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191, (1963); Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Release No. IA-5248. 17, C.F.R. Part 276 (June 5, 2019). Further, based on Highland Capital's role as sub-advisor and

investment adviser to Acis LP, a special relationship of trust and confidence existed between Acis LP and Highland Capital. *See W. Reserve Life Assur. Co. of Ohio v. Graben*, 233 S.W.3d 360, 373-74 (Tex. App.—Fort Worth 2007, no pet.). Thus, in its capacity of sub-advisor to Acis LP, Highland Capital owed fiduciary duties to Acis LP.

132. Dondero controlled the investment decisions of Highland Capital, as sub-advisor to Acis LP, and therefore acted as an investment adviser representative of Highland Capital. Dondero also was an access person of Highland Capital, pursuant to the Investment Advisers Act. Accordingly, as an access person and investment adviser representative of Highland Capital, Dondero shared in the fiduciary duties owed by Highland Capital to Acis LP.

133. While sharing in the fiduciary duties owed by Highland Capital, as sub-advisor to Acis LP, Dondero directed the numerous actions against Acis, specified above in Count 1, each constituting a breach of fiduciary duty to Acis. After May 7, 2018, Dondero continued to direct the actions of the Highlands against Acis, which actions also constitute breaches of fiduciary to Acis. Such additional actions include directing: (i) the Second Optional Redemption Notices; and (ii) the mismanagement of the CLOs during the Bankruptcy Cases, particularly by directing Highland Capital to only sell loans and not purchase loans for the CLOs, in an attempt to complete a stealth liquidation of the CLOs for the Highlands' benefit, and to the detriment of Acis LP.

134. By the foregoing actions, Dondero specifically intended to cause harm to Acis LP by denuding it of its assets and enriching the Highlands. In doing so, Dondero, as a control person and investment adviser representative of Highland Capital, in its capacity as sub-advisor to Acis, breached his fiduciary duties to Acis LP.

135. As a consequence, the Plaintiffs are entitled to an award of punitive damages against Dondero in an amount to be determined by the Court.

### Count 3: Alter Ego as to Dondero[29]

136.    The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

137.    "Delaware law permits a court to pierce the corporate veil of a company where there is fraud or where it is in fact a mere instrumentality of its owner." *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 102 (Bankr. D. Del. 2010) (citing *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)).[30]

138.    As previously found by this Court, the actions of Highland Capital and its affiliates were controlled by Dondero. As described in detail herein, Dondero masterminded and directed Highland Capital and its affiliates to commit the series of fraudulent transfers and other fraudulent schemes in order to denude Acis of its assets and transfer Acis's valuable business to the Highlands. Dondero controlled and used each of the Highlands to carry out this fraud against Acis, and each of the Highlands was a mere instrumentality of Dondero.

139.    Accordingly, Dondero is an alter ego of each of the Highlands, and Dondero should therefore be held liable for any actions of the Highlands pleaded herein or in the Highland Adversary.

### Count 4: Breach of Fiduciary Duty Against Waterhouse, as Treasurer of Acis GP

140.    The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

141.    Waterhouse served as Treasurer of Acis GP until May 7, 2018. As an officer of Acis GP, Waterhouse owed fiduciary duties to Acis LP, its limited partners, and its creditors. *See In re USACafes, L.P. Litigation*, 600 A.2d 43, 48-49 (Del. Ch. 1991) (holding that directors of a

---

[29] To the extent appropriate, Plaintiffs' alternatively plead alter ego as a remedy herein.

[30] To the extent Texas law applies to the alter ego claims, Texas similarly recognizes alter ego "when the corporate form has been used as part of a basically unfair device to achieve and inequitable result. Examples are when the corporate structure has been abused to perpetrate a fraud, evade an existing obligation . . . or justify a wrong." *SSP Partners v. Gladstrong Inv. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008).

