# Exhibit A



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.



**Signed April 13, 2018**

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-7 |
| | § | |
| Alleged Debtor. | § | |

_____

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, | § | CASE NO. 18-30265-SGJ-7 |
| L.L.C., | § | |
| | § | |
| Alleged Debtor. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF
### ORDERS FOR RELIEF ISSUED AFTER TRIAL ON
### CONTESTED INVOLUNTARY BANKRUPTCY PETITIONS

Joshua N. Terry (the "Petitioning Creditor" or "Mr. Terry") filed involuntary bankruptcy

petitions (the "Involuntary Petitions") against each of the two above-referenced related

1

companies (the "Alleged Debtors") on January 30, 2018.[1]  The Involuntary Petitions were

contested, and the court held a multi-day trial (the "Trial") spanning March 21, 22, 23, 27, and

March 29, 2018.[2]  This constitutes the court's findings of fact, conclusions of law and ruling,

pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.[3]  As explained below, the court has decided

that Orders for Relief are legally required and appropriate as to each of the Alleged Debtors.

## I.     FINDINGS OF FACT

### A.     Introduction.

1.     The Alleged Debtors—Acis Capital Management, L.P. ("Acis LP"), a Delaware

limited partnership, and ACIS CAPITAL MANAGEMENT GP, L.L.C. ("Acis GP/LLC"), a Delaware

limited liability company—are two entities in the mega-organizational structure of a company

that is known as Highland Capital Management, L.P. ("Highland").

2.     Highland is a Dallas, Texas-based company that is a Registered Investment

Advisor.  Highland was founded in 1993 (changing its original name from "Protective Asset

Management" to Highland in 1997) by James D. Dondero ("Mr. Dondero"), originally with a

---

[1] Exhs. 50 & 51.

[2] Shortly after the Involuntary Petitions were filed, the court held hearings on February 6-7, 2018, on the Petitioning Creditor's Emergency Motion to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets, and Import, Inter Alia, 11 U.S.C. § 363 [DE # 3] (the "303(f) Motion") and the Alleged Debtors' Emergency Motion to Seek Emergency Hearing on the Alleged Debtors' Motion to Dismiss Involuntary Petitions and Request for Award of Fees, Costs, and Damages [DE # 9] (the "Emergency Motion to Set Hearing on Motion to Dismiss").  The court ultimately granted the 303(f) Motion and denied the Emergency Motion to Set Hearing on Motion to Dismiss. Both the Petitioning Creditor and the Alleged Debtors have proposed that the court should consider the evidence it heard at the hearings held on February 6-7, 2018, in determining whether it should enter orders for relief.  The court has, accordingly, considered such evidence in this ruling.

[3] Bankruptcy subject matter jurisdiction exists in this contested matter, pursuant to 28 U.S.C. § 1334(b). This is a core proceeding over which the bankruptcy court may exercise subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute— 11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtors have their business headquarters in this district.

75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.[4]

3.      Both Mr. Dondero and Mr. Akada provided witness testimony at the Trial on the Involuntary Petitions, and their names are mentioned numerous times herein—since they were generally the subject of significant evidence and argument presented at the Trial.  Mr. Dondero is the chief executive officer for Highland and Mr. Akada is the chief investment officer.  Mr. Dondero is also the president of each of the two Alleged Debtors.

4.      Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles ranging from:  collateral loan obligation funds ("CLOs"); private equity funds; and mutual funds.

5.      Highland's CLO business was front-and-center at the Trial on the Involuntary Petitions.  The Alleged Debtor, Acis LP, for approximately the past seven years, has been the vehicle through which Highland's CLO business has been managed.

6.      The Petitioning Creditor, Mr. Terry, became an employee of Highland in the year 2005, starting as a portfolio analyst, promoting to a loan trader, then ultimately becoming the portfolio manager for (and 25% limited partner in) Highland's CLO business—specifically, Mr. Terry was the human being who was acting for the CLO manager, Acis LP.

7.      Mr. Terry was highly successful in his role in the CLO business, managing billions of dollars of assets during his tenure, but Mr. Terry and Mr. Dondero had a bitter parting of ways on June 9, 2016.  Specifically, Mr. Terry's employment was terminated on that date (for

---

[4] Mr. Dondero testified at the Trial that, three years ago, Messrs. Dondero and Akada sold their interests in Highland to a charitable remainder trust in exchange for a 15 year note receivable.

reasons that have been highly disputed) and his 25% limited partnership interest in Acis LP was deemed forfeited without any payment of consideration to him.

8.  In September 2016, Highland sued Mr. Terry in the 162nd Judicial District Court of Dallas County, Texas ("State Court 1") for breach of fiduciary duty/self-dealing, disparagement, breach of contract, and various other causes of action and theories. Mr. Terry asserted his own claims against Highland, and also claims against the two Alleged Debtors, Mr. Dondero, and others and demanded arbitration. On September 28, 2016, State Court 1 stayed the litigation and ordered the parties to arbitrate. The parties participated in ten days of arbitration in September 2017 before JAMS. On October 20, 2017, Mr. Terry obtained an Arbitration Award (herein so called),[5] jointly and severally against both of the Alleged Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate, which was based on theories of breach of contract and breach of fiduciary duties.

9.  There are still claims pending between and among the Petitioning Creditor, Highland, and others (not including the Alleged Debtors) in State Court 1.

10. A Final Judgment (herein so called) confirming the Arbitration Award was entered by the 44th Judicial District Court of Dallas County, Texas ("State Court 2") on December 18, 2017, in the same amount as that contained in the Arbitration Award— $7,949,749.15.[6]

11. Mr. Terry began pursuing post-judgment discovery soon after obtaining his Arbitration Award and even more so after entry of the Final Judgment. Mr. Terry undertook a UCC search on November 8, 2017, to investigate whether there were any liens on the Alleged

---

[5] Exh. 1.

[6] Exh. 105.

Debtors' assets (none appeared).[7]  Mr. Terry also pursued a garnishment of an Acis LP bank account (at a time when there was only around $2,000 in the account).  Mr. Terry's counsel deposed Highland's General Counsel Scott Ellington (who sat for the deposition as a representative of Acis, LP) on January 26, 2018, and asked numerous questions about: (a) how many creditors the Alleged Debtors had,[8] and (b) whether Acis LP was able to pay its debts as they became due,[9] but did not receive meaningful answers.

12.    Mr. Terry requested a temporary restraining order ("TRO") from State Court 2, on January 24, 2018, after discovering certain transactions and transfers involving Acis LP's interests, that he believed were pursued without any legitimate business purpose and with the purpose of denuding Acis LP of its assets and to make it judgment proof.  Most particularly, it appeared as though Highland was engaged in a scheme to transfer certain fee-generating CLO management contracts of Acis LP away from it and into a Cayman Island affiliate of Highland.[10] At a January 24, 2018 hearing on the request for a TRO, Acis LP agreed and State Court 2 ordered that, between that hearing and a later hearing on a request for a temporary injunction, no CLO management contracts would be transferred away from Acis LP and that no monies would be diverted from it.[11]

13.    Then, on January 29, 2018, the Controller of and CPA for Highland  (David Klos) submitted a Declaration to State Court 2 concerning the net worth of the Alleged Debtors, stating

---

[7] Exh. 84.

[8] Exh. 25, pp. 7-9.

[9] *Id.* at pp. 102-04.

[10] Exh. 27.

[11] Exh. 28.

that Acis GP/LLC had a net worth of $0 and that Acis LP might have a net worth, at best, of $990,141.[12] Mr. Terry thought this was preposterous—given the management fees that Acis LP was entitled to and the receivables that should be owing to it. Mr. Terry believes that the collateral management agreements on which Acis LP receives management fees have a present value of $30 million (about $6 million for each of the five CLOs which Acis LP has been managing).

14.     On January 29, 2018, the Alleged Debtors filed a motion for leave to post a supersedeas bond in the amount of **$495,070.50** with State Court 2 (purportedly half of the net worth of the two Alleged Debtors—as stated in the David Klos Declaration), so that they could suspend enforcement of the Final Judgment while they appealed it.[13] Although there is a very stringent standard for appealing an Arbitration Award, the Alleged Debtors apparently believe they have an argument that State Court 2 lacked the subject matter jurisdiction to confirm the Arbitration Award (a motion to vacate the Final Judgment based on this argument has previously been denied by State Court 2).[14]

15.     Meanwhile, Mr. Terry was learning of more transactions and transfers involving Acis LP's assets and interests. On January 29, 2018, Mr. Terry filed supplemental pleadings with State Court 2, alleging that further shenanigans (*i.e.,* transfers and transactions that would amount to fraudulent transfers) were underway at Acis LP and seeking a receiver.[15] Also, at

---

[12] Exh. 26.

[13] Exh. 73.

[14] *See* DE # 35, in Case No. 18-30264 and DE # 34 in Case No. 18-30265. Unless otherwise noted, references to "DE #" herein refer to the docket entry number at which a pleading appears in the docket maintained with the Bankruptcy Clerk in the Acis Capital Management L.P. bankruptcy case (Case No. 18-30264).

[15] Exhs. 28-31.

some point, in the weeks leading up to this, an Acis LP lawyer represented to Mr. Terry's counsel that the Alleged Debtors were "judgment proof."[16]

16.     At approximately 11:57 p.m. on January 30, 2018 (on the evening before a scheduled temporary injunction hearing in State Court 2—at which time State Court 2 presumably might have considered the Alleged Debtors' request to post the $495,070.50 supersedeas bond to stay enforcement of the Final Judgment), Mr. Terry filed the Involuntary Petitions, as a sole petitioning creditor, against both Acis LP and Acis GP/LLC.

17.     For purposes of this Trial (and this Trial only), the Alleged Debtors do not dispute that Mr. Terry has standing to be a petitioning creditor pursuant to Bankruptcy Code section 303(b)—in other words, they do not dispute that Mr. Terry is a holder of a claim against the Alleged Debtors that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount and that aggregates at least $15,775 in unsecured amount.  However, the Alleged Debtors argue that:  (a) the Alleged Debtors have *12 or more creditors* and, thus, three or more petitioning creditors were required to prosecute the Involuntary Petitions pursuant to Bankruptcy Code section 303(b)(1); (b) the Petitioning Creditor did not establish, pursuant to Bankruptcy Code section 303(h)(1), that the Alleged Debtors are not *generally paying their debts as such debts become due* unless such debts are the subject of a bona fide dispute as to liability or amount; (c) regardless of whether the Petitioning Creditor has met the statutory tests in sections 303(b)(1) and (h)(1), the Petitioning Creditor has acted in *bad faith*—which serves as an equitable basis for dismissal of the Involuntary Petitions; and (d) if the court disagrees with the Alleged Debtors and determines that the section 303(b) and (h) statutory tests are met, and also determines that the Petitioning Creditor has not acted in bad faith, the court should

---

[16] Exh. 27 (exhibit 3 thereto).

nevertheless **_abstain_** in this matter, pursuant to Bankruptcy Code **_section 305_**, since this is essentially a two-party dispute and the interests of creditors and the debtor would be better served by dismissal.

