# Exhibit B

```
                 IN THE UNITED STATES BANKRUPTCY COURT
                   NORTHERN DISTRICT OF TEXAS (DALLAS)

  In Re:                               )  Case No. 18-30264-Sgj7
                                       )  Dallas, Texas
  ACIS CAPITAL MANAGEMENT, L.P.,       )
                                       )
           Alleged Debtor.             )  March 23, 2018
                                       )  9:36 a.m.
  ------------------------------       )
                                       )
  ACIS CAPITAL MANAGEMENT GP, LLC,     )  Case No. 18-30265-sgj7
                                       )
           Alleged Debtor.             )
                                       )
  ------------------------------       )
```

                        TRANSCRIPT OF HEARING ON:

                       AS TO CASE NO. 18-30264-sgj7:
    [#80] EMERGENCY MOTION TO INTERVENE IN PROCEEDINGS CONTESTING
    INVOLUNTARY PETITIONS FILED BY CLO HOLDCO, LTD., HIGHLAND CLO
                      FUNDING, LTD., NEUTRA, LTD.;

      [#81] MOTION FOR EXPEDITED HEARING (RELATED DOCUMENTS #80
     MOTION TO INTERVENE) FILED BY CREDITOR HIGHLAND CLO FUNDING,
    LTD., CREDITOR CLO HOLDCO, LTD., CREDITOR NEUTRA, LTD.) FILED
                  BY PETITIONING CREDITOR JOSHUA TERRY

     [#87] OBJECTION TO (RELATED DOCUMENT(S): #80 EMERGENCY MOTION
    TO INTERVENE IN PROCEEDINGS CONTESTING INVOLUNTARY PETITIONS
     FILED BY CREDITOR HIGHLAND CLO FUNDING, LTD., CREDITOR CLO
    HOLDCO, LTD., CREDITOR NEUTRA, LTD., #81 MOTION FOR EXPEDITED
     HEARING (RELATED DOCUMENTS, #80 MOTION TO INTERVENE) FILED BY
       CREDITOR HIGHLAND CLO FUNDING, LTD., CREDITOR CLO HOLDCO,
       LTD., CREDITOR NEUTRA, LTD.) FILED BY PETITIONING CREDITOR
                              JOSHUA TERRY

  (cont'd. next page)

AS TO CASE NO. 18-30265-sgj7:

[#77] EMERGENCY MOTION TO INTERVENE IN PROCEEDINGS CONTESTING INVOLUNTARY PETITIONS FILED BY CLO FUNDING, LTD., HIGHLAND CLO FUNDING, LTD., NEUTRA, LTD.;

[#78] MOTION FOR EXPEDITED HEARING (RELATED DOCUMENTS #77 MOTION TO INTERVENE) FILED BY CLO FUNDING, LTD., HIGHLAND CLO FUNDING, LTD., NEUTRA, LTD.;

[#83] OBJECTION TO (RELATED DOCUMENT(S): #77 EMERGENCY MOTION TO INTERVENE IN PROCEEDINGS CONTESTING INVOLUNTARY PETITIONS FILED BY CREDITOR NEUTRA, LTD., CREDITOR HIGHLAND CLO FUNDING, LTD., CREDITOR CLO FUNDING, LTD., #78 MOTION FOR EXPEDITED HEARING (RELATED DOCUMENTS #77 MOTION TO INTERVENE) FILED BY CREDITOR NEUTRA, LTD., CREDITOR HIGHLAND CLO FUNDING, LTD., CREDITOR CLO FUNDING, LTD.) FILED BY PETITIONING CREDITOR JOSHUA TERRY

BEFORE THE HONORABLE STACEY G. JERNIGAN

UNITED STATES BANKRUPTCY COURT

Transcription Services:     eScribers, LLC
                            7227 North 16th Street
                            Suite #207
                            Phoenix, AZ 85020
                            (973) 406-2250

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE

```
 1  APPEARANCES:

 2  For the Debtor:              MICHAEL D. WARNER, ESQ.
                                 Cole Schotz P.C.
 3                               1700 City Center Tower II
                                 301 Commerce Street
 4                               Suite 1700
                                 Fort Worth, TX 76102
 5
                                 WARREN A. USATINE, EQ.
 6                               Cole Schotz P.C.
                                 25 Main Street
 7                               Hackensack, NJ 07601

 8                               GARY CRUCIANI, ESQ.
                                 MICHAEL P. FRITZ, ESQ.
 9                               McKool Smith
                                 300 Crescent Court
10                               Suite 1500
                                 Dallas, TX 75201
11
    For Joshua N. Terry,         RAKHEE V. PATEL, ESQ.
12  Petitioning Creditor:        ANNMARIE CHIARELLO, ESQ.
                                 Winstead PC
13                               2728 N. Harwood Street
                                 Suite 500
14                               Dallas, TX 75201

15                               BRIAN P. SHAW, ESQ.
                                 Clouse Dunn LLP
16                               1201 Elm Street
                                 Suite 5200
17                               Dallas, TX 75270

18  For Highland CLO Funding,    SCOTT RICHARD LARSON, ESQ.
    Ltd., CLO Holdco, Ltd., and  Bell Nunnally & Martin LLP
19  Neutra Ltd.:                 3232 McKinney
                                 Suite 1400
20                               Dallas, TX 75204

21

22

23

24

25
```