corporate general partner in a limited partnership owe fiduciary duties to the partnership and its limited partners); *Wallace v. Wood*, 752 A.2d 1175, 1180-82 (Del. Ch. 1999) (applying the holding in *USACafes* to the officers of the general partner in a limited partnership); *North Am. Catholic Educ. Programing Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) (fiduciary duties include creditors when the entity being managed is insolvent)*; In re Performance Nutrition, Inc.*, 239 B.R. 93, 111-12 (Bankr. N.D. Tex. 1999) (managers of a bankruptcy debtor owe broad-ranging fiduciary duties).[31]

142.   As described in detail above, while Treasurer of Acis GP, Waterhouse in coordination with Dondero and the other Defendants, participated in numerous actions that were incredibly detrimental and potentially fatal to Acis, while benefitting the Highlands, including the series of fraudulent transfers and other fraudulent schemes in order to denude Acis of its assets and transfer Acis's valuable business to the Highlands.  Such actions include: (i) payment of the *ultra vires* Expense Overpayments to Highland Capital; (ii) the various modifications to the Sub Agreements; (iii) diverting a portion of Acis's Performance Allocation to CLO Holdco upon the wind-up of CLO Value Fund; (iv) the ALF PMA Transfer; (v) the ALF Share Transfer; (vi) the Note Transfer; (vii) transfer of the 2017-7 Equity and 2017-Agreements; (viii) the thwarted Universal/BVK Agreement transfer; (ix) the attempted reset of CLO-3 in February 2018; and (x) the First Option Redemption Notices.

143.   By participating in the foregoing actions, Waterhouse specifically intended to cause harm to Acis LP by denuding it of its assets and enriching the Highlands. In doing so, Waterhouse, as an officer of Acis GP, breached his fiduciary duties to Acis LP.  Like Dondero,

---

[31] To the extent Texas law applies to the alter ego claims, Texas similarly recognizes alter ego "when the corporate form has been used as part of a basically unfair device to achieve and inequitable result. Examples are when the corporate structure has been abused to perpetrate a fraud, evade an existing obligation . . . or justify a wrong." *SSP Partners v. Gladstrong Inv. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008).

Waterhouse committed these acts while both an officer of Acis GP and an officer of Highland Capital—also demonstrating Waterhouse's flagrant conflict of interest and self-dealing.

144.     As a consequence, the Plaintiffs are entitled to an award of punitive damages against Waterhouse in an amount to be determined by the Court.

### Count 5:  Aiding & Abetting Breach of Fiduciary Duty by Dondero Against Waterhouse, Covitz, Ellington, Leventon, Sevilla, Surgent

145.     The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

146.     Under Delaware law, to prevail on a claim for aiding and abetting a breach of fiduciary duty, the claimant must show: (1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant knowingly participated in the fiduciary's breach; and (4) damages to the plaintiff resulting from the concerted action of the fiduciary and the defendant. *Miller v. Greystone Bus. Credit II, L.L.C. (In re USA Detergents, Inc.)*, 418 B.R. 533, 546 (Bankr. D. Del. 2009).[32]

147.     As the officers of Acis GP, Dondero and Waterhouse owed fiduciary duties to the partnership, its limited partners and its creditors.

148.     As explained above, Dondero and/or Waterhouse breached their fiduciary duties to Acis LP by directing and participating in the following actions: (i) payment of the *ultra vires* Expense Overpayments to Highland Capital; (ii) the various modifications to the Sub Agreements; (iii) diverting a portion of Acis's Performance Allocation to CLO Holdco upon the wind-up of CLO Value Fund; (iv) the ALF PMA Transfer; (v) the ALF Share Transfer; (vi) the

---

[32] Alternatively, to the extent Texas law would apply, to establish the claim of knowing participation in breach of fiduciary duty (the Texas corollary to aiding and abetting a breach of fiduciary duty), the claimant must show: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Harford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007). "Citing [] Texas cases, the Fifth Circuit has recognized a cause of action for knowing participation in breach of fiduciary duty with elements that are almost identical to Delaware's cause of action for aiding and abetting." *Milligan v. Salamone (In re Westech Capital Corp.)*, 2018 WL 1605171, 2018 Bankr. LEXIS 969, at *21 n.119 (Bankr. W.D. Tex. Mar. 29, 2018) (citing *Meadows*).