18.     The Petitioning Creditor argues that he has met the statutory tests of sections 303(b) and (h) but, even if he has not, there is a **_"special circumstances"_** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor—which "special circumstances," Mr. Terry alleges, have been established here.  Moreover, the Petitioning Creditor argues that the facts here **_do not warrant section 305 abstention_** because the interests of creditors and the Alleged Debtors would not be better served by dismissal.

19.     As further explained below, the court finds and concludes that the Petitioning Creditor has met his burden of proving by a preponderance of the evidence that the statutory tests of sections 303(b) and (h) are met here.  Thus, the court does not need to reach the question of whether there is a **_"special circumstances"_** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor, and—if so—whether the exception is applicable here.[17]

20.     Moreover, the Alleged Debtors have not shown by a preponderance of the evidence that the Petitioning Creditor acted in bad faith, such that the Involuntary Petitions should be dismissed.

---

[17] *See e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

21.     Finally, the Alleged Debtors also have **not shown facts here that warrant section 305 abstention** because they have not shown that the interests of creditors and the Alleged Debtors would be better served by dismissal.

**B.      The CLO Business:  Understanding the Alleged Debtors' Business Operations, Structure, and What Creditors and Interest Holders They Actually Have.**

22.     Highland set up its first CLO in the year 1996.  Highland was one of the early participants in the CLO industry.

23.     The Alleged Debtors were formed in 2011 to be the new "brand" or face of the Highland CLO business, after Highland's name had suffered some negative publicity in the marketplace.

24.     Acis LP has acted as the portfolio manager of Highland's CLOs since 2011.  Acis LP currently has a contractual right to CLO portfolio management fees on five CLOs[18] which were referred to at the Trial as CLO 2013-1; CLO 2014-3; CLO 2014-4; CLO 2014-5; and CLO 2016-6.  CLOs typically have an 8-12 year life.  Thus, there are still several years of life left on these CLOs (since the oldest one was established in the year 2013).

25.     The key "players" in and features with regard to the Highland CLOs, during the time period relevant to the issues adjudicated at the Trial, have been:

(a)     <u>The CLO manager.</u>  As mentioned earlier, the CLO manager is the Alleged Debtor, Acis LP.  Acis LP, has collateral management agreements (hereinafter, the "CLO Collateral Management Agreements") with the CLOs (which CLOs were set up as special purpose entities) and, pursuant thereto, receives

---

[18] There is still another Highland CLO (CLO 2017-7), set up in April 2017, as to which Acis LP's contractual right to manage was terminated shortly before the Petition Date, as will be further described herein.

9

management fees[19] from the CLOs in exchange for managing the pool of assets within the CLOs and communicating with investors in the CLOs.[20]  As mentioned earlier, Mr. Terry was the human being that performed the management function at Acis LP until Highland fired him on June 9, 2016 and also terminated his limited partnership interest in Acis LP.  Mr. Terry, and all employees who have ever provided services to the CLO manager, are Highland employees—which were provided to Acis LP through shared and sub-advisory services agreements— as further explained below.  Thus, to be clear, Acis LP has always essentially subcontracted its CLO managerial function out to Highland.

(b) <u>The pool of assets.</u> Within each CLO that the CLO manager manages is a basket of loans that the CLO manager purchases.  The basket of loans typically consists of approximately 200 loans-payable (or portions of loans payable), on which large well-known companies typically are the makers/obligors (and which loans, collectively, provide a variable rate of interest).[21]  The CLO manager can typically decide to buy and sell different loans to go into the pool of assets, with certain restrictions, during a four or five year reinvestment time period.

---

[19] These fees typically include "senior fees" (*e.g.,* 15 basis points); additional "subordinate fees" (*e.g.,* 25 basis points) if the CLOs are passing certain tests; and perhaps even an "incentive fee" beyond a certain hurdle rate (*e.g.,* after the equity in the CLO received an internal rate of return of 10%, the CLO manager would get 15% of the excess).  Exh. 82, p. 59, lines 14-25.

[20] *See,* as an example, Exh. 3 (the collateral management agreement between Acis LP and CLO 2014-3). Note that the document is entitled "Portfolio Management Agreement" but, to avoid confusion with other similarly titled documents and to highlight the true nature of the agreement, the court uses the defined term "CLO Collateral Management Agreement," which terminology the lawyers also sometimes used at the Trial.

[21] Exh. 8.

(c)     The CLO investors (*i.e.,* CLO note holders).  These may be any number of

persons or entities, including pension funds, life insurance companies, or others

who decide to invest in the CLOs and contribute capital to fund the purchase of a

CLO's loan pool, and, in return, receive fixed rate notes payable—the ratings on

which can range anywhere from Triple-A to Single-B, depending upon the risk

option the investor chooses.  There are typically five or six traunches of notes

issued by the CLO (with the top AAA-rated traunche being the least risky and the

bottom traunche being the most risky) and—to be clear—the CLO itself (again, in

each case, the CLO is a special purpose vehicle) is the obligor.  As the CLO

manager receives income from the pool of loans in the CLO, he distributes that

income to the CLO investors, in accordance with their note indentures,[22] starting

with the top traunche of notes and then down to the other traunches.  The top

traunche of notes (AAA-rated) is considered the "controlling" class and a

majority of holders in this class can terminate the CLO manager (*i.e.,* Acis LP) for

cause on 45 days' notice, although all parties seem to agree this would be a rare

event.

(d)     The CLO equity holder.  The CLO equity holder actually is a holder of

subordinated notes issued by the CLOs (*i.e.,* the bottom traunche of notes on

which the CLO special purpose entity is obligated), and has voting rights and is

itself a capital provider, but it takes the most risk and receives the very last cash

---

[22] The indenture trustee on the CLO notes may actually operate as a payment agent in some cases, for purposes of making the quarterly note payments to holders.

flow from the CLOs.  It, in certain ways, controls the CLO vehicle[23]—for example, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the traunches of notes, starting at the top with the Triple A's).  Note that, until recently, a separate entity known as Acis Loan Funding, Ltd. ("ALF"), which was incorporated under the laws of the island nation of Guernsey,[24] was the CLO equity holder.  To be clear, ***ALF was essentially the equity owner in the CLO special purpose entities—not the equity owner of Acis LP***.  Acis LP was a party to a separate portfolio management agreement with ALF (hereinafter, the "ALF Portfolio Management Agreement"—not to be confused with the CLO Collateral Management Agreements that Acis LP separately has with the special purpose CLOs).  No fees were paid from ALF to Acis LP pursuant to the ALF Portfolio Management Agreement (rather, fees are only paid to Acis LP on the CLO Collateral Management Agreements).  The complicated structure of the CLO business—all parties seemed to agree—has been developed, among other reasons, to comply with "risk-retention requirements" imposed by the U.S. Congress's massive Dodd-Frank financial reform legislation[25] enacted in year 2010, in response to the financial crisis and recession that first began in 2008.

---

[23] The top traunche of AAA notes also has certain control—such as the ability to terminate the portfolio manager for cause, on notice.

[24] Guernsey is located in the English Channel.  ALF was created in August 2015.

[25] Simply put, one of the results of the Dodd-Frank legislation (*i.e.*, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, H.R. 4173, 124 Stat. 1376-2223, 111th Congress, effective July 21, 2010), which was implemented over a period of several years, was that, ***subsequent to December 2016***, managers of securitizations needed to retain at least a 5% interest in that securitization.  Thus, if a $400 million CLO were to be

     (e)    <u>The Equity Owners of ALF</u>.  Until recently (*i.e.,* until October 24, 2017—four days after the Arbitration Award), Acis LP itself, as required for a CLO manager, had a 15% indirect ownership in ALF, in order to be regulatory compliant.[26]  The parties sometimes refer to ALF (and the web of ownership between it and Acis LP) as the "risk retention structure."[27]  The evidence at the Trial revealed that ALF (which has recently been renamed), now, has three equity owners:  (i) a 49% equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that was seeded with contributions from Highland, is managed/advised by Highland, and whose independent trustee is a long-time friend of Highland's chief executive officer, Mr. Dondero; (ii) 2% is owned by Highland employees; and (iii) finally, ALF ***may*** be 49% owned by a third-party institutional investor based in Boston that Highland believed it was required to keep anonymous at the Trial.  Not only is the court unaware of who this independent third-party is, but the evidence seems to suggest that it may have acquired its interest fairly recently or may have simply committed to invest recently.[28]

---

issued, the CLO manager would need to retain at least 5% or $20 million of the assets in the CLO (which 5% could be either all at the equity level or vertically, up and down the note trounches).  There are multiple ways to accomplish this 5% retention (*i.e.,* with either the CLO manager directly investing in at least 5% of the CLO or doing it through a controlled subsidiary).  This particular rule was announced in ***December 2014*** and the SEC thereafter issued a no action letter stating that ***if a CLO was issued prior to December 2014***, then any refinancing of such CLO that happens within four years can be done without risk retention in place.  Resets of any CLO (*i.e.,* changes in terms and maturity—as opposed to mere changes in interest rates), on the other hand, must have risk retention in place.  ***Four of Acis LP's current CLOs were issued prior to December 2014***.  Thus, these four CLOs are still technically able to do a refinancing without a risk retention structure in place.  In any event, by early-to-middle 2017, Acis LP was risk retention compliant.  Exh. 82, pp. 65-69 & 75.  That was recently changed—on October 24, 2017—four days after the Arbitration Award—as later explained herein.

[26] *See* n.23, *supra*.

[27] *See* Demonstrative Aid No. 3.

[28] *See* Exh. 173, which seems to suggest that the only equity owners of ALF just prior to October 24, 2017 were Acis LP and the DAF, until Acis LP's interest in ALF was sold back to ALF on October 24, 2017.  *See also* Exh. 82, p. 162, lines 2-7.

(f)    The underwriter for the CLO notes.   As with any publicly traded notes, there is

an underwriter for the CLO notes which solicits investors for the CLO notes

(examples given at the Trial:  Mizuho Securities USA, LLC; Merrill Lynch; JP

Morgan Chase).[29]  The CLO notes are traded on the Over-the-Counter Market.

(g)    The independent indenture trustee for the CLO notes.  As also with any issuance

of publicly traded notes, there is an indenture trustee (example given at the Trial:

U.S. Bank).[30]

26.    Mr. Terry, the Petitioning Creditor, as earlier mentioned, began working for

Highland in 2005 until his employment was terminated on June 9, 2016.