1  A.    Yes.
2  Q.    Who controls what donations the charitable foundation
3  makes?
4  A.    So it's -- it's -- it's a donor-advised fund but it's --
5  it's administered by The Dallas Foundation, and -- and --
6  and -- primarily.  And -- I'm not sure if you're familiar
7  with -- with -- with what I -- The Dallas Foundation does, but
8  they -- they provide all of the operational and -- and
9  structural management for a donor-advised fund.
10       And -- and -- and -- and the way these things are set up,
11 they'll have a staff that help you write the -- the -- the --
12 the different grants that you're going to make, determine who
13 to donate the money to, evaluate those -- those different
14 charities, and help you plan out how -- how the charity is --
15 is -- is to go about its -- its -- its donations.
16 Q.    Is The Dallas Foundation an affiliate of Highland?
17 A.    No.
18 Q.    With regard to this charitable foundation, who decides
19 how the charitable foundation invests its money?
20 A.    So the -- the investments within the charitable
21 foundation ultimately are -- are managed by a -- a trustee;
22 his name is Grant Scott.  And so we have a independent trustee
23 that -- that -- that oversees the -- the investing activity
24 of -- of the charitable foundation.
25 Q.    Is Mr. Scott a friend Highland?

1  A.   Yes.  He -- he and Jim go way back; twenty, thirty years.
2  Q.   You also mentioned he was an independent trustee?
3  A.   Yes.  He's a -- he's a lawyer and that -- that's his
4  role:  to -- to -- to be the -- the independent trustee for
5  the transaction.
6  Q.   Do you understand if Mr. Scott owes any duties to the
7  foundation?
8  A.   Well, yeah.  I mean, as the trustee, he has a fiduciary
9  duty to the -- to the foundation.
10 Q.   And do you have a general understanding of what the
11 fiduciary duty is?
12 A.   Well, he's -- he's supposed to make sure that the -- the
13 foundation's interests are -- are -- are put first, ahead of,
14 you know, anybody else in the -- in the -- in his dealings,
15 and to make sure that it's -- it's administered in a -- in a
16 fair and lawful way.
17 Q.   Is Mr. Scott an employee of Highland?
18 A.   No.
19 Q.   Has he ever been?
20 A.   No.
21 Q.   Does Highland own any of the assets in the charitable
22 foundation?
23 A.   No, they do not.
24 Q.   What about Mr. Dondero?
25 A.   No, he does not.

1  Acis started, right?

2  A.  Correct.

3  Q.  And was that third-party investor notified regarding the

4  pendency of the arbitration in the various litigation?

5  A.  What term did you use, pendence?

6  Q.  The existence of it?

7  A.  I believe so.

8  Q.  And they knew coming in that there was this existing

9  litigation, and they decided to invest nevertheless, right?

10 A.  Yes.

11 Q.  Now, under that is this charitable foundation that we've

12 been referencing, this forty-nine percent.  We've called that

13 the DAF -- I know that there's another entity called CLO

14 Holdco Limited, can we just call that the DAF; is that fair

15 enough?

16 A.  It's fine with me.

17 Q.  Okay.  And that's kind of loosely what Highland refers to

18 is -- in shorthand is the DAF, right?

19 A.  That's right.

20 Q.  And that stands for donor advised funds?

21 A.  Yes.

22 Q.  All right.  Who advises the donor advised fund?

23 A.  To do what?

24 Q.  Well, on investment decisions?

25 A.  So the donor advised fund has a management contract with

1   Highland to manage its investments.
2   Q.   And does Highland manage all the donor advised fund's
3   assets?
4   A.   I don't know if it's all of them.
5   Q.   The original underlying assets that are -- that comprise
6   the donor advised fund, what was the source of those assets?
7   A.   Could you -- could you narrow that down a bit for me.
8   What do you mean by "source?"
9   Q.   What was the seed investment, the capital that initially
10  capitalized the DAF, where did that come from?
11  A.   It was a donation from Highland.
12  Q.   And what type of assets were donated by Highland to the
13  DAF?
14  A.   They were primarily CLO equity, equity some debt.
15  Q.   And that CLO equity and debt has performed well
16  subsequent to that initial contribution, right?
17  A.   I think it's done well.  I don't know what you mean by
18  "well" but that's a fair word.
19  Q.   You're pleased with the performance of those -- those
20  assets have increased in value from the time that they were
21  originally contributed until now?
22  A.   They have increased.
23  Q.   Now, the DAF has what you call -- what you refer to as an
24  independent trustee, right?
25  A.   Yes.

1   Q.   Was it ever true?
2   A.   No.
3   Q.   And the general partner there, DAF GP, LLC, (ph.) Grant
4   Scott managing member, trustee -- whatever his exact title is,
5   who is Mr. Scott?
6   A.   He's a truly independent trustee.  I've known him for a
7   long time.  He's a patent attorney by training, but he has the
8   time and inclination and he enjoys being involved with the
9   charities.
10  Q.   You said he's independent.  In what way is he
11  independent?
12  A.   He's never been an employee or relative or whatever the
13  violations of the independence rules are.
14  Q.   Okay. And it was asked of Mr. Okada and - today and
15  asked of you in the deposition about certain signage rights
16  that Highland gets for places like the Dallas Zoo or the Perot
17  Museum.  Why is that?  Why does it not say DAF or donor-
18  advised fund at the Dallas Zoo as opposed to Highland Capital?
19  A.   Well, because we gave all the money to the charity,
20  Highland did, I would say as point number one.  Plus you could
21  make the signage anything you want.  Where anything -- any
22  time we donate money, we can make the signage anything we
23  want, but there's -- DAF doesn't get any benefit for the
24  signage.  It helps Highland to be active in the community and
25  charitable in the community, so we generally give the signage

C E R T I F I C A T I O N

I, Clara Rubin, the court-approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

March 27, 2018

_____   _____
**CLARA RUBIN**                        DATE