Note Transfer; (vii) transfer of the 2017-7 Equity and 2017-Agreements; (viii) the thwarted Universal/BVK Agreement transfer; (ix) the attempted reset of CLO-3 in February 2018; (x) the First Option Redemption Notices; (xi) the Second Optional Redemption Notices; and (xii) the mismanagement of the CLOs during the Bankruptcy Cases, particularly by directing Highland Capital to only sell loans and not purchase loans for the CLOs, in an attempt to complete a stealth liquidation of the CLOs for the Highlands' benefit, and to the detriment of Acis LP.

149.    On information and belief, as part of the pattern, practice, and routine in conducting the affairs of Highland Capital, Dondero consulted and coordinated with Waterhouse, Covitz, Ellington, Leventon, Sevilla, Surgent.  Accordingly, on information and belief, to carry out the foregoing actions, Waterhouse, Covitz, Ellington, Leventon, Sevilla, and Surgent knowingly participated in Dondero's numerous breaches of fiduciary duty against Acis.

150.    Acis suffered significant damages as a proximate result of such concerted actions of Dondero, Waterhouse, Covitz, Ellington, Leventon, Sevilla, and Surgent, including those to transfer Acis's sundry valuable assets to the Highlands, in an effort to destroy Acis.

151.    Acis therefore seeks actual and exemplary damages against Waterhouse, Covitz, Ellington, Leventon, Sevilla, and Surgent for aiding and abetting Dondero's numerous breaches of fiduciary duties to Acis LP, its limited partners, and its creditors.

### Count 6:  Aiding & Abetting Breach of Fiduciary Duty Against Grant Scott

152.    The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

153.    Under Delaware law, to prevail on a claim for aiding and abetting a breach of fiduciary duty, the claimant must show: (1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant knowingly participated in the fiduciary's breach; and (4) damages to the plaintiff resulting from the concerted action of the

fiduciary and the defendant. *Miller v. Greystone Bus. Credit II, L.L.C. (In re USA Detergents, Inc.)*, 418 B.R. 533, 546 (Bankr. D. Del. 2009).[33]

154. As the officers of Acis GP, Dondero and Waterhouse owed fiduciary duties to the partnership, its limited partners and its creditors.

155. As explained above, Dondero and/or Waterhouse breached their fiduciary duties to Acis LP by directing and participating in the ALF Share Transfer, among many other actions.

156. Grant Scott coordinated with Dondero and/or Waterhouse to carry out the ALF Share Transfer. Accordingly, Grant Scott knowingly participated in Dondero's and/or Waterhouse's breaches of fiduciary duty against Acis in connection with the ALF Share Transfer.

157. Acis suffered damages as a proximate result of such concerted actions of Grant Scott and Dondero and/or Waterhouse, which were part of Defendants' efforts to destroy Acis.

158. Acis therefore seeks actual and exemplary damages against Grant Scott for aiding and abetting Dondero's and/or Waterhouse's breaches of fiduciary duties to Acis LP, its limited partners, and its creditors, in connection with the ALF Share Transfer.

### Count 7: Aiding & Abetting Breach of Fiduciary Duty Against William Scott and Bestwick

159. The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

160. Under Delaware law, to prevail on a claim for aiding and abetting a breach of fiduciary duty, the claimant must show: (1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant knowingly participated in the

---

[33] Alternatively, to the extent Texas law would apply, to establish the claim of knowing participation in breach of fiduciary duty (the Texas corollary to aiding and abetting a breach of fiduciary duty), the claimant must show: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Harford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007). "Citing [] Texas cases, the Fifth Circuit has recognized a cause of action for knowing participation in breach of fiduciary duty with elements that are almost identical to Delaware's cause of action for aiding and abetting." *Milligan v. Salamone (In re Westech Capital Corp.)*, 2018 WL 1605171, 2018 Bankr. LEXIS 969, at *21 n.119 (Bankr. W.D. Tex. Mar. 29, 2018) (citing *Meadows*).

fiduciary's breach; and (4) damages to the plaintiff resulting from the concerted action of the fiduciary and the defendant. *Miller v. Greystone Bus. Credit II, L.L.C. (In re USA Detergents, Inc.)*, 418 B.R. 533, 546 (Bankr. D. Del. 2009).[34]

161.    As the officers of Acis GP, Dondero and Waterhouse owed fiduciary duties to the partnership, its limited partners and its creditors.