27.    Acis LP and Acis GP/LLC have never had any employees.  Rather, all employees

that work for any of the Highland family of companies (including Mr. Terry) have, almost

without exception, been employees of Highland itself.  Highland has approximately 150

employees in the United States.  Highland provides employees to entities in the organizational

structure, such as Acis LP and Acis GP/LLC, through both the mechanism of:  (a) a Shared

Services Agreement (herein so called),[31] which provides "back office" personnel—such as

human resources, accounting, legal and information technology to the Highland family of

companies; and (b) a Sub-Advisory Agreement (herein so called),[32] which provides "front

office" personnel to entities—such as the managers of investments like Mr. Terry.  The evidence

indicated that this is typical in the CLO industry to have such agreements.  The court notes that

---

[29] *See* Exh. 193.

[30] *See* Exh. 7.

[31] Exhs. 17, 99, 179 & 5.

[32] Exhs. 18, 178 & 4.

all iterations of the Shared Services Agreements and Sub-Advisory Agreements between Acis LP and Highland were signed by Mr. Dondero both as President of Acis LP and as President of the General Partner of Highland.

28.     Because Acis LP essentially subcontracts out all of its functions to Highland pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, Acis LP has very few vendors or creditors.  Rather Highland incurs expenses and essentially bills them to Acis LP through these two agreements.[33]  In other words, Highland is one of Acis LP's largest and most frequent creditor.

29.     The evidence reflected that at all times Mr. Dondero has been the President of both of the Alleged Debtors, and there have been, at all times, very few, if any, other officers. It appears that the only other officer of Acis GP/LLC that ever existed was Frank Waterhouse, Treasurer.[34]  It also appears that the only other officer of Acis LP that ever existed was Frank Waterhouse, Treasurer, Mr. Terry as Portfolio Manager, and someone named Patrick Boyce as Secretary at one time.[35]

30.     Mr. Dondero testified that he has decision making authority for the Alleged Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington (General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant General Counsel of Highland) and is rarely involved in "nitty gritty negotiations."   Sometimes instructions will come to him from the compliance group headed up by Chief Compliance Officer Thomas Surgent.  Additionally, he testified that he signs hundreds of documents per

[33] Exh. 83, pp. 228 (line 8)-230 (line 14).

[34] *See, e.g.*, Exh. 10 & Exh. 173, p.3

[35] Exhs. 14 & 15.

week, and much of what he signs is on advice of counsel and he sometimes even delegates to his assistant the authority to sign his name. As set forth above, Mr. Ellington (who *did not* testify at the Trial)[36] and Mr. Leventon (who *did* testify at the Trial) are not officers, directors, or employees of the Alleged Debtors. Mr. Leventon is designated to be the representative for the Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-Trial discovery)—he explained that this representative-authority derives from the Shared Services Agreement. Mr. Leventon testified that he takes his instructions generally through his direct supervisor, Mr. Ellington, although Highland partners can ask him to perform legal services for any of Highland's 2,000 entities.

> **C.     Transfers and Transactions Involving the Alleged Debtors Since the Litigation with Mr. Terry Commenced—and Especially After the Arbitration Award.**

31.     Below is a listing of some (but not necessarily all) of the transfers and transactions that the Alleged Debtors, Highland, and related parties undertook *after* the litigation with Mr. Terry commenced.

(a)     <u>Acis LP's Sale to Highland of a "Participation Interest" in its CLO Cash Flow Stream.</u>  On October 7, 2016 (approximately one month after the litigation arose among Mr. Terry, Highland, and the Alleged Debtors), Acis LP sold to Highland a participation interest in its expected future cash flow from the CLO Collateral Management Agreements—specifically, it sold a portion of the cash flow it expected to earn from November 2016 to August 2019 (not the full life of the CLOs), for $666,655 cash, plus a $12,666,446 note payable from Highland to

---

[36] Mr. Ellington did testify at a hearing in the bankruptcy court on February 6, 2018—which the parties asked this court to take judicial notice of—and also provided deposition testimony that was submitted into evidence. *See* Exh. 25.

16

Acis LP (hereinafter, the "Acis LP Note Receivable from Highland"). Mr. Dondero signed the purchase and sale agreement for both purchaser and seller.[37] Mr. Dondero signed the Acis LP Note Receivable from Highland, which accrued interest at 3% per annum. It appears that the $666,665 cash down payment was actually paid, and a payment required on the Acis LP Note Receivable from Highland of $3,370,694 on May 31, 2017, was actually made. The Acis LP Note Receivable from Highland was payable in three installments, with a $5,286,243 payment required on May 31, 2018, and a $4,677,690 payment required on May 31, 2019. When viewed in complete isolation, this transaction does not necessarily appear problematic. Although there was evidence that Acis LP had been managing the five CLOs for about $10 million per year of fees, some of the recitals in the purchase and sale agreement suggest that there may have been a sound business reason for the transaction and the arbitration panel,[38] viewing this transaction in isolation, did not think it was necessarily problematic or actionable. In any event, Highland is adamant it was a net neutral transaction.

(b)   Transfer of Acis LP's interest in ALF. Recall that ALF was the entity that held equity (*i.e.,* the subordinated notes) in the CLO special purpose vehicles, and held voting rights and was a capital provider to the overall risk retention structure supporting the CLOs. And Acis LP, in turn, held a 15% indirect interest in ALF. On October 24, 2017 *(four days after the Arbitration Award),* Acis, LP entered into an agreement with ALF whereby ALF acquired back the shares that Acis LP

---

[37] Exhs. 14 & 15.

[38] Exh. 1, p. 18.

17

indirectly held in ALF (966,679 shares) for the sum of $991,180.13.[39]  No credible business justification was offered for this transaction, other than mostly uncorroborated (and self-serving) statements from Highland witnesses that Acis LP was "toxic" in the market place (due to the litigation with Mr. Terry) and this was a step in the process of extricating Acis LP from the CLO business.[40]  The court finds the testimony about Acis LP's toxicity in the marketplace to not be credible or at all convincing.  For one thing, a new CLO (Acis CLO 2017-7, Ltd.) was closed on April 10, 2017 with Acis LP as the portfolio manager.  Moreover, Acis LP subcontracts all of its CLO management function to Highland—and there was no evidence to suggest that anyone in the marketplace at this juncture differentiates between Acis LP (whose president is Mr. Dondero) and Highland (whose president is Mr. Dondero).  *In any event, the October 24, 2017 transaction had the highly consequential effect of making Acis LP "noncompliant" or unable to continue serving as a CLO manager for regulatory purposes for any new CLOs or reset CLOs (or for a refinancing of any of the Highland CLOs that had been created after December 2014)[41] because aspects of the federal Dodd Frank legislation require CLO managers to have "skin in the game" with regard to the CLOs they manage (i.e., they must retain at least 5% of CLOs they manage).*  Mr. Akada, who testified that he had been involved with the CLO business from the beginning and that the CLO team

---

[39] Exh. 173.

[40] There were also a few hearsay-laden emails offered, that the court did not find probative.  Exhs, 19-22.

[41] *See* n.23 *supra*.

reported to him (including Mr. Terry before his termination), testified that he had no knowledge of this particular transaction. The document effectuating this transaction was signed by Frank Waterhouse, Treasurer for and on behalf of Acis LP, acting by its general partner, Acis GP/LLC.[42]

(c)   ALF Next Decides to Jettison Acis, LP as its Portfolio Manager and Replace it with a new Highland Cayman Island Entity.  On October 27, 2017 (seven days after the Arbitration Award), ALF—having purchased back the ownership interest that Acis LP had in it, just three days earlier—decided that it would no longer use Acis LP as its portfolio manager and entered into a new portfolio management agreement to supersede and replace the ALF Portfolio Management Agreement. Specifically, on October 27, 2017, ALF entered into a new Portfolio Management Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd., replacing Acis LP in its role with ALF.[43]  This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017.[44]

(d)   The Acis LP Note Receivable from Highland is Transferred from Acis LP to Yet Another Highland Cayman Island Entity.  On November 3, 2017 (10 days after the Arbitration Award), Acis LP assigned and transferred its interests in the Acis LP Note Receivable from Highland—which at that point had a balance owing of over $9.5 million—to a Highland Cayman Island entity known as Highland CLO

---

[42] Exh. 173, p. 3.

[43] Exh. 43.

[44] Exh. 168.

Management Ltd. which apparently was created sometime recently to be the new collateral manager of the CLOs (in other words, the new Acis LP).[45]  The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for Acis LP and Mr. Dondero for Highland and some undecipherable name for Highland CLO Management Ltd.[46]  The document recites that (i) Highland is no longer willing to continue providing support services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into the collateral manager role if Acis  LP will assign to it the Acis LP Note Receivable from Highland.   One more thing:  since Acis LP was expected to potentially incur future legal and accounting/administrative fees, and might not have the ability to pay them when due, ***Highland CLO Management Ltd.*** agreed to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal expenses and up to $1 million of future accounting/administrative expenses.[47]

(e)     <u>Various Additional Transactions that further Transitioned CLO Management and Fees Away from Acis LP to Highland Cayman Island Entity.</u>  On December 19, 2017—just one day after the Arbitration Award was confirmed with the entry of the Final Judgment—the vehicle that can most easily be described as the Acis LP "risk retention structure" (necessitated by federal Dodd Frank law) was transferred away from Acis LP and into the ownership of Highland CLO

---

[45] Exh. 16.

[46] *Id.* at p.6.

[47] *Id.* at pp. 1 & 2.

Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017[48]).

(f)    In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.[49]   In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.[50]

(g)    <u>Change of Equity Owners of the Alleged Debtors</u>.  When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners: (a) Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the Trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest.  When Acis GP/LLC was formed

---

[48] Exh. 157.

[49] *See* Ex. 45 (the Transfer Document); *see also* Exh. 4 (the March 17, 2017 Third Amended and Restated Sub-Advisory Agreement between Acis LP and Highland); Exh. 5 (the March 17, 2017 4th Amended & Restated Shared Services Agreement between Acis LP and Highland); Exh. 165 (March 17, 2017 Staff and Services Agreement between Acis CLO Management, LLC and Acis LP); Exh. 166 (March 17, 2017 Master Sub-Advisory Agreement between Acis CLO Management, LLC and Acis LP).

[50] *See* Exhs. 161 & 162.

(*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment

Trust.   After Mr. Terry was terminated by Highland, his 25% limited partnership

interest in Acis LP was forfeited and divided among the two remaining limited

partners: Mr. Akada (increasing his interest by 10% up to 25%), and Dugaboy

Investment Trust (increasing its interest by 15% up to 74.9%).   But, more

importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on

December 18, 2017), both Mr. Akada and Dugaboy Investment Trust conveyed

their entire limited partnership interests in Acis LP—25% and 74.9%,

respectively—to a Cayman Island entity called Neutra, Ltd., a Cayman Islands

exempted company.   Dugaboy Investment Trust also conveyed its 100%

membership interest in Acis GP/LLC to Neutra, Ltd.  Mr. Akada testified that he

did this on advice of counsel.  He also did not dispute that he had made millions

of dollars of equity dividends from his equity investment in Acis LP in recent

years[51]—which he conveyed away for no consideration on December 18, 2017.