162.    As explained above, Dondero and/or Waterhouse breached their fiduciary duties to Acis LP by directing and participating in the following actions, among others: (i) the ALF PMA Transfer; (ii) the ALF Share Transfer; (iii) the attempted reset of CLO-3 in February 2018; (iv) the First Option Redemption Notices; and (v) the Second Optional Redemption Notices.

163.    William Scott and Bestwick coordinated with Dondero and/or Waterhouse to carry out the foregoing actions. Accordingly, William Scott and Bestwick knowingly participated in Dondero's and/or Waterhouse's breaches of fiduciary duty against Acis in connection with such actions.

164.    Acis suffered damages as a proximate result of such concerted actions of William Scott, Bestwick and Dondero and/or Waterhouse, which were part of Defendants' efforts to destroy Acis.

165.    Acis therefore seeks actual and exemplary damages against William Scott and Bestwick for aiding and abetting Dondero's and/or Waterhouse's breaches of fiduciary duties to Acis LP, its limited partners, and its creditors.

---

[34] Alternatively, to the extent Texas law would apply, to establish the claim of knowing participation in breach of fiduciary duty (the Texas corollary to aiding and abetting a breach of fiduciary duty), the claimant must show: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Harford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007). "Citing [] Texas cases, the Fifth Circuit has recognized a cause of action for knowing participation in breach of fiduciary duty with elements that are almost identical to Delaware's cause of action for aiding and abetting." *Milligan v. Salamone (In re Westech Capital Corp.)*, 2018 WL 1605171, 2018 Bankr. LEXIS 969, at *21 n.119 (Bankr. W.D. Tex. Mar. 29, 2018) (citing *Meadows*).

### Count 8: Willful Violation of the Automatic Stay Against Dondero, Covitz, Leventon, William Scott, Bestwick

166.    The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

167.    A willful violation of the automatic stay does not require a specific intent.

Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded.

*Campbell v. Countrywide Home Loan, Inc.,* 545 F.3d 348, 355 (5th Cir. 2008) (quoting *In re Chestnut,* 422 F.3d.298, 302 (5th Cir. 2005).

168.    "It is not up to a party exercising a self-help remedy to determine, to the preclusion of this court, what is or is not property of the estate." *Chesnut v. Brown (In re Chesnut),* 300 B.R. 880, 887 (Bankr. N.D. Tex. 2003).

169.    Section 362(k)(1) of the Bankruptcy Code provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." The Fifth Circuit has indicated that remedies under section 362(k)(1) are available to trustees. *St Paul Fire & Marine Ins. Co. v. Labuzan,* 579 F.3d 533, 539-540 (5th Cir. 2009). The term "individual" is not defined by the Bankruptcy Code, but it is used throughout the Code to refer to debtors and non-debtors. *See Homer Nat'l Bank v. Namie,* 96 B.R. 652, 654 (W.D. La. 1989) (citing, *inter alia*, 11 U.S.C. §§ 522(b) (individual as debtor), 321(a)(1) (individual as trustee)).

170.    Further, pursuant to section 105(a) of the Bankruptcy Code, "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The purpose of section 105(a) is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their

jurisdiction." 2 COLLIER ON BANKRUPTCY ¶ 105.01 (collecting cases). This is consistent with the broad equitable authority of the bankruptcy courts. *See United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549 (1990).

171.    Dondero, Covitz, Leventon, Bestwick, and William Scott knew the automatic stay was in effect when they intentionally acted on behalf of Highland Capital and Highland Funding, without Court approval, to force the Trustee to effectuate the optional redemptions, including when Leventon demanded on June 20, 2018, that the Trustee take actions to effectuate the optional redemption by June 21, 2018.

172.    Dondero, Covtiz, Leventon, Bestwick, and William Scott knew the automatic stay was in effect when they intentionally acted on behalf of Highland Capital and Highland Funding, without Court approval, to force the Trustee to effectuate the optional redemptions, including each occasion described herein when the Optional Redemption Notices were sent.