(h)  <u>The Intended Reset of Acis CLO 2014-3.</u>  With all of the above maneuverings

having been accomplished, Highland was posed to do a reset on Acis CLO 2014-3

in February 2018 (until Mr. Terry filed the Involuntary Petitions).  The investment

bank Mizuho Securities USA, LLC was engaged November 15, 2017[52] and a final

offering circular was issued in January 2018[53]—contemplating a reset of Acis

CLO 20-14-3 with the recently created Highland CLO Management Ltd.

---

[51] Exh. 23, p.3.

[52] Exh. 104.

[53] Exh. 31.

Identified as the new portfolio manager, rather than Acis LP.  The act of implementing a reset on the CLO was not in itself suspect.  However, the reset would, of course, have the effect of depriving Acis LP from a valuable asset—an agreement that could realistically be expected to provide millions of dollars of future collateral management fees—coincidentally (or not) just after Mr. Terry obtained his large judgment.

**D.      Findings Regarding Credibility of Witnesses.**

32.      The court found the testimony of Mr. Terry to be very credible.  He was very familiar with the financial condition of the Alleged Debtors, since he presided over the business of the Alleged Debtors from their inception until June 9, 2016, and has also closely followed publicly available information regarding the companies since his termination.  Mr. Terry credibly testified that the Alleged Debtors have never had a significant number of creditors, since most of the Alleged Debtors' vendors are engaged by and send their invoices to Highland, and Highland simply obtains reimbursement from the Alleged Debtors (and other entities in the Highland family), as its in-house lawyers determine is appropriate, through the Shared Services Agreement and Sub-Advisory Agreement.  Thus, Highland should at all times be the Alleged Debtors' main creditor.  The court finds that Mr. Terry had a good faith belief that the Alleged Debtors had only a handful of creditors (maybe four or so) besides him and Highland.  The court also finds that Mr. Terry—at the time he filed the Involuntary Petitions—had a good faith belief that the Alleged Debtors and those controlling them were engaged in an orchestrated, sophisticated effort to denude the Alleged Debtors of their assets and value (*i.e.*, transferring assets and rights for

less than reasonably equivalent value), which started with intensity after issuance of the Arbitration Award (if not sooner).[54]

33.     The court found the testimony of almost all of the witnesses for the Alleged Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey plausible deniability.  For example, sometimes business decisions concerning the Alleged Debtors were said to have been made by a "collective," and other times the in-house Highland lawyers (who, of course, are not themselves officers or employees of Acis LP and Acis GP/LLC) stressed that Mr. Dondero (the president and manager of the two entities) had ultimate decision making authority for them.  Meanwhile, Mr. Dondero testified that, while he has decision making authority at Acis LP, he usually delegates to Highland's in-house lawyers Scott Ellington and Isaac Leventon.   He testified that he signs hundreds of documents per week and often must rely on information of others when signing.  Additionally, Mr. Dondero (again, the President of each of the Alleged Debtors) testified that he had never even read the Arbitration Award.  While Mr. Dondero is the chief executive of a multi-billion dollar international investment company, and naturally has widespread responsibilities and must delegate to and rely upon others including lawyers, this court simply does not believe that he never read the Arbitration Award.  The court perceived the animosity between Mr. Dondero and Mr. Terry to be rather enormous and Mr. Dondero even testified (as did others) that the litigation with Mr. Terry was hurting Acis LP and Highland in the CLO marketplace (*i.e.,* no investors or underwriters wanting to be associated

---

[54] The court also found that the deposition testimony of Brian Shaw and Rahkee Patel (counsel for Mr. Terry) was also credible and did not demonstrate any bad faith on their parts in filing the Involuntary Petitions on behalf of Mr. Terry.

with the Acis brand).[55]  If that were the case, it strains credulity to suggest Mr. Dondero never

even read the Arbitration Award.

34.     As mentioned earlier, in December 2017, Acis GP/LLC became 100% owned by

a Cayman Island entity known as Neutra, Ltd. (whose beneficial owner is a Dondero family

trust) and Acis LP became 99.9% owned by Neutra, Ltd.  The directors of Acis GP/LLC and

Acis LP are provided to it now by an entity known as "Maples Fiduciary Services"—another

Cayman Island entity, but the Highland Assistant General Counsel could not remember the

names of those directors provided to Acis GP/LLC and Acis LP, except for perhaps one.  Mr.

Dondero, when questioned about some of the recent transactions pertaining to Acis LP, testified

that there were tax reasons—tax lawyers recommended the recent transactions and transfers.  No

tax lawyers testified.  Mr. Dondero also testified that certain transactions were at the directive of

the Thomas Surgent group (the Highland chief compliance officer).  Neither Mr. Surgent nor

anyone else from the compliance group testified.

35.     Meanwhile, Mr. Akada, who, while testifying, seemed like a generally lovely

person and seemed as knowledgeable as a human being could possibly be on the topic of CLOs

generally, had no idea if he was an officer or director of the Alleged Debtors, nor did he know

whom its officers were.  He could not testify as to the meaning of certain transactions in which

Acis LP had engaged in during recent weeks and said that he signed certain documents on advice

of counsel.  He also could not even testify as to whether Highland was opposing the Involuntary

Petitions.

36.     Again, there was a lot of plausible deniability at Trial as to the "whos" and

"whys" for the recent maneuverings involving the Alleged Debtors assets and rights in the weeks

---

[55] No such investors or underwriters provided testimony.

25

since the Arbitration Award.  The one thing that the court was wholly convinced of was that conflicts of interest among Highland and the Alleged Debtors abound, and no one is looking out for the interests of the Alleged Debtors as a fiduciary should.

### E. Evidence Regarding the Number of Creditors of the Alleged Debtors.[56]

37.    The Alleged Debtors do not dispute Mr. Terry's claim for the purposes of counting creditors under section 303(b) of the Bankruptcy Code.  However, Mr. Terry asserts that the Alleged Debtors have fewer than 12 creditors, and the Alleged Debtors dispute this fact. Specifically, the Alleged Debtors initially filed on January 31, 2018, a Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Dondero listing 18 creditors (the "Original Notice of Creditors").[57]  The Alleged Debtors subsequently filed on February 5, 2018, a First Amended Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Leventon listing 19 creditors (the "First Amended Notice of Creditors").[58]  Finally, the Alleged Debtors filed on March 6, 2018, a Second Amended Notice of List of Creditors Pursuant to Fed. R. Bank. P. 1003(b) signed by Mr. Leventon listing 20 creditors (the "Second Amended List of Creditors").[59]  The following chart summarizes the name, amount, and nature of the 20 creditors listed by the Alleged Debtors in their Second Amended List of Creditors.

---

[56] The court notes that neither Mr. Terry nor the Alleged Debtors attempted to differentiate between the creditors of Acis GP/LLC versus the creditors of Acis LP, but rather presented evidence regarding the collective number of creditors for both of the Alleged Debtors.  This seems legally appropriate, since Acis LP is the entity that incurred most of the debt, and ACIS GP/LLC would be liable on such debt as the general partner of Acis LP.

[57] *See* DE # 7 in Case No. 18-30264 & DE # 7 in Case No. 18-30265.

[58] *See* DE # 17 in Case No. 18-30264 & DE # 16 in Case No. 18-30265.

[59] *See* DE # 39 in Case No. 18-30264 & DE # 38 in Case No. 18-30265.

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness[60] |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

38.     First, the court believes it necessary to remove certain insider creditor claims, which are required not to be counted pursuant to section 303(b)(2) of the Bankruptcy Code.[61] This would clearly include Highland (the Alleged Debtors do not dispute this).

---

[60] The dollar amounts listed here are based upon the amounts listed in the Second Amended List of Creditors.

[61] *In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000).

39.     Additionally, there were certain creditors that filed sworn statements saying they were not creditors of the Alleged Debtors or were subsequently removed from the creditor list by agreement of the Alleged Debtors.  These creditors would include Case Anywhere, CSI Global Deposition Services,[62] Elite Document Technology, JAMS, Inc.,[63] Stanton Advisors LLC,[64] and the TASA Group, Inc..[65]  Thus, the updated chart now shows 13 creditors of the Alleged Debtors.

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |

[62] CSI Global Deposition Services was removed as a creditor by the agreement of the Alleged Debtors.

[63] JAMS, Inc. was removed as a creditor by agreement of the Alleged Debtors.

[64] Stanton Advisors LLC was removed as a creditor by agreement of the Alleged Debtors.

[65] *See* Exh. 40B, Exh. 186, Exh. 92, and Exh. 94.

| 16 | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | ~~The TASA Group. Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

40.     Next, the court finds that there are certain creditors included in the "Law Firm Vendor" category (*e.g.*, experts, data hosting, document managers, court reporters) that are really creditors of the individual law firms and/or Highland, and that these law firm vendor creditors should not be considered creditors of the Alleged Debtors.  For these, there was no evidence of a direct contractual obligation on the part of either the Alleged Debtors or Highland—although the court certainly understands that, when the law firms would retain vendors, they would bill these to either the Alleged Debtors or Highland as an expense to be reimbursed.  Most of these were already eliminated with agreement of the Alleged Debtors but, from the remaining list of creditors, this would include David Langford (a Dallas County court reporter).[66]  To be clear, while the individual law firm creditors may ultimately have a right to reimbursement for these vendor expenses from Highland (who may then potentially have a right to reimbursement from the Alleged Debtors via the Shared Services and Sub-Advisory Agreements), the court does not find this vendor to have a claim ***directly*** against the Alleged Debtors for purposes of section 303(b) of the Bankruptcy Code.

---

[66] *See* Exh. 40D, Exh. 187, Exh. 40O.

41.     Next, as to the Stanton Law Firm, the court finds that this creditor should also be removed from the pool of creditors that "count," for section 303(b) purposes, since this claim appears to be the subject of a "bona fide dispute as to liability or amount,"[67] based on the evidence presented at the Trial.  First, there was no engagement letter between either of the Alleged Debtors and the Stanton Law Firm produced.[68]  Second, the heavily redacted invoice of the Stanton Law Firm dated October 18, 2016 shows only that it was relating to the "Joshua Terry Matter" and that it was billed to Highland.[69]  Third, the Responses and Objections to Mr. Terry's Notice of Intention to Take Depositions by Written Questions sent to the Stanton Law Firm[70] provides the following responses:

> **Question No. 11**: What is the total amount of debt Acis Capital Management L.P. to the Firm. is liable to the Firm.
>
> **Answer**: Acis Capital Management L.P.'s debt to the Firm is unknown at this time.
>
> **Question No. 12**: What is the total amount of debt Acis Capital Management GP, LLC is liable for to the firm?
>
> **Answer**: Acis Capital Management GP, LLC to the Firm is unknown at this time.
>
> **Question No**. **13**: Is any other party also liable for the debt of Acis Capital Management L.P. to the Firm? If so, please state the liable party and portion of Acis Capital Management L.P. debt the other party is liable for to the Firm.