173.    Pursuant to section 362(k)(1), the Plaintiffs seek recovery of damages commensurate with its injury, due to Defendants' violations of the automatic stay. Further, given these blatant and willful violation of the automatic stay (as well as the TRO), Plaintiffs seek attorneys' fees, punitive damages, and sanctions, as the Court finds appropriate, pursuant to section 105(a) of the Bankruptcy Code.

### Count 9:  Turnover of Property of the Estate under 11 U.S.C. § 542(a) Against CLO Holdco for Acis LP's Performance Allocation

174.    The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

175.    Under section 542(a) of the Bankruptcy Code, "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 . . . shall deliver to the trustee, and account for, such property or the

value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

176.    Under section 541(a) of the Bankruptcy Code, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). Further, the "estate is comprised of [such] property, wherever located and by whomever held." *Id.*

177.    Upon the wind-up of CLO Value Fund, Acis LP was owed at least $678,159 for its Performance Allocation; however, Dondero caused at least $332,284 of Acis LP's Performance Allocation to be diverted from the Master Fund to CLO Holdco.

178.    The property, or value of such property, wrongfully transferred to CLO Holdco, totaling at least $332,284, in CLO Holdco's possession, custody, or control, was property of the estate, and the value of such property was not of inconsequential value or benefit to the estate.[35]

179.    Pursuant to section 542(a) of the Bankruptcy Code, CLO Holdco must deliver to the Acis the property or value of such property, totaling at least $332,284, wrongfully transferred to CLO Holdco.

180.    Therefore, Acis, now vested with all claims of the Trustee, seeks turnover of Performance Allocation, totaling at least $332,284, transferred to CLO Holdco, to the extent allowed pursuant to section 542 of the Bankruptcy Code.

### Count 10: Money Had and Received Against CLO Holdco for Acis LP's Performance Allocation

181.    The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

182.    "An action for money had and received arises when the defendant obtains money which in equity and good conscience belongs to the plaintiff. This action  . . . looks only to the

---

[35] Although the bankruptcy estate ceased to exist after the Effective Date, Acis has standing to bring this claim because the Plan specifically and unequivocally provided for retaining and enforcing turnover claims against CLO Holdco. *See* Plan, Ex. "A" ¶¶ 2, 7; *In re Crescent Res., LLC*, 455 B.R. 115, 129-30 (Bankr. W.D. Tex. 2011).

justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no pet.) (internal citations omitted).

183. Upon the wind-up of CLO Value Fund, Dondero diverted at least $332,284 of the Performance Allocation, which was due and owing to Acis LP, from the Master Fund to CLO Holdco. This money rightfully belongs to Acis LP, and by receipt of such money, CLO Holdco was unjustly enriched in the amount at least $332,284. Therefore, the Plaintiffs are entitled to damages against CLO Holdco in the amount of at least $332,284.

### Count 11: Punitive Damages

184. The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

185. Dondero masterminded and directed, in coordination with the other Defendants, the fraudulent scheme described herein against Acis and its creditors, and acted with malice toward Acis and its creditors.

186. Further, Plaintiffs are entitled to punitive damages in connection with Dondero's and Waterhouse's breaches of fiduciary duty to Acis described herein. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W. 3d 213, 232 (Tex. 2019).

187. Thus, the Plaintiffs plead for such damages in connection with each Count pleaded herein that will support a claim for punitive damages.

### Count 12: Attorneys' Fees and Costs,
### Including all Allowed Professionals' Fees and Expenses in the Bankruptcy Cases

188. The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

189. To the extent permitted under applicable law, Plaintiffs seek attorneys' fees and costs incurred in bringing this Adversary Proceeding. Plaintiffs further seek recovery from Defendants of all allowed professionals' fees and expenses in the Bankruptcy Cases, which were

losses to Acis resulting from Dondero's and/or Waterhouse's breaches of fiduciary duties to Acis. *See Meyers v. Moody*, 693 F.2d 1196, 1214 (5th Cir. 1982).