---

[67] *See Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014) (a claimholder does not have standing to file a petition under section 303(b) if its claim is "the subject of a bona fide dispute as to liability or amount"); *In re Smith*, 415 B.R. 222, 237 (Bankr. N.D. Tex. 2009) (only "a holder of a claim ... that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" is counted in determining the number of creditors necessary to file an involuntary petition).

[68] Rather, there is only an engagement letter between Lackey Hershman LLP (acting on behalf of its client, Highland) and Stanton Advisors LLC to act as an expert in the Terry litigation.  *See* Exh. 144.  As previously noted, the claim of Stanton Advisors LLC was removed from the creditor list by agreement of the Alleged Debtors.

[69] *See* Exh. 40R.

[70] The court notes that these responses were actually signed by James Michael Stanton, attorney for Stanton LLP.  *See* Exh. 139.

**Answer**: Whether any other party is also liable to the firm for the debt of Acis Capital Management, L.P. is unknown at this time.

**Question No. 14**: Is any other party also liable for the debt of Acis Capital Management GP, LLC to Firm? If so, please state the liable party and portion of Acis Capital Management GP, LLC debt the other party is liable for to the Firm.

**Answer**: Whether any other party is also liable for the debt of Acis Capital Management GP, LLC is unknown at this time. . . .

**Question No. 21**: Does the Firm currently represent Acis Capital Management, L.P.? If so, please state the representation.

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time.

**Question No. 22**: Does the Firm currently represent Acis Capital Management GP, LLC? If so, please state the representation?

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time. . . .[71]

The court finds that this evidence demonstrates that the claim of the Stanton Law Firm is the subject of a bona fide dispute as to either liability or amount and should not be counted since there is no real way of even knowing who the Stanton Law Firm was engaged by and, thus, whether the Alleged Debtors are even responsible for these alleged legal fees. The court would also specifically refer to the testimony of Mr. Leventon, the in-house lawyer employed by Highland who was in charge of allocating all of the bills that came into Highland's legal invoicing system, where he described a process in which all legal bills relating to the "Terry Matter" would automatically be assigned to the Alleged Debtors, without any real regard to whether the particular law firm had even been engaged by the Alleged Debtors or if whether the

---

[71] *See* Exhibit 139.

representation was actually relating to one of the other parties in the Terry litigation (*e.g.*, Highland, Mr. Dondero, etc.). Accordingly, the court finds that there is a bona fide dispute as to whether the Alleged Debtors are actually liable for the Stanton Law Firm legal fees and that they should not be counted as a creditor for purposes of section 303(b) of the Bankruptcy Code.[72]

42.     Thus, it appears, at most, that there are 11 creditors[73] of the Alleged Debtors as set forth in the chart below:

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |

---

[72] *See also In re CorrLine Int'l, LLC*, 516 B.R. 106, 152 (Bankr. S.D. Tex. 2014) (bankruptcy court found that creditors contained in the alleged debtor's list of creditors with uncertain or unknown amounts could not be counted towards the numerosity requirement of section 303(b)).

[73] The court notes that, in all likelihood, the list of creditors that should be tallied for purposes of section 303(b) may actually be less than 11, because certain of the remaining creditors (*i.e.*, Drexel Limited, Highfield Equities, Inc., Lackey Hershman LLP, and David Simek) received payments during the 90 days preceding the Petition Date—and, thus, arguably should not be counted as creditors pursuant to section 303(b) of the Bankruptcy Code (which instructs that transferees of voidable transfers should not be counted). *See, e.g.*, Exh. 124 & Exh. 131. Additionally, certain of the remaining law firm creditors that are owed legal fees are also creditors of Highland and Highland-affiliates, not just the Alleged Debtors. To elaborate, many of these law firm creditors were employed to represent not only the Alleged Debtors, but also Highland and Highland-affiliates, so there may be an actual dispute as to the allocation of these legal fees among Highland and the Alleged Debtors (thus there could be bona fide disputes as to the amounts allocated by Highland's in-house lawyers to the Alleged Debtors). *See, e.g.*, Ex. 123 (McKool Smith, P.C. engagement letter referencing representation of numerous parties) & Exhibit 90 (Reid Collins & Tsai's Answers and Objections to Mr. Terry's Deposition by Written Questions, questions 13 & 14, stating that based upon allocation determinations to be made by Highland, other individuals may be liable for the full amount of the debt including Acis LP, Highland, Mr. Dondero, and Mr. Okada).

| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees[74] | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| ~~16~~ | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| ~~17~~ | ~~Stanton Law Firm~~ | ~~Legal Fees~~ | ~~$88,133.99~~ |
| ~~18~~ | ~~The TASA Group, Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

43.     Finally, on the topic of creditor numerosity, the court further finds that the evidence strongly suggested hurried manufacturing of creditors on the part of the Alleged Debtors and Highland, in order to bolster an argument that having a sole petitioning creditor was legally inadequate in this case.[75]  For example, the Klos Declaration and other information, that was provided to State Court 2 and in discovery, only days before the Involuntary Petitions were filed,

---

[74] Mr. Terry has also argued that certain of the law firm creditors (McKool Smith, P.C., Lackey Hershman, LLP, and Reid Collins & Tsai) are "insiders" that must be excluded from the creditor list pursuant to section 303(b) of the Bankruptcy Code.  While there may be some support in case law for such an argument, Mr. Terry would ultimately need to show by a preponderance of the evidence that the law firms exercised such control or influence over the Alleged Debtors as to render their transactions not at arm's length.  *See In re CorrLine Intern., LLC*, 516 B.R. 106, 157-58 (Bankr. S.D. Tex. 2014) (citing *Kepler v. Schmalbach (In re Lemanski)*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986)).  *See also In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) (in evaluating whether insider status existed for purposes of evaluating alleged fraudulent conveyance court considered  (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length).  Because there was no evidence suggesting abuse or control by these law firm creditors, nor was there any evidence that would suggest that their dealings with the Alleged Debtors were anything but arm's length, the court finds that these law firm creditors should not be excluded from the creditor list as "insiders" pursuant to section 303(b) of the Bankruptcy Code.

[75] *See* the Original Notice of Creditors, the First Amended Notice of Creditors, and the Second Amended Notice of Creditors.

seemed to show only a small number of creditors of Acis LP—Mr. Terry credibly testified that he thought there were less than 12 creditors based on his review of such information, as well as his understanding of the Alleged Debtors' business.  Yet, only a few days later, the Alleged Debtors filed their Original Notice of Creditors, which showed 18 creditors, which was amended twice to add another creditor and then yet another.  This simply does not jive in the court's mind and supports this court's belief that the Alleged Debtors were scurrying to determine which Highland creditors might cogently be painted as Acis LP creditors—so as to preclude Mr. Terry from being able to file the Involuntary Petitions as the single, petitioning creditor.

F.    **Evidence Regarding Whether the Alleged Debtors are Generally Not Paying Debts as They Become Due (Unless Such Debts are the Subject of a Bona Fide Dispute as to Liability or Amount).**

44.    The evidence submitted reflects that, for the 11 creditors identified above, 9 out of 11 have unpaid invoices that were more than 90 days old.  The remaining 2 of the 11 were McKool Smith, P.C. (current counsel for the Alleged Debtors) and the Petitioning Creditor.[76]  The court makes findings with regard to each of the 11 creditors below—focusing specifically on whether the Alleged Debtors have been paying these creditors as their debts have become due.

45.    First, with regard to Andrews Kurth & Kenyon ("AKK"), the evidence reflected that out of the $211,088.13 allegedly owed by Acis LP to AKK, the great majority of it— $173,448.42—was invoiced on November 16, 2016[77] (more than 14 months before the Petition Date).  Other, smaller amounts were invoiced on a monthly basis in each of the months August 2017, September 2017, October 2017, November 2017, and December 2017.  Although requested in discovery, no engagement letter for AKK was produced and AKK represented in

---

[76] Exhs. 40 & 54.

[77] Exh. 40.

written discovery that, to its knowledge, none existed.[78]  The court notes anecdotally that AKK's invoices (although allegedly related to Acis LP legal matters) were addressed to Highland.[79]  In any event, AKK represented that both the Alleged Debtors and Highland are jointly and severally liable for the fees owed to it.[80]  AKK also represented that, to its knowledge, the amounts owing to it by Acis LP and Highland are not disputed.[81]  AKK also represented that it has not provided legal work on a contingency basis for the Alleged Debtors or Highland.[82]  The court makes a logical inference that AKK expected timely payment of its invoices—the largest of which was dated more than 14 months prior to the Petition Date—and, thus, it has generally not been paid timely.

46.     Next, with regard to Drexel Limited, the Petitioning Creditor concedes that its $6,359.96 indebtedness (which is a fee rebate owing to it) is not past-due.

47.     Next, with regard to Highfield Equities, Inc., the Petitioning Creditor concedes that its $2,510.04 indebtedness (which is also a fee rebate owing to it) is not past-due.

48.     Next, with regard to the Jones Day law firm, the $368.75 indebtedness owed to it is well more than 90 days old.  Specifically, there is a six-and-a-half-month old invoice dated July 19, 2017 invoice in the amount of $118.75, and two five-month old invoices dated August 30, 2017 (both in the amount of $150).[83]  The court makes a logical inference that Jones Day

---

[78] Exh. 98, Requests 1-2.

[79] Exh. 98, pp. AKK000061-AKK000060.

[80] Exh. 98, Question 13.

[81] Exh. 98, Questions 52-55.

[82] Exh.  98, Questions 73-75.

[83] Exh. 40K.

expected timely payment of its invoices prior to the Petition Date and, thus, it has generally not been paid timely.

49.     Next with regard to the Petitioning Creditor, Mr. Terry, the court notes that his liquidated claim in the amount of $8,060,827.84 first arose with the final Arbitration Award on October 20, 2017 (although such award was not confirmed by State Court 2 until December 18, 2017).  The judgment was unstayed as of the January 30, 2018 Petition Date, although the Alleged Debtors state that they still desire to appeal it—as difficult as that is in the situation of an arbitration award.  The court makes a logical inference that the Alleged Debtors had, on the Petition Date, no intention of paying this claim any time soon based on their conduct after the Arbitration Award—although the Arbitration Award had only been in existence for three-and-a-half months as of the Petition Date. The cash in the Alleged Debtors' bank accounts is wholly insufficient to cover the Arbitration Award and, meanwhile, corporate transactions have been ongoing to ensure that no cash streams will be coming into Acis LP in the future in the same way that they have in the past.  Thus, this court finds that this large claim, as of the Petition Date, was not being paid timely.