## VI. <u>PRAYER</u>

Plaintiffs respectfully request that the Court:

(i)  enter judgment against Dondero, as an officer and member of Acis GP, for breach of fiduciary duty;

(ii)  enter judgment against Dondero, as an officer, access person, and investment adviser representative of Highland Capital, pursuant to the Sub-Advisory Agreement, for breach of fiduciary duty;

(iii)  find that Dondero is the alter ego of Highland Capital, Highland Funding, Highland Advisor, Highland Holdings, and Highland Management, and that Dondero is therefore liable for the actions of Highland Capital, Highland Funding, Highland Advisor, Highland Holdings, and Highland Management, as pleaded herein and in the Highland Adversary;

(iv)  enter judgment against Waterhouse, as an officer of Acis GP, for breach of fiduciary duty;

(v)  enter judgment against Waterhouse, Ellington, Covitz, Leventon, Sevilla, and Surgent for aiding and abetting breach of fiduciary duty by Dondero and/or Waterhouse in connection with each applicable action pleaded herein which caused damages to Acis;

(vi)  enter judgment against Grant Scott for aiding and abetting breach of fiduciary duty by Dondero and/or Waterhouse in connection with the ALF Share Transfer;

(vii)  enter judgment against William Scott and Bestwick for aiding and abetting breach of fiduciary duty by Dondero and/or Waterhouse in connection with the (i) the ALF PMA Transfer; (ii) the ALF Share Transfer; (iii) the attempted reset of CLO-3 in February 2018; (iv) the First Option Redemption Notices; and (v) the Second Optional Redemption Notices;

(vii)    enter judgment against Dondero, Covitz, Leventon, Bestwick, and William Scott for willful violation of the automatic stay, pursuant to 11 U.S.C. § 362(k);

(ix)    enter judgment against CLO Holdco for turnover, pursuant to 11 U.S.C. § 542(a), of a portion of Acis LP's Performance Allocation, in the amount of $332,284, for services Acis LP provided to CLO Value Fund;

(x)    enter judgment against CLO Holdco for money had and received for a portion of Acis LP's Performance Allocation, in the amount of $332,284, for services Acis LP provided to CLO Value Fund;

(xi)    enter judgment against Defendants for punitive damages, as the Court finds appropriate;

(xii)    enter judgment against Defendants for pre- and post-judgment interest at the greatest amount permitted by law;

(xiii)    enter judgment against Defendants for all attorneys' fees and costs incurred in connection with the prosecution of this Adversary Proceeding and for all allowed professionals' fees and expenses incurred by the estates in the Bankruptcy Cases, as the Court finds appropriate; and

(xiv)    grant any other such relief that the Plaintiffs may show themselves to be justly entitled in law or in equity.

**Dated:  April 11, 2020.**

Respectfully submitted,

By:/s/Rakhee V. Patel
    Rakhee V. Patel
    State Bar No. 00797213
    Phillip Lamberson
    State Bar No. 00794134
    Jason A. Enright
    State Bar No. 24087475
    Annmarie Chiarello
    State Bar No. 24097496
    **WINSTEAD PC**
    500 Winstead Building
    2728 N. Harwood Street
    Dallas, Texas 75201
    Telephone: (214) 745-5400
    Facsimile: (214) 745-5390
    rpatel@winstead.com
    plamberson@winstead.com
    jenright@winstead.com
    achiarello@winstead.com

    **COUNSEL FOR REORGANIZED
    DEBTORS**

    -and-

By:/s/Brian P. Shaw
    Brian P. Shaw
    State Bar No. 24053473
    **ROGGE DUNN GROUP, PC**
    500 N. Akard Street, Suite 1900
    Dallas, Texas 75201
    Telephone: (214) 888-5000
    Facsimile: (214) 220-3833
    shaw@roggedunngroup.com

    **COUNSEL FOR REORGANIZED
    DEBTORS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2020, notice of this document will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this adversary proceeding pursuant to the Electronic Filing Procedures in this District.  Service will also be made as required and allowed by Federal Rule of Bankruptcy Procedure 7004.

*/s/ Jason A. Enright*
One of Counsel