50.     Next with regard to KPMG LLP, the $34,000 indebtedness owed to it was for the service of auditing Acis LP's financial statements, pursuant to an engagement letter with it dated March 1, 2017.[84]  KPMG's engagement letter reflected a $40,000 flat fee was agreed to by Acis LP for the service, of which 40% was due October 2017 (*i.e.,* $16,000), with another 45% was due in January 2018 ($18,000), and the remaining 15% would be due at the time that a final bill was sent.  Acis LP has only paid $6,000 of the agreed upon amount—meaning $28,000 was overdue as of the January 30, 2018 Petition Date (with $10,000 of that being four months past

---

[84] Exh. 40M.

due).  The court makes a logical inference that KPMG LLP expected payment of its audit fees in

accordance with its engagement letter and, thus, it has generally not been paid timely.

      51.    Next with regard to Lackey Hershman LLP, the $236,977.54 indebtedness owed

to it was for legal services provided to the Alleged Debtors and Highland in connection with the

arbitration and litigation with Mr. Terry.  No engagement letter was provided, but the invoices

for their services are all directed to Highland.[85]  The evidence reflected that three invoices had

not been paid as of the Petition Date:  an October 31, 2017 invoice in the amount of $56,909.53;

a November 30, 2017 invoice setting forth new fees in the amount of $84,789.83; and a

December 31, 2017 invoice setting forth new fees in the amount of $95,278.18.[86]  The court

makes a logical inference that Lackey Hershman LLP expected prompt payment on its invoices

(if nothing else, the statement on its invoice indicating "Total now due")[87] and, thus, it has

generally not been paid timely.

      52.    Next with regard to Reid Collins & Tsai LLP, the $17,383.75 indebtedness owed

to it was billed in an invoice dated August 31, 2017, indicating an August 31, 2017 "Due Date"

(five months before the Petition Date).[88]  Although requested in discovery, no engagement letter

for this firm was produced and Reid Collins & Tsai LLP in fact represented in written discovery

that none existed.[89]  Moreover, written discovery propounded on the law firm indicated that,

while Acis LP was liable on this debt, other parties including Acis GP/LLC, Highland, Mr.

---

[85] Demonstrative Aid No. 1 (Lackey Hershman tab).

[86] Exh. 40, p. 3.

[87] Demonstrative Aid No. 1 (Lackey Hershman tab).

[88] Exh. 40P; Exh. 130, pp. 7-8.

[89] Exh. 90, Requests 1 & 2; Ex. 130, Requests 1 & 2.

Dondero, the Dugaboy Trust, and Mr. Akada might also be liable for the full amount of the debt—subject to Highland's allocation determinations.[90]  Based on this evidence, the court makes a logical inference that Reid Collins & Tsai LLP generally has not been paid timely.

53.     Next with regard to CT Corporation and the $517.12 indebtedness that the Alleged Debtors represent is owed, CT Corporation asserts that $4,074.84 is, in fact, owed to it by Acis LP and Acis GP/LLC.[91]  CT Corporation also believes Highland has liability for the Alleged Debtors' indebtedness.[92]  CT Corporation also believes the amount owed to it is undisputed.[93]  CT Corporation further represents that its invoices are due upon receipt.[94] CT Corporation produced several invoices in discovery, all showing due upon receipt, and one was dated as far back as December 31, 2016 (in the amount of $932).[95]  Based on this evidence, the court makes a logical inference that CT Corporation expected prompt payment on its invoices and, thus, has not been paid timely.

54.     Next with regard to David Simek, the Petitioning Creditor concedes that his $1,233.19 indebtedness (which is apparently an expense reimbursement relating to some consulting) is not past-due.

---

[90] Exh. 90, Questions 13 & 14; Exh. 130, Questions 13-14.

[91] Exh. 143, Questions 12 & 13.

[92] *Id.* at Question 14.

[93] *Id.* at Questions 22 & 23.

[94] *Id.* at Question 30.

[95] *Id.* at p. 8; Exh. 40T.

55.     In summary, the evidence reflects that the creditors of the Alleged Debtors are generally not being paid timely (except for perhaps four that are relatively insignificant and which may also be able to look to Highland for payment).[96]

56.     Further on the topic of timeliness, Mr. Leventon (Highland's in-house Assistant General Counsel) testified that 96% of bills submitted get paid more than 90 days after they are submitted, that approximately 70% of bills are later than 120 days after they are submitted, and some are even later than 150 days.  Mr. Leventon testified that this was a result of Acis LP receiving cash on a quarterly basis from the CLOs.  He further elaborated and testified that, for example, if Acis LP got cash on say February 1st, and it received a legal bill on that same day, that he would probably not approve it and allocate it until say February 8th.  By that time, Acis LP would have already used up all its cash, and that particular creditor would need to wait until the next quarterly payment was received in order to be paid.  He further testified that he explained this to law firms before their engagements and that, if they wanted the business, they would need to understand the process.  There are several things the court finds problematic about this testimony.  First, no testimony was offered showing that this was, in fact, the understanding of the law firms or other creditors, and, moreover, none of the engagement letters or invoices submitted into evidence reflect such payment terms.  Without this additional evidence, the court believes that the Alleged Debtors' testimony regarding how it paid invoices was mostly self-serving and did not support a finding that the Alleged Debtors were generally paying their debts

_____

[96] Courts have also held that a debtor is generally not paying its debts as they become due when a debtor is found to have been transferring assets so as to avoid paying creditors.  *See, e.g., In re Moss*, 249 B.R. 411, 423 (Bankr. N.D. Tex. 2000) (bankruptcy court determined that an alleged debtor was not paying its debts as they came due when the alleged debtor "attempted to delay creditors through the transfers of assets she has made," concluding that "[the alleged debtor's] overall conduct of her financial affairs has been poor").  This court has also found that there may have been significant transfers of the Alleged Debtors' assets prior to the filing of the Involuntary Petitions to potentially avoid paying creditors (*i.e.*, Mr. Terry) and this may provide further support for the court's finding that the Alleged Debtors are generally not paying their debts as they become due under section 303(h).

as they became due.[97]  Second, to the extent Mr. Leventon's testimony demonstrates that

creditors of the Alleged Debtors expected to be paid on a quarterly basis (at the latest), certain of

the remaining 11 creditors have debts that are significantly older than four months (*i.e.*, CT

Corporation, Jones Day, AKK, and possibly even Reid Collins & Tsai LLP).  Third, the

Financial Statements of Acis LP submitted into evidence do not support the notion that the cash

balances at Acis LP were only sufficient enough to pay vendors once every quarter.[98]  For

example, the balance sheet for January 31, 2017 shows a cash balance in Acis LP bank accounts

of $1,061,663.19; the balance sheet for February 28, 2017 shows a cash balance in Acis LP bank

accounts of $905,212.36; the balance sheet for March 31, 2017 shows a cash balance in Acis LP

bank accounts of $525,626.59; the balance sheet for April 30, 2017 shows a cash balance in Acis

LP bank accounts of $117,885.96; the balance sheet for May 31, 2017 shows a cash balance in

Acis LP bank accounts of $62,733.31; the balance sheet for June 30, 2017 shows a cash balance

in Acis LP bank accounts of $10,329.15; the balance sheet for July 31, 2017 shows a cash

balance in Acis LP bank accounts of $701,904.39; the balance sheet for August 31, 2017 shows a

cash balance in Acis LP bank accounts of $332,847.05.[99]  In summary, while there may be cash

fluctuations with Acis LP, there is not a clear pattern of Acis LP being only able to pay vendors

once every quarter.

---

[97] *See In re Trans-High Corp.*, 3 B.R. 1, 2-3 (Bankr. S.D.N.Y. 1980) (bankruptcy court found that evidence
showing that the petitioning creditor gave the debtor generous terms of payment (90 days) which were substantially
better than the terms set forth in the actual writings between the parties supported finding that the alleged debtors
were generally paying debts as they became due and that the involuntary petition must be dismissed).

[98] Exh. 147.

[99] *Id.*

## II.      Conclusions of Law

Section 303 of the Bankruptcy Code sets forth the various requirements for initiating an involuntary bankruptcy case.  First, pursuant to section 303(b) of the Bankruptcy Code, an involuntary case may be filed against a person by the filing with the bankruptcy court of a petition under Chapter 7—

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount ... [that] aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims . . .[100]

Thus, if there are twelve or more eligible creditors holding qualified claims on the Petition Date, three or more entities must participate in the involuntary filing and must hold unsecured claims aggregating $15,775.00.  If there are less than twelve creditors, a single creditor with an unsecured claim of $15,775.00 may file the involuntary petition.  To the extent a bankruptcy court finds that the requisite number of petitioning creditors have commenced the involuntary case, the court shall order relief against the debtor under the chapter under which the petition was filed only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[101]

Here, as noted earlier, the Alleged Debtors have made four arguments as to why an order for relief should not be entered against the Alleged Debtors: (1) the Alleged Debtors have 12 or

---

[100] 11 U.S.C.A § 303(b) (West 2018).

[101] 11 U.S.C.A § 303(h) (West 2018).

more creditors, and, thus, with Mr. Terry being the sole petitioning creditor, the Involuntary

Petitions were not commenced by the requisite number of creditors; (2) the Alleged Debtors are

generally paying their debts as they become due; (3) the Involuntary Petitions were filed in bad

faith by Mr. Terry; (4) the interests of creditors and the debtors would be better served by

dismissal and the court should abstain pursuant to section 305 of the Bankruptcy Code.

### A. Have the Requisite Number of Creditors Commenced the Involuntary Proceedings?

Pursuant to section 303(b)(2) of the Bankruptcy Code, a sole petitioning creditor holding

at least $15,775 in claims can initiate an involuntary bankruptcy case so long as the alleged

debtors have fewer than 12 creditors. After the Second Amended List of Creditors was filed, Mr.

Terry had the burden, by a preponderance of the evidence, of showing that the Alleged Debtors

actually had less than 12 qualified creditors.[102] Here, the court has found that the Alleged

Debtors have, *at most*, 11 qualified creditors.[103] Accordingly, Mr. Terry has met his burden of

showing that the Alleged Debtors have less than 12 creditors for section 303(b) purposes, and

that he, as the sole petitioning creditor, was permitted to file the Involuntary Petitions. While

Mr. Terry has made additional arguments as to why certain of these 11 creditors should not be

counted as creditors for purposes of section 303(b) of the Bankruptcy Code, the court does not

believe it necessary to address these arguments at this time.[104]

---

[102] *See In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222, 229 (Bankr. N.D. Tex. 2009).

[103] To be clear, the court believes that even on these 11, there are likely bona fide disputes as to the liability or amount that *Acis LP* has—as opposed to the liability or amount that Highland or other insiders bear responsbility.

[104] Moreover, as previously stated, since the court has determined there are fewer than 12 creditors, the court need not address whether there is a "special circumstances" exception to the statutory requirements of section 303, in situations where an alleged debtor may have engaged in fraud, schemes, or artifice to thwart a creditor or creditors. *See, e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

**B.      Are the Alleged Debtors Generally Paying Their Debts as They Become Due?**

Section 303(h) of the Bankruptcy Code requires that a court shall enter order for relief in an involuntary case "if … (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount . . . ."[105]  Again, the burden is on the Petitioning Creditor to prove this element by a preponderance of the evidence.[106]  The determination is made as of the filing date of the Involuntary Petitions.[107]  In determining whether an alleged debtor is generally paying its debts as they come due, courts typically look to four factors: (i) the number of unpaid claims; (ii) the amount of such claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall conduct in its financial affairs.[108]  No one factor is more meritorious than another; what is most relevant depends on the facts of each case.[109]  Courts typically hold that "generally not paying debts" includes regularly missing a significant number of payments *or* regularly missing payments which are significant in amount in relation to the size of the debtor's operation.[110]

---

[105] 11 U.S.C.A § 303(h) (West 2018).

[106] *See Norris v. Johnson (In re Norris)*, No. 96-30146, 1997 WL 256808, at *3-*4 (5th Cir. Apr. 11, 1997) (unpublished).

[107] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 222 (5th Cir. 1993).

[108] *See, e.g., In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (citing *In re Norris*, 183 B.R. 437, 456-57 (Bankr. W.D. La. 1995)).

[109] *In re Bates*, 545 B.R. 183, 186 (Bankr. W.D. Tex. 2016) (also noting that petitioning creditors' counsel consistently argued that the final prong—overall conduct in financial affairs—should be afforded more weight than the other factors, and the court found no authority to support this assertion).

[110] *See, e.g., In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980).  See also *Concrete Pumping Serv., Inc. v. King Constr. Co. (In re Concrete Pumping Serv., Inc.)*, 943 F.2d 627, 630 (6th Cir.1991) (a debtor was not paying his debts as they became due where the debtor was in default on 100% of its debt to only one creditor); *Knighthead Master Fund, L.P. v. Vitro Packaging, LLC (In re Vitro Asset Corp.)*, No. 3:11–CV–2603–D (N.D.Tex. Aug. 28, 2012) (district court found error in bankruptcy court ruling that the debtors were generally paying their debts as they became due, where bankruptcy court had relied on the fact that the alleged debtors had a significant number of third-party creditors/trade vendors, which had been continually paid, even though the unpaid debts to the petitioning creditors far exceeded the paid debts in terms of dollar amount; petitioning creditors were holders of promissory notes that were guaranteed by the alleged debtors, as to which the primary obligor and alleged

43

Furthermore, any debt which the alleged debtor is not current on as of the petition date should be considered as a debt not being paid as it became due.[111]

Here, the court concludes that the creditors of the Alleged Debtors—what few there are—are generally not being paid as their debts have become due (except for perhaps four[112] that are relatively insignificant and which may also be able to look to Highland for payment). Mr. Terry has met his burden by a preponderance of the evidence as to section 303(h) of the Bankruptcy Code.

### C. With the Section 303 Statutory Requirements Being Met by the Petitioning Creditor, Should the Court, Nonetheless, Dismiss the Involuntary Petitions Because They Were Filed in Bad Faith?

Despite Mr. Terry meeting the necessary statutory requirements for this court to enter orders for relief as to the Alleged Debtors pursuant to section 303 of the Bankruptcy Code, the Alleged Debtors have argued that the Involuntary Petitions must, nonetheless, be dismissed because they were filed in "bad faith" by Mr. Terry. As support for this argument, the Alleged Debtors rely primarily on the Third Circuit's decision in *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015). While the court certainly acknowledges that authority exists in other circuits that suggests that dismissal of an involuntary bankruptcy case may be appropriate—even when section 303's statutory requirements have been met—based upon an

---

debtors had ceased making interest payments; the unpaid debts represented 99.9% of the total dollar amount of debt of each of the alleged debtors); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–51 (E.D.N.Y. 1996) (even though the debtor only had two outstanding debts, the total dollar amount failed to establish that, in terms of dollar amounts, the debtor was paying anywhere close to 50% of his liabilities, so he was not generally paying his debts as they became due); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (while the debtor was paying small recurring debts, he was not paying 99 percent of his debts in the aggregate amount and thus was not generally paying his debts as they became due).

[111] *In re Bates*, 545 B.R. 183, 188 (Bankr. W.D. Tex. 2016).

[112] Those four are: Drexel Limited ($6,359.96); Highfield Equities ($2,510.04); David Simek ($1,233.19); and McKool Smith ($70,082.18).

independent finding of "bad faith," the court need not ultimately decide the efficacy or applicability of such authority, because the court does not believe that the evidence demonstrated any "bad faith" on the part of Mr. Terry (or his counsel) in filing the Involuntary Petitions. Indeed, the evidence suggested that Mr. Terry and his counsel filed the Involuntary Petitions out of a legitimate concern that Highland was dismantling and denuding Acis LP of all of its assets and value and that a bankruptcy filing was the most effective and efficient way to preserve value for the Acis LP creditors. The court concludes that Mr. Terry was wholly justified in pursuing the Involuntary Petitions.

**D.** **Should This Court, Nonetheless, Abstain and Dismiss the Involuntary Petitions Pursuant to Section 305 of the Bankruptcy Code?**

Section 305(a)(1) of the Bankruptcy Code provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension; . . .[113]

Courts construing section 305(a)(1) of the Bankruptcy Code have found that abstention in a properly filed bankruptcy case is an ***extraordinary remedy***.[114]  Moreover, granting an abstention motion pursuant to section 305(a)(1) of the Bankruptcy Code requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of ***both*** the ***debtor*** and its ***creditors*** must be served by granting the request to abstain.[115]  The moving party bears the

---

[113] 11 U.S.C.A. § 305(a)(1) (West 2018).

[114] *In re AMC Investors, LLC*, 406 B.R. 478, 487 (Bankr. D. Del. 2009); *see also In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007); *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718, 726 (Bankr. N.D. Ill. 1996).

[115] *In re Smith*, 415 B.R. 222, 238-39 (Bankr. N.D. Tex. 2009) (citing to *AMC Investors, LLC*, 406 B.R. at 488).

burden to demonstrate that dismissal benefits the debtor and its creditors.[116]  Courts must look to

the individual facts of each case to determine whether abstention is appropriate.[117]

Case law has set forth a litany of factors to be considered by the court to gauge the

overall best interests of the creditors and the debtor for section 305(a)(1) purposes:

> (1) the economy and efficiency of administration;
> (2) whether another forum is available to protect the interests of both parties or
> there is already a pending proceeding in state court;
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
> (4) whether there is an alternative means of achieving an equitable distribution of
> assets;
> (5) whether the debtor and the creditors are able to work out a less expensive out-
> of-court arrangement which better serves all interests in the case;
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that
> it would be costly and time consuming to start afresh with the federal bankruptcy
> process; and
> (7) the purpose for which bankruptcy jurisdiction has been sought.[118]

While all factors are considered, not all are given equal weight in every case and the court should

not conduct a strict balancing.[119]

> i.      *Factor 1: The Economy and Efficiency of Administration.*

---

[116] *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

[117] *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001).

[118] *Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65 (citing to *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)); *see also Smith*, 415 B.R. at 239; *AMC Investors, LLC*, 406 B.R. at 488; *In re Euro-American Lodging Corp.*, 357 B.R. 700, 729 (Bankr. S.D.N.Y. 2007); *but see Spade*, 258 B.R. at 231-32 (Bankr. D. Colo. 2001) (applied a four criteria test in evaluating section 305 abstention which included:  (1) the motivation of the parties who sought bankruptcy jurisdiction; (2) whether another forum was available to protect the interests of both parties or there was already a pending proceeding in state court; (3) the economy and efficiency of administration; and (4) the prejudice to the parties).  The Alleged Debtors cite to the case of *In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y. 2016), in particular, as support for why this court should abstain under section 305(a) of the Bankruptcy Code and dismiss the Involuntary Petitions.  However, in *Murray*, Judge Gerber was analyzing dismissal of an involuntary proceeding pursuant to section 707 of the Bankruptcy Code, more specifically for "cause," and not based upon abstention under section 305(a) of the Bankruptcy Code.  Thus, the court is not convinced *Murray* is relevant to this court's section 305 abstention analysis.

[119] *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (citing *Monitor Single Lift*, 381 B.R. at 464).

The economy and efficiency of administering a case in the bankruptcy court is routinely evaluated in considering abstention under section 305 of the Bankruptcy Code. Here, the evidence suggests that the most economical and efficient forum for these parties to resolve their disputes is the bankruptcy court. The court heard ample evidence that the Alleged Debtors are already, essentially, in the process of being liquidated by Highland. This is not a situation where an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy.[120] Because of the fact that the Alleged Debtors are already in the process of being liquidated, the bankruptcy court (and not a state court) is the most efficient and economical forum to complete this liquidation and distribute whatever assets remain to creditors in accordance with the distribution scheme set forth in the Bankruptcy Code and with the oversight of a neutral third-party trustee. Thus, with the bankruptcy court being the more economic and efficient forum for administering this case, this factor goes against abstention.

> ii.     *Factors 2, 3, 4, 5, and 6: Whether Another Forum is Available to Protect the Interests of Both Parties Or There is Already a Pending Proceeding in State Court; Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution; Whether There is an Alternative Means of Achieving an Equitable Distribution of Assets; Whether the Debtor and the Creditors are Able to Work Out a Less Expensive Out-of-Court Arrangement Which Better Serves All Interests in the Case; and Whether a Non-Federal Insolvency Has Proceeded So Far in Those Proceedings That it Would Be Costly and Time Consuming to Start Afresh With the Federal Bankruptcy Process.*

---

[120] *See, e.g., In re The Ceiling Fan Distrib., Inc.*, 37 B.R. 701 (Bankr. M.D. La. 1983) (noting that while the dissection of a living business may not properly be the business of a bankruptcy court, the division of a "carcass" and the reclamation of pre-petition gouging may well be); *In re Bos*, 561 B.R. 868, 898-99 (Bankr. N.D. Fla. 2016) (citing as one of the reasons to abstain under section 305 of the Bankruptcy Code the fact that entities and subsidiaries under the alleged debtor's umbrella were still operating successful businesses and had employed more than 500 people); *but see Remex Elecs. Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 484-86 (S.D. Fla. 1991) (in affirming the bankruptcy court's decision to dismiss an involuntary bankruptcy case, the district court also found that "the interests of a defunct business enterprise would be little affected by the pendency of a bankruptcy proceeding," which the district court believed favored abstention).

The court believes that factors 2-6 should be grouped together for purposes of its abstention analysis, since all of these factors specifically touch on the availability of an alternative forum to achieve an ***equitable*** distribution.[121]  By way of example, where bringing a case into the bankruptcy court would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute, some courts have found that abstention is the more appropriate choice since keeping the case would transform the bankruptcy process into a collection device.[122]  Here, the Alleged Debtors have repeatedly argued that, because there is already pending state court litigation involving Mr. Terry, Highland, and the Alleged Debtors, these cases should be dismissed and the parties should go back to state court to resolve their issues.  The court does not agree for several reasons.

First, it is worth noting that this court has already heard multiple days of evidence in this case (including almost five days just for the Trial) and would certainly not be "starting afresh" by any means if things go forward in the bankruptcy court.  Additionally, while the Alleged Debtors have argued that a significant amount of attorney's fees have already been spent litigating this case in state court (which they believe supports abstention), the court surmises that these fees have not been wasted dollars, as the money expended by the parties developed discovery of facts that could assist a bankruptcy trustee in pursuing avoidance actions that may be viable and might lead to value that could pay creditors' claims.[123]

---

[121] *See, e.g., In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 460-70 (Bankr. S.D.N.Y. 2008).

[122] *AMC Investors, LLC*, 406 B.R. at 488; *see also Axl Indus., Inc.*, 127 B.R. at 484-86.

[123] *See, e.g., The Ceiling Fan Distributor, Inc.*, 37 B.R. at 703 (the court noted that, despite there being significant legal expenses in the state court, such expenses were not wasted since the legal work done to date would be quite helpful to a trustee).

Second, this court heard considerable evidence involving potentially voidable transfers that may have occurred involving the Alleged Debtors and Highland/Highland-affiliates and, while the state court certainly provides a forum for eventually bringing fraudulent transfer claims, the court also heard evidence that none of these claims have actually been brought in the state court.[124]  Moreover, to the extent fraudulent transfer claims were to be pursued in state court and were successful, the state court would still need the ability to reach the assets of alleged fraudulent transfer recipients (which, in this situation, include certain Highland-affiliates located in the Cayman Islands).  The bankruptcy court has concerns whether a state court process could efficiently accomplish this task.[125]  Similarly, it is worth noting that, while a request for a receiver was filed in the state court by Mr. Terry, such request had not yet been heard and decided by the state court.  Thus, at the present time, it does not appear that there is an alternative forum to address the pertinent issues in this case, without the necessity of significant, additional steps being taken by the parties in the state court.

Third, this court believes that a federal bankruptcy proceeding is necessary in order to achieve an equitable result in this case.  Specifically, the court heard evidence from the Alleged Debtors that, if this court chose to abstain and dismiss the Involuntary Petitions, the Alleged Debtors would ultimately pay all of their creditors in full, except for Mr. Terry.  This clearly demonstrates how keeping the case in the bankruptcy court is necessary to allow an equitable

---

[124] *See, e.g., In re Texas EMC Mgmt., LLC,* Nos. 11-40008 & 11-40017, 2012 WL 627844, at *3 (Bankr. S.D. Tex. 2012) (noting that one of the reasons abstention was proper under section 305 of the Bankruptcy Code was because the issues to be litigated amongst the parties were already joined in the state court litigation); *Spade*, 258 B.R. at 236 (court held that one of the reasons abstention was warranted under section 305 of the Bankruptcy Code was because the petitioning creditors had already filed and had pending a "collection case" in the state court).

[125] *See, e.g., Smith*, 415 B.R. at 239 (the bankruptcy court held that there "are remedies under the Bankruptcy Code that are not available to Rhodes under state law, due to Mr. Smith's transfer of the majority of his assets to the Cook Island Trust," and "federal proceedings may be necessary to reach a just and equitable solution").

distribution to **all creditors**, including Mr. Terry. Additionally, a federal bankruptcy court has certain tools available to it that are not available to a state court such as the ability to invalidate potential *ipso facto* clauses in contracts pursuant to section 365 of the Bankruptcy Code, sell assets free and clear of liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, and impose the automatic stay pursuant to section 362 of the Bankruptcy Code. These are all useful tools available to the Alleged Debtors in a bankruptcy case that would be lost if this court were to ultimately abstain.

Finally, there was more than enough evidence showing the acrimonious and bitter relationship that exists between Mr. Terry and Mr. Dondero. Thus, the availability of an out-of-court arrangement being obtained in this case is, in this court's mind, slim to none.

In summation, the court finds that all of the factors above support this case staying with the bankruptcy court.

        iii.     *Factor 7: The Purpose for Which Bankruptcy Jurisdiction Has Been Sought.*

The Alleged Debtors have repeatedly argued that Mr. Terry filed this case in bad faith and as a litigation tactic to gain some sort of advantage in the state court proceedings. The court has already found above that these cases were not filed in bad faith and that Mr. Terry has met the necessary statutory requirements of section 303 of the Bankruptcy Code. Moreover, it is worth noting that at least one court has stated that the filing of an involuntary bankruptcy petition is always a "litigation tactic," but whether the filing is inappropriate for abstention purposes is a fact-dependent determination.[126] Here, the facts show that there was no inappropriateness

---

[126] *In re Marciano*, 459 B.R. 27, 50 (B.A.P. 9th Cir. 2011) (noting that while the filing of the involuntary bankruptcy was a litigation tactic, the bankruptcy court did not abuse its discretion in denying the alleged debtor's motion to dismiss based upon the bankruptcy court's primary concern that the issue of equality of distribution would not effectively be dealt with in another forum).

behind Mr. Terry's decision to file the Involuntary Petitions. Specifically, Mr. Terry repeatedly and credibly testified that the purpose for filing the Involuntary Petitions was to ensure that creditors (including him) were treated fairly and received an equal distribution from the Alleged Debtors' assets, not to gain some sort of advantage in the state court. This testimony was absolutely consistent with additional evidence showing that, since the entry of the arbitration award, there has been a calculated effort (largely by Highland) to effectively liquidate the Alleged Debtors. Unlike the bankruptcy court in *In re Selectron Mgmt. Corp.*,[127] which had no evidence or "smoking gun" showing that steps were being taken by the alleged debtor to evade payment on the petitioning creditor's judgment, thereby necessitating abstention, this court has heard ample evidence showing that the Alleged Debtors, with the aid of Highland, were transferring assets away from the Alleged Debtors, so that Mr. Terry would have nowhere to look at the end of the day.

In light of the court's analysis of all the seven factors above, the Alleged Debtors have not credibly shown how both the Alleged Debtors and the creditors are better served outside of bankruptcy. If this matter were to remain outside of bankruptcy, there seems to be a legitimate prospect that the Alleged Debtors and Highland will continue dismantling the Alleged Debtors, to the detriment of Acis LP creditors. Abstention would fly in the face of fundamental fairness and the principles underlying the Bankruptcy Code.

Beyond just addressing the factors above, the Alleged Debtors have also argued that, if this court were to not abstain under section 305 of the Bankruptcy Code, there would be

---

[127] *In re Selectron Mgmt. Corp.*, No. 10-75320-DTE, 2010 WL 3811863, at *6-7 (Bankr. E.D.N.Y. Sept. 27, 2010); *see also In re White Nile Software, Inc.*, No. 08–33325–SGJ–11, 2008 WL 5213393, at *4 (Bankr. N.D. Tex. Sept. 16, 2008) (finding that where the filing of a voluntary chapter 11 did not appear to be about insuring a distribution to creditors or winding down or giving a soft landing to a business or avoiding dismantling and dissipation of valuable assets or preserving avoidance actions, but rather was about changing the forum of ongoing litigation between the parties, abstention under section 305 was proper).

significant harm to the "equity" of the Alleged Debtors. Specifically, the Alleged Debtors have argued that, if this court were to enter orders for relief, the equity would be forced to "call" and ultimately liquidate CLO 2014-3 (and perhaps all of the CLOs Acis LP manages), resulting in substantial losses to the equity on their investments. First, to be clear, the current equity of the Alleged Debtors is being held by a Highland-affiliate called Neutra, Ltd., which actually only became the equity of the Alleged Debtors on December 19, 2017. But this is not the "equity" being referred to by the Alleged Debtors in its argument. Rather, the so-called "equity," about which the Alleged Debtors seemed so concerned, is actually *certain parties that own the equity of the entity that owns the equity in the CLOs*—which includes (a) an unnamed third-party investor out of Boston (49%),[128] (b) a charitable foundation managed by a Highland-affiliate (49%), and (c) Highland employees (2%). However, abstention under section 305 of the Bankruptcy Code does not require this court to look at what is in the best interests of these third-parties (who are not current creditors or interest holders of the Alleged Debtors), but rather what is in the best interests of the Alleged Debtors and the creditors. Accordingly, the Alleged Debtors' effort to argue potential harm to these parties is misplaced for purposes of evaluating abstention under section 305 of the Bankruptcy Code, and, if anything, further highlights who the Alleged Debtors are really out to protect—Highland and Highland-affiliates. Moreover, the court would note that, even if there were to be a "call" and liquidation of CLO 2014-3, thereby ending the Alleged Debtors' right to receive future management fees, there would still be potential assets for a chapter 7 trustee to administer such as chapter 5 causes of action (which include fraudulent transfers) as well as the Alleged Debtors' contingent claim for approximately

---

[128] Notably, this entity never appeared at the Trial or filed papers stating that it would be harmed by entry of orders for relief in these cases.

$3 million in expense reimbursement owing by Highland CLO Management Ltd., as part of the November 3, 2017 transfer of the Acis LP Note Receivable from Highland. Thus, even if the so-called doomsday scenario of an equity call on CLO 2014-3 (or other CLOs) were to happen, there is still a potential benefit to creditors if this court chooses not to abstain.

## III.    CONCLUSION

In conclusion, these involuntary proceedings were appropriately filed under section 303, and orders for relief will be issued forthwith.  This court declines to exercise its discretion to abstain, because a chapter 7 trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP, as discussed above.  A chapter 7 trustee appears necessary to resolve the inherent conflicts of interest between the Alleged Debtors and Highland.  A chapter 7 trustee will have tools available to preserve value that a state court receiver will not have.  The bankruptcy court is single handedly the most efficient place to administer property of the estate for creditors.  This is not just a two party dispute between Mr. Terry and the Alleged Debtors, and even if it were, dismissal or abstention is clearly not warranted.

### ###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###