Joseph Y. Ahmad (Bar No. 00941100)
Shawn M. Bates (Bar No. 24027287)
Thomas Cooke (Bar No. 24124818)
**AHMAD, ZAVITSANOS & MENSING PLLC**
1221 McKinney St. Suite 2500
Houston, Texas 77010
(713) 655-1101 Telephone
(713) 655-0062 Facsimile
joeahmad@azalaw.com
sbates@azalaw.com
tcooke@azalaw.com
**COUNSEL FOR PLAINTIFFS AND
REORGANIZED DEBTORS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 18-30264-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | |
| | § | **(Jointly Administered Under Case** |
| **Debtors.** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| | § | **Chapter 11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | |
| **LLC, Reorganized Debtors,** | § | **Adversary No. 20-03060-SGJ** |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **JAMES DONDERO,** *et al.,* | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

### BRIEF IN SUPPORT OF PLAINTIFFS' OBJECTION TO REPORT AND RECOMMENDATION TO THE DISTRICT COURT THAT IT GRANT DEFENDANT JAMES DONDERO'S MOTION FOR JUDGMENT ON THE PLEADINGS AND "SUPPLEMENTAL" MOTION FOR SUMMARY JUDGMENT AND DISMISS WITH PREJUDICE ALL REMAINING COUNTS AGAINST DONDERO

## I.    SUMMARY OF THE OBJECTION

Acis objects to the Bankruptcy Court's Report and Recommendation[1] on four grounds. First, the Bankruptcy Court failed to follow binding authorities on privity, a necessary element of res judicata. Under those authorities, privity is lacking and res judicata cannot be applied. Second, Acis's claims against Dondero are separate from the dismissed claims against Highland and were expressly reserved by the Bankruptcy Court. Third, the Restatement's exception for consent judgments allows Acis's claims to proceed against Dondero even if the elements of res judicata are otherwise satisfied. Finally, the Bankruptcy Court should not have considered any of Dondero's res judicata arguments because Dondero waived the affirmative defense.

## II.    PERTINENT BACKGROUND

### A.    Dondero drove Acis and Highland into bankruptcy and lost control of both entities.

Defendant James Dondero was the chief executive of Highland Capital Management, LP ("Highland") and controlled it from 1993 to January 2020.[2]  Dondero was also Acis's chief executive from 2011 to 2018.[3]  Through a series of transactions, mostly in the fall and winter of 2017, Dondero used his control over Highland and Acis to transfer Acis's assets to a network of Highland affiliates that, directly or indirectly, he owned and controlled.[4]

In January 2018, former Acis partner Josh Terry filed an involuntary bankruptcy petition

---

[1]    Case No. 20-03060, Dkt. 239, Report and Recommendation to the District Court that it Grant Defendant James Dondero's Motion for Judgment on the Pleadings and "Supplemental" Motion for Summary Judgment and Dismiss with Prejudice All Remaining Counts Against Dondero ("Report and Recommendation").

[2]    *See* Case No. 18-30264, Dkt. 827, p. 12 (noting that Dondero was chief executive of Highland since he co-founded it in 1993); Case No. 20-03190, Dkt. 190, p. 4 (noting that Dondero ceased to be Highland's chief executive in January 2020).  All page numbers for docket cites refer to the pagination imprinted at the top of the page by the Court's electronic case filing system.

[3]    *See* Case No. 18-30264, Dkt. 827, p. 12 (noting that Dondero was "President of the Debtor-Acis at all relevant times prepetition"); Case No. 18-30264, Dkt. 829, pp. 15-16 ¶ Z(i)(g) (granting former Acis limited partner Josh Terry 100% equity in Acis and permitting him to structure Acis's management).

[4]    *See* Case No. 18-30264, Dkt. 827 pp. 19–23.

2

as to Acis, initiating Case No. 18-30264 (the "Acis Bankruptcy").[5] In October 2019, Highland also filed for bankruptcy, initiating Case No. 19-34054 (the "Highland Bankruptcy").[6]

The bankruptcies cost Dondero control of both companies. In January 2019, the Court confirmed a plan in the Acis Bankruptcy whereby former Acis partner Josh Terry obtained 100% of Acis's equity.[7] In January 2020, Dondero executed an agreement whereby he resigned as officer and director of Highland, and an independent board assumed control.[8] Throughout the summer of 2020, Dondero proposed several reorganization plans, all of which Highland rejected.[9] "When Dondero's plans failed to gain support, he and entities under his control engaged in substantial, costly, and time-consuming litigation for Highland."[10] Highland's new CEO, James Seery, testified that Dondero even threatened to "burn the place down" if his proposals were not accepted.[11] On October 9, 2020, Dondero resigned from all his positions with all Highland affiliates.[12] On December 7, 2020, Highland filed an adversary proceeding in the Bankruptcy Court against Dondero.[13] On December 10, 2020, the Bankruptcy Court entered an order restraining Dondero from communicating with Highland employees.[14]

The Highland Bankruptcy extinguished any interest Dondero had in Highland. In

---

[5]    Case No. 18-30264, Dkt. 1.

[6]    Case No. 19-34054, Dkt. 1.

[7]    Case No. 18-30264, Dkt. 829, pp. 15–16 ¶ Z(i)(g).

[8]    *See* Case No. 19-34054, Dkt. 339 ("James Dondero will no longer be a director, officer, managing member, or employee of [Highland] or [its general partner] and will have no authority, directly or indirectly, to act on the Debtor's behalf."); Dkt. 354-1, p. 2 ("The Independent Directors will be granted exclusive control over the Debtor and its operations.").

[9]    Case No. 19-34054, Dkt. 3903, p. 10.

[10]    *Id.*

[11]    *Id.* at n.17.

[12]    *Id.* at 10-11.

[13]    Case No. 20-03190, Dkt. 1.

[14]    Case No. 20-03190, Dkt. 10.

December 2015, Dondero transferred his Highland partnership interest to the Hunter Mountain Investment Trust ("HMIT") in exchange for a note payable to his personal trust, the Dugaboy Investment Trust ("Dugaboy").[15] In January 2021, Highland filed its Fifth Amended Plan of Reorganization, whereby the interests held by HMIT and Dugaboy were canceled.[16] Dondero has testified that he stopped receiving Dugaboy Note payments when Highland declared bankruptcy.[17]

**B.      The Bankruptcy Court confirmed a Plan that allowed Acis to assert separate claims for the same conduct against Dondero and the Highland Entities.**

On May 30, 2018, Highland and its affiliate, Highland CLO Funding, Ltd. ("HCLOF") filed the original complaint in Adversary Proceeding No. 18-03078 (the "Highland Adversary").[18] On July 2, 2018, Acis filed its answer and counterclaims, alleging that Highland, HCLOF, and various of their affiliates including Highland CLO Management, Ltd. ("HCLOM") and Highland HCF Advisor, Ltd. ("HCF Advisor") had participated in a "scheme comprised of a series of fraudulent transfers in an effort to denude Acis LP of value[.]"[19] In November 2018, Acis amended its answer to add claims against Highland CLO Holdings, Ltd. ("HCLOH") regarding the fraudulent transfer of Acis CLO 2017-7, Ltd. ("CLO-7").[20]

On January 31, 2019, the Bankruptcy Court entered a Confirmation Order whereby it approved the *Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital*

---

[15]   *See* Case No. 18-30264, Dkt. 99, 112:7-113:3 (Dondero's testimony that he sold his interest in Highland to a "remainder trust"); No. 19-34054, Dkt. 3903, p. 40 (referring to the note as the "Dugaboy Note").

[16]   *See* Case No. 19-34054, Dkt. 3903, p. 12; *see also* Case No. 19-34054, Dkt. 1808.

[17]   Ex. 1, Dondero's October 14, 2024 Deposition Transcript, App. 10, 181:1-12.

[18]   Case No. 18-03078, Dkt. 1.  The Court's Report and Recommendation refers to the Highland Adversary as the "Prior Acis Action."  *See* Dkt. 188.

[19]   *See* Case No. 18-03078, Dkt. 23.

[20]   Case No. 18-03078, Dkt. 84.

*Management GP, LLC* (the "Plan").[21] The Plan acknowledges the Highland Adversary as such,[22] referring to it in Exhibit A under the subheading "Highland Affiliate Claims."[23] Then, **quite separately**, the Plan provides in a section entitled "***Dondero*** Claims" that all "Estate Claims . . . against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor," including claims for breach of fiduciary duty, self-dealing, *ultra vires*, and "usurpation of corporate opportunities."[24] Notably, many of the transactions that the Plan lists under "Dondero Claims" involved transactions for which Acis was **already** pursuing the Highland Entities[25] in the Highland Adversary in the Bankruptcy Court.[26] Indeed, much of the same conduct is laid out in the **separate** "Highland Affiliate Claims" section on the preceding page of the Plan.[27]

The Bankruptcy Court confirmed the Plan with minimal, "non-material" changes.[28] Accordingly, the Bankruptcy Court ordered that "all terms and conditions set forth in the Plan are hereby APPROVED" and that "[t]he terms of the Plan **are incorporated by reference into**, and **as an integral part of**, this Order."[29] The Confirmation Order acknowledged Exhibit A of the Plan as a "specific and unequivocal reservation of Estate Claims and Estate Defenses as required under

---

[21]   Case No. 18-30264, Dkt. Nos. 829 & 830.

[22]   Case No. 18-30264, Dkt. 660, p. 6.

[23]   *Id.* at 44 ¶ 10.

[24]   *Id.* at 45 ¶ 11 (emphasis added).

[25]   The various Highland affiliates who were parties to the Highland Adversary (including Highland itself) are referred to herein collectively as the "Highland Entities" or simply the "Highlands".

[26]   *See id.*; *see also* Case No. 18-30264, Dkt. 661, p. 23 (providing that Acis shall retain all causes of action belonging to the Debtors, including "the claims and causes of action described on Exhibit A to the Plan"); Case No. 18-03078, Dkt. 84, pp. 13–15 ¶¶ 44-47 (modifications to agreements), pp. 26-27 ¶¶ 75–77 (BVK Agreement), pp. 23–26 ¶¶ 69-74.

[27]   *See* Case No. 18-30264, Dkt. 660, p. 9 ¶ 10.

[28]   Case No. 18-30264, Dkt. 829, pp. 10–11 ¶ P.

[29]   *Id.* at 28 ¶ 4 (emphasis added).

applicable Fifth Circuit authority."[30] Crucially, this section stated that unless an Estate Claim was *expressly released* in the Plan or a Final Order, "such causes of action are hereby *expressly reserved*," and that "no preclusion doctrine," including, explicitly, res judicata, would apply to such causes of action "upon *or after* the confirmation *or consummation* of the Plan."[31]

On April 11, 2020, Acis filed the instant Adversary Proceeding against James Dondero, CLO HoldCo, Ltd. ("CLO HoldCo"), and several other named individuals (the "Dondero Adversary").[32] Acis's Original Complaint in the Dondero Adversary sought to hold Dondero accountable for his individual fiduciary role in many of the same transactions for which Acis was pursuing the Highland Entities. Acis had no reason to doubt that it could pursue Dondero separately—the Plan that the Court had confirmed months earlier *made clear* that Highland Affiliate Claims *were separate from* the Dondero Claims, even if the claims implicated some of the same conduct.

## C. The Bankruptcy Court approved a Settlement Agreement preserving Acis's Dondero Adversary claims, even where they overlapped with its Highland Adversary claims.

On August 3, 2020, the Bankruptcy Court entered an order directing Highland, Acis, the UCC, and Dondero (among others) to mediate their various disputes in the Highland Bankruptcy.[33] One of the results of that mediation was a settlement agreement that Acis and Highland entered on September 9, 2020 (the "Highland Settlement Agreement"), and which Dondero did *not* join.[34]

The Highland Settlement Agreement provided that Acis's proof of claim in the Highland Bankruptcy would be permitted, Highland's proofs of claim in the Acis Bankruptcy would be

---

[30]   *Id.* at 39 ¶ 27.

[31]   *Id.* (emphasis added).

[32]   Case No. 20-03060, Dkt. 1.

[33]   Case No. 19-34054, Dkt. 912.

[34]   *See* Case No. 19-34054, Dkt. 1088-1.

withdrawn, and Acis would dismiss certain named parties (the "HCMLP Released Parties") with prejudice.[35] The HCMLP Released Parties included all the Highland Entities (except HCLOF) *and* all the individual Highland employees named as defendants in the Dondero Adversary—*with the notable exception of Dondero himself*.[36] The Highland Settlement Agreement explicitly provided that Dondero was *not* an "HCMLP Released Party" and retained Dondero as a defendant in the Dondero Adversary.[37]

On September 23, 2020, Highland filed a motion for the Bankruptcy Court to approve the Highland Settlement Agreement (the "Settlement Motion").[38] The Settlement Motion acknowledged the existence of the Dondero Adversary[39] and acknowledged that the settlement was for substantially less than Acis's $75 million proof of claim, which itself was "substantially below what Acis contended its claim was actually worth (which, on information and belief, was in excess of $200 million with punitive damages)."[40] The Settlement Motion clearly alerted all concerned that it "does not release any claims in favor of or against . . . (v) James Dondero."[41]

On October 5, 2020, Dondero objected to the Highland Settlement Agreement.[42] On October 28, 2020, the Bankruptcy Court entered an order overruling Dondero's objection, granting the Settlement Motion, and approving the Highland Settlement Agreement (the "Settlement

---

[35]  *See* Case No. 19-34054, Dkt. 1088-1, p. 4 ¶ 2 (stating that the Release attached to the Agreement was "incorporated by reference into this Agreement as if fully set forth herein"); Case No. 19-34054, Dkt. 1088-2, p. 5 ¶ 2 (attached Release providing that "each Acis Released Party and HCMLP Released Party . . . will coordinate to cause the Filed Cases . . . to be dismissed with prejudice as to any Acis Released Party or HCMLP Released Party").

[36]  Case No. 19-34054, Dkt. 1088-2, p. 3 ¶ 1.

[37]  *Id.*; *see also id.* ¶ 4(d) (defining "Filed Cases" as including the Dondero Adversary).

[38]  Case No. 19-34054, Dkt. 1087.

[39]  *Id.* at 6 ¶ 19.

[40]  *Id.* at 13 ¶ 35.

[41]  Case No. 19-34054, Dkt. 1087, p. 8 n.6.

[42]  Case No. 19-34054, Dkt. 1121.

Order").[43] The Settlement Order states that "[t]he Settlement and the Release, attached hereto as Exhibit 1 and Exhibit 2, are ***approved in all respects*** pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure."[44] The Settlement Order further notes that the "legal and factual bases set forth in the Motion establish good cause" for granting the Motion and that the Settlement Agreement and Release are "fair and equitable."[45]

**D.      Acis settled its claims in the Highland Adversary based on agreements that explicitly reserved its right to assert claims against Dondero for the same transactions.**

On November 3, 2020, pursuant to the Bankruptcy Court-approved Highland Settlement Agreement, Acis filed an unopposed motion to dismiss Highland, HCF Advisor, HCLOM, and HCLOH from the Highland Adversary with prejudice ***and*** with the proviso that the requested dismissal would "have no effect on the claims of any Defendant other than the Highland Released Parties."[46] The Bankruptcy Court granted this motion on November 6, 2020.[47]

On April 28, 2021, Acis entered a settlement agreement with HCLOF whereby Acis agreed to file a motion to dismiss HCLOF and its individual directors from the Dondero Adversary (the "HCLOF Settlement Agreement").[48] Like the Highland Settlement Agreement, the HCLOF Settlement Agreement explicitly provided that Dondero was ***not*** a released party and specifically retained him as a defendant in the Dondero Adversary.[49] On May 3, 2021, Acis filed a motion to

---

[43]   Case No. 19-34054, Dkt. 1302.

[44]   *Id.* at 3 ¶ 2 (emphasis added).

[45]   *Id.*

[46]   Adversary No. 18-03078, Dkt. 215.

[47]   Adversary No. 18-03078, Dkt. 216.

[48]   Ex. 2, HCLOF Settlement Agreement.

[49]   *Id.* at App. 23 ¶ 9 (providing that Dondero was not a released party); *see also id.* at 1 (referring to the Dondero Adversary as the "Second Lawsuit"), App. 22-23 ¶ 7 (agreeing to release named HCLOF employees from the "Second Lawsuit," but omitting Dondero).

dismiss HCLOF and its directors.[50] On May 6, 2021, the Court granted Acis's motion.[51]

### E.    The District Court Dismissed Claims 3 and 5.

On October 15, 2024, the Bankruptcy Court raised res judicata *sua sponte* and recommended dismissal of two of Acis's claims: claim 3 (alter ego) and claim 5 (fraudulent transfer) on the grounds that they were precluded by the two prior dismissals.[52] Acis objected.[53] On October 24, 2024, the District Court adopted the recommendation and dismissed claims 3 and 5.[54] Acis moved to vacate that order on the grounds that its objections had not been heard.[55] On January 6, 2025, the District Court vacated its order but re-adopted the recommendation, holding that the two prior agreed dismissals were res judicata as to Acis's Counts 3 and 5 against Dondero.[56]

Now pending before the Court is Dondero's Motion for Judgment on the Pleadings as to Acis's remaining claims.[57] On January 25, 2025, the Bankruptcy Court entered its Report and Recommendation recommending dismissal of all remaining claims based on the purported res judicata effect of the same prior dismissal orders.[58] Acis now objects.

---

[50]   Adversary No. 18-03078, Dkt. 223.

[51]   Adversary No. 18-03078, Dkt. 224.

[52]   Case No. 20-03060, Dkt. 188.

[53]   Case No. 20-03060, Dkt. 200; *see also id.* Dkt. 201 (Brief in Support).

[54]   Case No. 20-03060, Dkt. 188.

[55]   Case No. 3:24-cv-02036, Dkt. 5.

[56]   Case No. 3:24-cv-02036, Dkt. 13.

[57]   Case No. 20-03060, Dkt. 210.

[58]   Case No. 20-03060, Dkt. 239, Report and Recommendation to the District Court that it Grant Defendant James Dondero's Motion for Judgment on the Pleadings and "Supplemental" Motion for Summary Judgment and Dismiss with Prejudice All Remaining Counts Against Dondero ("Report and Recommendation").

### III.   ARGUMENT AND AUTHORITIES

The Report and Recommendation misapplies res judicata. A claim is barred by res judicata only if all four elements are established: (1) the parties are identical or in privity, (2) the prior judgment was rendered by a court of competent jurisdiction, (3) the prior judgment was a final judgment on the merits, and (4) the same claim or cause of action was involved in both actions. *Sacks v. Texas Southern University*, 83 F.4th 340, 344 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 2520 (2024). The first and fourth elements are lacking here. Dondero and Highland are not in privity under the applicable authorities, which the Bankruptcy Court wrongly ignored. The claims are not the same because Acis's claims against Dondero were expressly reserved by the Bankruptcy Court, and they arise from a different "transaction" or series of facts. Moreover, the prior dismissals were consent judgments that did not adjudicate liability, so their preclusive effects do not include barring this lawsuit. Therefore, Acis's remaining claims against Dondero should be allowed to proceed.

### A.   Dondero and Highland are not in privity.

The Bankruptcy Court found Dondero and Highland to be in privity solely based on Acis's allegations that they were once alter egos. This is wrong as a matter of law. In *Meza*, the Fifth Circuit limited privity to three narrow categories, none of which apply here. *See Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990). The privity inquiry is ***always*** confined to these categories, including when (as here) privity is asserted by a new defendant against a repeat plaintiff. Accordingly, the Bankruptcy Court erred by distinguishing *Meza*. The "alter ego" theory does not suffice for privity under *Meza* because Dondero and Highland ceased to be alter egos before the prior dismissals, and thus had no relationship of control, representation, or shared property interests at the relevant time. Moreover, the claims at issue here are not dependent on any alter ego allegation. Therefore the first element of res judicata is not satisfied.

10

**1. The Bankruptcy Court should have applied *Meza* and *Taylor*.**

The Fifth Circuit has held that "privity exists in just three, narrowly-defined circumstances: (1) where the non-party is the successor in interest to a party's interest in property; (2) where the non-party controlled the prior litigation; and (3) where the non-party's interests were adequately represented by a party to the original suit." *Meza*, 908 F.2d at 1266. The Supreme Court has clarified that a non-party's interests are "adequately represented" for preclusion purposes "only if, at a minimum: (1) The interests of the nonparty and her representative are aligned; ***and*** (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Taylor v. Sturgell*, 553 U.S. 880, 900 (2008) (emphasis added).

The Bankruptcy Court's Report and Recommendation fails to identify any basis for privity or nonparty preclusion recognized by *Meza* and *Taylor*. The Bankruptcy Court distinguished both cases on the grounds that they involved a new plaintiff suing a repeat defendant, whereas the case at bar involves a repeat plaintiff (Acis) suing a new defendant (Dondero).[59] The Bankruptcy Court supposed that this makes *Meza* and *Taylor* inapplicable, because "[a]llowing a nonparty defendant in a subsequent action to ***benefit*** from a judgment of nonliability as to his alleged alter egos rendered in a prior litigation initiated by the same plaintiffs does not implicate the concerns expressed in *Meza* and *Taylor* that such plaintiffs will be denied their opportunity to be adequately represented and to fully and fairly litigate their claims."[60]

---

[59] Report and Recommendation, pp. 9-10.

[60] *Id.* at 10.

This is incorrect. The Fifth Circuit applies *Meza* to all determinations of privity, including where, as here, the defendant claims privity with a party to a prior suit involving the same plaintiff. For instance, the Fifth Circuit applied *Meza* in its 2023 decision in *Sacks*, where the same plaintiff had sued TSU and lost (*Sacks I*) and then sued a new defendant, Weeden, for the same claims (*Sacks II*). *See* 83 F.4th at 333-34, 346. The new defendant (Weeden) asserted res judicata, and therefore needed to establish privity with the prior defendant (TSU). *Id.* at 346. Applying *Meza*, the Fifth Circuit made it clear that privity is limited to *Meza*'s three prongs: "Weeden is not a successor in interest and did not control *Sacks I*. So he is only in privity with named defendants in *Sacks I* if his interests were adequately represented." *Id.* This demonstrates that *Meza* applies to a nonparty defendant's assertion of privity, even where the plaintiff in the prior suit was the same.[61]

Likewise, *Taylor*'s narrow definition of adequate representation applies to nonparty defendants who assert privity with a party previously sued by the same plaintiff. *See, e.g.*, *Clyce v. Farley*, 836 Fed. Appx. 262, 269 (5th Cir. 2020) (analyzing whether defendants in later suit were adequately represented by defendants in prior suit brought by the same plaintiff) (citing *Taylor*, 553 U.S. at 893-95); *Torello v. Mortg. Elec. Registration System, Inc.*, 2013 WL 3289526, at *9 (N.D. Tex. June 28, 2013) (applying *Taylor*'s definition of adequate representation to determine whether new defendants were in privity with prior defendants); *Hernandez v. U. of Texas-Pan Am.*, 2017 WL 6444957, at *5 (S.D. Tex. Aug. 10, 2017) (same). Accordingly, *Taylor*'s narrow concept of adequate representation is applicable here, and the Bankruptcy Court erred by ignoring it.

---

[61]   *See also Clyce v. Farley*, 836 Fed. Appx. 262, 269 (5th Cir. 2020) (reversing district court's res judicata dismissal where the prior suit involved the same plaintiff and different defendants, and the new defendants failed to show privity with the prior defendants under any prong of *Meza*).

### 2.   Under *Meza* and *Taylor*, privity is lacking.

*Meza* and *Taylor* do not permit finding privity here. Privity only exists if the later defendant (1) is the prior defendant's successor in interest, (2) controlled the prior litigation, or (3) was adequately represented by the prior defendant. *Meza*, 908 F.2d at 1266.  In dismissing claims 3 and 5, the District Court pointed out that alter egos are sometimes found to be in privity under a theory of either control or adequate representation.[62] But here, neither theory applies because ***Dondero was not the alter ego of the Highlands during the prior litigation***. Therefore, Dondero's "alter ego" status could not give him control or representation through the Highlands—there ***was no*** alter ego relationship at the relevant time.

***First***, Dondero did not control the prior litigation. For preclusion purposes, a party is said to "control" the prior litigation only if they had "effective choice as to the legal theories and proofs" advanced on behalf of the party to the prior action as well as "control over the opportunity to obtain review." *Students for Fair Admissions, Inc. v. U. of Texas at Austin*, 37 F.4th 1078, 1087 (5th Cir. 2022). Dondero had neither. Dondero lost control over Highland well before the Highland Adversary was dismissed, having ceded control to an independent board in January 2020.[63] Dondero could not convince Highland to approve any of his proposed plans for reorganization, and in fact did everything in his power to thwart Highland's plans to reorganize, to the point that the Bankruptcy Court enjoined him from communicating with Highland employees altogether.[64]

---

[62]   Case No. 3:24-cv-02036, Dkt. 13, p. 2.

[63]   *See* Case No. 20-03190, Dkt. 190, p. 4.

[64]   *See* Case No. 19-34054, Dkt. 3903, p. 10 (regarding Dondero's failed efforts to get Highland to confirm his bankruptcy plans); Case No. 20-03190, Dkt. 10 (restraining Dondero from contact with Highland).

Dondero ceased to be Highland's chief executive in January 2020.[65] By the time the Bankruptcy Court approved the Highland Settlement on October 27, 2020, Dondero had resigned from *every* position with *all* Highland Entities.[66] The Highland Adversary was therefore *not* under Dondero's control, because Dondero was unable to control the Highlands' litigation strategy and did not control the opportunity to obtain review.[67]

      *Second*, Dondero was not "adequately represented" by the Highlands in the prior litigation. "Adequate representation requires alignment of interests between the nonparty and representative and that the representative 'understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty.'" *Goodson v. Nasco Healthcare Inc.*, 2024 WL 4829487, at *2 (N.D. Tex. Nov. 19, 2024) (quoting *Taylor*, 553 U.S. at 900).[68] Neither Dondero nor the Bankruptcy Court has attempted to show adequate representation, and they cannot. Highland and Dondero's interests were demonstrably ***not*** aligned during the prior litigation—in fact, they were ***suing each other*** during the Highland Adversary.[69] Parties who are suing each other cannot be in privity. *See Gulf Island-IV, Inc. v. Blue Streak-Gulf Is Ops*, 24 F.3d 743, 747 n.5 (5th Cir. 1994) (finding no privity where new defendant had filed crossclaim against prior defendant in the court below, demonstrating their interests were not identical). None of the

---

[65]   *See* Case No. 20-03190, Dkt. 190, p. 4.

[66]   Case No. 19-34054, Dkt. 3903, pp. 10–11.

[67]   Since an agreed dismissal is not generally reviewable, Dondero would have needed to control the decision to settle in order for this prong to be satisfied. But he lost control of Highland well before the settlement negotiations began, and he did not join the settlement agreement. *See* Case No. 19-34054, Dkt. 1088-1.

[68]   Historically, the Fifth Circuit has regarded representation as "adequate" if the prior party's interests were "so closely aligned to the non-party's interests as to be his virtual representative." *Meza*, 908 F.2d at 1267 (quoting *Aerojet-General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975)). However, the Supreme Court rejected the concept of "virtual representation" in *Taylor*, 553 U.S. at 904.

[69]   *See* Case No. 19-34054, Dkt. 3903, p. 10 (documenting Dondero's litigation against Highland in the summer of 2020); Case No. 20-03190, Dkt. 1 (Highland's complaint initiating an adversary proceeding against Dondero).

Highlands purported to represent Dondero in the lawsuit,[70] and the Bankruptcy Court did not take any special care to protect Dondero's interests.[71] Thus, there was no adequate representation.

**Third**, although it was not alleged by any party and not mentioned by the Court, Dondero is not the successor in interest to the Highlands' property interests—he sold his Highland partnership interest in December 2015, and whatever indirect interest he retained was extinguished by Highland's bankruptcy plan.[72]

Since no prong of *Meza* is satisfied, there is no privity. Without privity, there is no res judicata. This should end the analysis.

### 3. The 'alter ego' cases do not articulate an exception to *Meza* or *Taylor*.

Despite the clear outcome under *Meza*, the Bankruptcy Court takes the position that a plaintiff's alter ego allegation can—standing alone—suffice to find privity between a nonparty defendant and a defendant to a prior suit.[73] This holding cannot be found in any of the cases offered in support. *Flores*, for instance, held a corporate control person could not use res judicata to avoid liability for a default judgment entered against the corporation under his watch, because "[t]he entire purpose of the alter ego theory of liability would be undermined if the alter ego of a corporation could force parties to relitigate otherwise precluded claims against the corporation." *Flores v. Bodden*, 488 Fed. Appx. 770, 778–79 (5th Cir. 2012). *Flores* does **not** find privity based

---

[70] As explained above, Highland was no longer under Dondero's control or even affiliated with him by the time the Highland Settlement was approved.

[71] No one has argued or suggested that the Court adopted any special procedure to protect Dondero's interests, but the Court's approval of the Highland Settlement Plan (which included an agreement to dismiss the Highland adversary) demonstrates the lack of any such protection. The Court approved the settlement **over Dondero's objection** even though it expressly carved Dondero's claims out to his detriment. *See* Case No. 19-34054, Dkt. 1088-2, p. 3 ¶ 1; Dkt. 1121.

[72] *See* Case No. 18-30264, Dkt. 99, 112:7–113:3 (Dondero's testimony that he sold his interest in Highland to a "remainder trust" in exchange for a note); Case No. 19-34054, Dkt. 3903, p. 12.

[73] Report and Recommendation, p. 11 n.32.

on a *former* alter ego relationship that ended long before judgment was entered.  Neither did *Dudley*,[74] nor any other case cited by Dondero or the Bankruptcy Court. This makes sense, because such a holding would contradict *Meza*, and *Meza* remains good law.[75]

The analogy to *Flores* is also misleading, because that case involved an ***adjudication of liability*** against the defendant, not a voluntary dismissal. *See Flores*, 488 Fed. Appx. at 771. The Bankruptcy Court relied on the District Court's reasoning that "[i]f the situation were reversed, and Acis had obtained a judgment of liability against Highland, Dondero would certainly not be able to avoid preclusion and force Acis to relitigate liability for the same underlying conduct."[76] But the situation that the District Court describes is not the "reverse" of Acis's situation at all. The dismissals did ***not*** find that any of the Highlands were not liable. In fact, the dismissals made no findings at all.[77] If either dismissal ***had*** made a finding on a specific question of liability—whether in Acis's favor or Highland's—that finding would be binding in subsequent litigation under the doctrine of ***issue*** preclusion (i.e., collateral estoppel). *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326-331 (1979). It might even bind parties not in "privity" under *Meza* (e.g., Dondero) because district courts have broad discretion to apply issue preclusion even where mutuality is lacking. *Id.* at 331; *Meza*, 908 F.2d at 1273 (explaining "identity of the parties" requirement is

---

[74]   In *Dudley*, the Fifth Circuit held a "stockholder ***may be*** in privity with his corporation . . . such that a judgment against the latter is res judicata as to the former, if the two are found to be alter egos." *Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir. 1974) (emphasis added). Nothing in the decision suggests that alter egos are ***always*** in privity, nor that privity persists after the alter ego relationship has ended.

[75]   The Fifth Circuit relies on *Meza* regularly and without reservation. *See, e.g.*, *Sacks*, 83 F.4th at 346; *Armadillo Hotel Group, L.L.C. v. Harris*, 84 F.4th 623, 631 (5th Cir. 2023); *Matter of Little River Healthcare Holdings, L.L.C.*, No. 21-50616, 2022 WL 1568367, at *6 (5th Cir. May 18, 2022); *Clyce v. Farley*, 836 Fed. Appx. at 269.

[76]   Report and Recommendation, p. 2 (citing Case No. 3:24-cv-02036-N, Dkt. 13, p. 3).

[77]   *See* Adversary No. 18-03078, Dkt. 216; Dkt. 224.

lower for issue preclusion). But this is not an ***issue*** preclusion case, and it never could be.[78] This

is an attempt to assign a ***claim***-preclusive effect to an agreed dismissal, to bar claims against

someone who was never dismissed. For that purpose, *Meza* sets the outer bounds. Under *Meza*,

neither Dondero nor Acis nor anyone else could ever establish the requisite privity between

Dondero and the Highlands, because the relationship did not exist at the relevant time.

### 4.   Regardless, claims 1, 2, and 4 do not depend on any alter ego allegation.

Even if the "alter ego" cases articulated an exception to *Meza*—and they do not—they

would not justify dismissal of claims that are unrelated to alter ego. The District Court has already

dismissed claims 3 and 5 based on res judicata.[79] Acis maintains (and incorporates by reference)

its objections to the dismissal of those claims.[80] However, the rationale for dismissing claims 3

and 5 should not be applied to the remaining claims. Claim 3 was an alter ego claim, and claim 5

was a claim for fraudulent transfer.[81] The Bankruptcy Court recommended dismissing both

because they were logically dependent upon treating Highland and Dondero as alter egos—claim

3 because it ***was*** a claim for alter ego, and claim 5 because the only avenue to recovery was ***through***

***the Highlands*** as initial transferees.[82] Essentially, the Court was concerned that it would be unable

to grant Acis relief unless it treated Dondero and the Highlands as identical, which would itself

prevent relief under the doctrine of res judicata.[83]

---

[78]   Issue preclusion does not apply to consent judgments containing no findings of fact or law, except to the extent factual or legal determinations in a settlement agreement are incorporated by reference. *See Hughes v. Santa Fe Intern. Corp.*, 847 F.2d 239, 241 (5th Cir. 1988).

[79]   Case No. 3:24-cv-02036-N, Dkt. 13, p. 4.

[80]   Case No. 20-03060, Dkt. 200; *see also id.* at Dkt. 201 (Brief in Support).

[81]   *See* Case No. 20-03060, Dkt. 111, pp. 42-43; 44-46.

[82]   *See* Case No. 20-03060, Dkt. 188, at pp. 36-39 (explaining the logical dependency of claim 5 on the alter ego theory as a basis for applying res judicata).

[83]   *See* Case No. 20-03060, Dkt. 188, at p. 8 (explaining that Acis "is not asserting its alter ego 'claim' as a separate and independent cause of action but rather ***as a remedy that forms a basis for recovery against Dondero in connection with the fraudulent transfer cause of action in Count 5***.") (emphasis in original).

This logic cannot be applied to Acis's other claims. For instance, claim 1 is a breach of fiduciary duty claim against Dondero himself, as President of ***Acis***.[84] The alter ego theory is not logically essential to this claim in any way, because Acis could recover on claim 1 without any legal determination as to Dondero's relationship with the Highlands. In other words, claim 1 states a plausible claim for relief without raising the res judicata concern that motivated dismissal of claims 3 and 5. Therefore, even if the "alter ego" theory justified dismissing claims 3 and 5, the same rationale does not apply to Acis's remaining claims. The Bankruptcy Court should have considered this distinction and recommended against dismissal of the remaining claims.

## B.     Acis's claims against Dondero are not the same as the dismissed Highland claims.

Res judicata applies only where "the same claim or cause of action was involved in both actions." *Petro-Hunt, L.L.C. v. U.S.*, 365 F.3d 385, 395 (5th Cir. 2004). To determine whether two claims are the same, the Fifth Circuit applies the "transactional test" articulated in Section 24 of the Restatement (Second) of Judgments. *See Ries v. Paige (In re Paige)*, 610 F.3d 865, 875 (5th Cir. 2010). Two claims are generally the same if they arose from the same transaction or series of connected transactions. *See* Restatement (Second) of Judgments § 24 (1982). What constitutes a "transaction" or a "series" is determined pragmatically, taking into account factual connections, convenience, and "whether their treatment as a unit conforms to the parties' expectations". *Id*. There is also an exception for ***express reservation***—where a judgment "expressly leaves open the opportunity to bring a second action on specified parts of the claim or cause of action," it does not operate to preclude the reserved claim or cause of action. *See Ries*, 610 F.3d at 875.

---

[84]     Case No. 20-03060, Dkt. 111, pp. 39-41.

There are three reasons why the "same claim" element is not satisfied. **First**, the dismissal orders were entered pursuant to agreements expressly reserving Acis's claims against Dondero, so under *Ries*, the reserved claims are not precluded. **Second**, Dondero's role in the transactions should be treated as separate from the Highlands' in order to conform to the parties' expectations. **Third**, the facts giving rise to Dondero's liability are fundamentally different from the facts giving rise to liability for Highland and its affiliates.

### 1. The settlement agreement expressly reserving Dondero was incorporated by the Bankruptcy Court's orders.

The Bankruptcy Court's orders consistently treated Acis's claims against Highland and its claims against Dondero as separate, even where those claims arose from the same transactions.[85] Moreover, the Court issued an order approving a Settlement Agreement between Acis and the "Highland Released Entities" that expressly reserved Acis's claims against Dondero.[86]  The order stated that the Highland Settlement Agreement was "approved **in all respects**," that Dondero's 9019 Objection to the Highland Settlement Agreement was overruled, and that the Court would "retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order."[87]

Accordingly, the Bankruptcy Court expressly reserved Acis's claims against Dondero, notwithstanding the outcome of the Highland Adversary or dismissal of any parties thereto. *See, e.g.*, *Hospitality House, Inc. v. Gilbert*, 298 F.3d 424, 430–33 (5th Cir. 2002) (holding that an order retaining jurisdiction over a settlement agreement evinces the court's intention to enforce the agreement); *Morawski Farmers Texas County Mutual Insurance Company*, No. 2:13-CV-00102-

---

[85]   *See* Section II, *supra*.
[86]   *See* Case No. 19-34054, Dkt. 1302.
[87]   *Id.* at 3-4 ¶¶ 2-6.

JRG, 2014 WL 991573, at *5 (E.D. Tex. Mar. 11, 2014) (holding that a court's intent to approve the carve-out provision of a settlement agreement is demonstrated by an order approving the agreement "*in all respects*"). The settlement agreement should not be ignored merely because the dismissals did not expressly incorporate it. Express incorporation language is sufficient to make a settlement agreement part of a dismissal order. *See Seven Networks, LLC v. Motorola Mobility LLC*, No. 3:21-CV-01036-N, 2022 WL 426589, at *3 (N.D. Tex. Feb. 10, 2022). But language *retaining jurisdiction* accomplishes the same purpose. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994). Moreover, neither *Seven Networks* nor *Kokkonen* involved an *earlier order* expressly approving the settlement agreement. Here, the claims against Dondero were reserved by the settlement approval order—the later dismissals did not undo the reservation.

## 2. Treating the Dondero and Highland claims as a unit does *not* conform to the parties' expectations.

Under the transactional test, whether two claims are the same is "determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and *whether their treatment as a unit conforms to the parties' expectations* or business understanding or usage." *Houston Prof'l Towing Ass'n v. City of Hous.*, 812 F.3d 443, 447 (5th Cir. 2016) (emphasis added). Here, it makes no pragmatic sense to treat Acis's claims against Dondero and the Highlands as the same claims, because doing so would fly in the face of the parties' expectations. All parties reasonably expected the actions against Dondero and the Highlands to proceed separately, based on the Bankruptcy Plan, the settlement agreement, the motion to approve the settlement agreement, the order approving the settlement agreement, and the conduct of the parties throughout the past four years.

First and foremost, Acis's claims against Dondero were specifically and unequivocally preserved by the Plan, *separate* from any claims Acis maintained against the Highland Entities.[88] The Plan unequivocally stated that no subsequent order would be res judicata as to any Estate Claims unless those claims were expressly waived or released.[89] The dismissals of the Highlands do not expressly waive or release Dondero.[90] Accordingly, under the Plan's plain language, they did not dismiss him. As a creditor in the bankruptcy proceeding, Dondero cannot now avoid the clear effect of the Bankruptcy Plan's plain language. *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (enforcing release provision in Bankruptcy Plan "[r]egardless of whether that provision is inconsistent with the bankruptcy laws or within the authority of the bankruptcy court"). Thereafter, the parties clearly understood "Highland Affiliate Claims" and "Dondero Claims" to be separate.

This understanding is demonstrated by the language of both settlement agreements, which explicitly provided that Dondero was *not* a released party and retained Dondero as a defendant in this proceeding.[91] Similarly, Acis and the Highlands relied on this understanding when they settled the Highland Adversary for a fraction of what Acis's overall claims were worth.[92] The same intent was expressed in Highland's Settlement Motion,[93] which the Court considered in approving the Settlement Agreement.[94] Clearly, Acis and the Highlands did not believe that the dismissals would release Dondero. In fact, **Dondero** evidently did not even think this until the Court raised res

---

[88]    Case No. 18-30264, Dkt. 829, at 39 ¶ 27.

[89]    *Id.*

[90]    Case No. 19-34054, Dkt. 1087, p. 8 n.6 (reserving Dondero), p. 13 ¶ 35 (acknowledging settlement amount less than total claim).

[91]    *See* Case No. 19-34054, Dkt. 1088-2, p. 3 ¶ 1; Case No. 20-03060, Dkt. 223-2, at p. 23 ¶ 9.

[92]    *See* Case No. 19-34054, Dkt. 1087, p. 13 ¶ 35.

[93]    Case No. 19-34054, Dkt. 1087.

[94]    Case No. 19-34054, Dkt. 1302, at 3 ¶ 2.

judicata *four years later*.[95] Thus, the clear intent and understanding of Acis, the Highlands, and Dondero was that claims against Dondero were separate from the claims against any Highland Affiliate, so they should be treated as separate claims under the transactional test.

### 3. Acis's claims against Dondero depend on different facts from its claims against Highland.

Whether two claims are the same also depends on "whether the two actions under consideration are based on the *same nucleus of operative facts*." *Petro-Hunt*, 365 F.3d at 395. Here, the Bankruptcy Court has recommended dismissal of claims arising from *fundamentally different facts* than those that were at issue in the Highland Adversary.

For example, the breach of fiduciary duty alleged against Dondero in the present action involves an entirely different duty—arising from different documents and a different set of facts— than the duties Highland breached. In the Highland Adversary, Acis asserted that Highland breached its fiduciary duties to Acis under the entities' Sub-Advisory Agreement and the "special relationship of trust and confidence" that arose from Highland's role as an investment adviser to Acis.[96] Conversely, *Dondero's* fiduciary duty to Acis as President of Acis GP arose from Delaware common law and the Acis Limited Partnership Agreement.[97] This duty is separate and independent from the duties that *Highland* owed Acis. The question of whether this duty existed, what this duty entailed, and whether Dondero breached it requires the resolution of several other factual questions that were never at issue in the Highland Adversary, including:

---

[95]  Dondero litigated throughout this period without once arguing that the dismissal orders were res judicata, despite many opportunities to do so, including his objection to the Settlement Motion [Case No. 19-34054, Dkt. 1121], his prior Rule 12 motion to dismiss [Case No. 20-03060, Dkt. 115], and his prior motion for summary judgment [Case No. 20-03060, Dkt.140].

[96]  Case No. 18-03078, Dkt. 157, p. 78 ¶ 265.

[97]  *See* Case No. 20-03060, Dkt. 140 and Dkt. 167 (briefing by Acis and Dondero agreeing that Dondero's duties as President of Acis GP were defined by the Acis LPA and the Delaware common law).

- whether Dondero personally benefited from the actions he took that injured Acis;[98]

- whether Dondero complied with the Acis LPA's requirement that he and his affiliates render services for Acis at "arms-length terms that are fair and reasonable to the Partnership";[99]

- whether Dondero complied with the Acis LPA's requirement that he resolve conflicts of interest in "good faith";[100]

- whether Dondero was obligated, as he claims, to allow Acis's servicer fees to pass directly to the limited partners under Section 3.09 of the Acis LPA, **and** if so, whether his conduct comported with that obligation;[101]

- whether Dondero's fraudulent transfers went to "a new entity that will be primarily owned by one or more members of the Founding Partner Group," as those terms are used in Section 4.08 of the Acis LPA.[102]

The upshot of the above list—which is illustrative and not exhaustive—is that the duties Dondero breached as President of Acis GP were different from the duties that Highland breached as Acis's sub-advisor, and therefore the "operative facts" giving rise to the respective breaches are also different. Accordingly, Acis's breach of fiduciary duty claim against Dondero is not "the same claim or cause of action" as the breach of fiduciary duty claim asserted in the Highland Adversary.

## C.  The court should have applied the Restatement exception limiting the preclusive effects of consent judgments.

Even though a consent judgment is considered "final" and "on the merits", the preclusive effect of a consent judgment differs from the preclusive effect of an adjudication. *Kaspar Wire Works, Inc. v. Leco Engr. & Mach., Inc.*, 575 F.2d 530, 538 (5th Cir. 1978). One key difference is that a consent judgment does not preclude suit against later defendants who are jointly or vicariously liable for the same conduct, unless the dismissal order releases them expressly. *See*

---

[98]  *See* Case No. 20-03060, Dkt. 140, pp. 16, 20, 24–25 (in which Dondero argues that to prevail on its breach of fiduciary duty claim against him, Acis must show that Dondero benefited from his misdeeds).

[99]  *See* Case No. 20-03060, Dkt. 167, p. 15.

[100]  *See id.*

[101]  *See id.* at 19-20.

[102]  *See id.* at 26.

Restatement (Second) of Judgments § 51 (1982).[103] Here, Dondero and Highland are jointly or vicariously liable for some of the same conduct.[104] The prior dismissals releasing the Highlands were consent judgments.[105] And the prior dismissals did not expressly release Acis's claims against Dondero.[106] The Restatement's exception for consent judgments therefore applies, and Acis's suit against Dondero is not barred. Accordingly, *even if* the elements of res judicata were otherwise satisfied, res judicata would not bar Acis's claims.

This result makes sense, given the policy considerations behind the doctrines of res judicata and alter ego. One purpose of res judicata is "promoting judicial economy by preventing needless litigation." *Parklane*, 439 U.S. at 326. That purpose would be undermined by a rule that says, in essence, that a plaintiff who settles with a corporation automatically releases all claims against the corporation's former alter ego. Such a result would tend to discourage settlement agreements, leading to *more* needless litigation instead of less. It would also undermine the purpose of alter ego.[107] It would signal to the James Donderos of the world that they can abuse the corporate form all they want, *so long as* they manage to bankrupt their alter ego and jump ship before a final judgment is reached. By the time the now-bankrupt entity is held liable for the actions of its former

---

[103] The Fifth Circuit has *explicitly adopted* "the principles of the First and Second Restatement of Judgments and their application to consent judgments." *Kaspar*, 575 F.2d at 539-40. The Second Restatement provides, "[i]f two persons have a relationship such that one of them is vicariously responsible for the conduct of the other, and an action is brought by the injured person against one of them . . . (4) A judgment by consent for or against the injured person does not extinguish his claim against the person not sued in the first action . . ." Restatement (Second) of Judgments § 51 (1982).

[104] Alter ego liability is a theory of vicarious liability. *AIX Specialty Ins. Co. v. SLJ Co., LLC*, No. 3:14-CV-0806-N, 2015 WL 12469125, at *4 (N.D. Tex. Mar. 24, 2015).

[105] *See* Case No. 20-03060, Dkt. 211, p. 9 (acknowledging dismissal orders were "stipulated and agreed"). A consent judgment is any judgment entered on agreement of the parties. *See Smith v. School Board of Concordia Parish*, 906 F.3d 327, 334 (5th Cir. 2018).

[106] *See* Adversary No. 18-03078, Dkt. 216; Dkt. 224.

[107] The alter ego doctrine's purpose is to prevent companies from abusing the corporate form in order to avoid liability. *See Gardemal v. Westin Hotel Company*, 186 F.3d 588, 593 (5th Cir. 1999).

controller, it may well have no funds left to satisfy a final judgment—but the former controller,

who caused all the trouble in the first place, could nonetheless hide behind res judicata because he

was the bankrupt entity's alter ego at the time of the plaintiff's injury. To prevent this absurd result,

the Restatement rule—already adopted by the Fifth Circuit in *Kaspar*—should be reaffirmed.

### D.    Dondero waived res judicata.

The Bankruptcy Court should not have considered Dondero's res judicata arguments as to

the remaining claims, because Dondero waived the defense. Res judicata is an affirmative defense,

so defendants bear the burden to plead and prove it. *Sacks*, 83 F.4th at 344 (citing FED. R. CIV. P.

8(c)(1)); *see also Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1199 ("Res judicata

is an affirmative defense which is considered waived if not specifically pleaded in the answer or

an amended answer permitted under Fed. R. Civ. P. 15(a)."). An affirmative defense must be pled

with enough factual particularity to give the plaintiff fair notice of the defense that is being

advanced. *See Rogers v. McDorman*, 521 F.3d 381, 385–86 (5th Cir. 2008) ("A defendant should

not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense."). Failure

to plead an affirmative defense with sufficient particularity waives the defense. *See, e.g.*, *Ullmann

v. OBMI Miami, Inc.*, No. 3:23-CV-1772-B, 2024 WL 2970054, at *3 (N.D. Tex. June 12, 2024)

(striking generically pleaded defense of failure to satisfy condition precedent because "[w]ithout

identifying the specific conditions precedent that [plaintiff] failed to satisfy, however, [plaintiff]

cannot be said to have fair notice of this defense").

Here, Dondero generically pleaded the affirmative defense of res judicata in his Original

Answer.[108] But he made this pleading without identifying ***which*** prior judgment barred Acis's

---

[108]    *See* Case No. 20-03060, Dkt. 19.

claims—indeed, without making any factual allegations whatsoever.[109] Moreover, it is clear from Dondero's subsequent pleadings that the res judicata argument he raised in his Answer was squarely addressed at the 2017 JAMS Arbitration—***not*** the Highland Adversary.[110] In over four and a half years of litigation, Dondero did not raise the affirmative defense until invited to do so by the Bankruptcy Court. Accordingly, Dondero did not give the required fair notice of this defense, and the affirmative defense of res judicata was waived and should not have been considered.

## IV.    CONCLUSION

Because res judicata has not been established as to Acis's remaining claims, Acis respectfully urges the District Court to reject the Report and Recommendation of the Bankruptcy Report regarding Dondero's pending Motion for Judgement on the Pleadings and "Supplemental" Motion for Summary Judgment.

---

[109]    Further, since Dondero's original answer *pre-dated* the dismissals with prejudice, it is impossible to read the answer as raising a res judicata defense based on the dismissals. *Compare id.* (dated June 22, 2020) *with* Adversary No. 18-03078, Dkt. 216 (dated November 6, 2020) and 224 (dated May 6, 2021).

[110]    *See* Case No. 20-03060, Dkt. 140, pp. 13 and 19 (Dondero's brief in support of his motion for summary judgment raising res judicata arguments solely as to the 2017 JAMS Arbitration).

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 18-30264-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **Case No. 18-30265-SGJ-11** |
| **LLC,** | § | |
| | § | **(Jointly Administered Under Case** |
| **Debtors.** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| | § | **Chapter 11** |

| | | |
|---|---|---|
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | |
| **LLC, Reorganized Debtors,** | § | **Adversary No. 20-03060-SGJ** |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, FRANK** | § | |
| **WATERHOUSE, SCOTT ELLINGTON,** | § | |
| **HUNTER COVITZ, ISAAC LEVENTON,** | § | |
| **JEAN PAUL SEVILLA, THOMAS** | § | |
| **SURGENT, GRANT SCOTT, HEATHER** | § | |
| **BESTWICK, WILLIAM SCOTT, AND** | § | |
| **CLO HOLDCO, LTD.,** | § | |
| | § | |
| **Defendants.** | § | |

## ACIS CAPITAL MANAGEMENT, L.P. AND
## ACIS CAPITAL MANAGEMENT GP, LLC'S APPENDIX IN SUPPORT OF
## PLAINTIFFS' OBJECTION TO REPORT AND RECOMMENDATION TO THE
## DISTRICT COURT THAT IT GRANT DEFENDANT JAMES DONDERO'S MOTION
## FOR JUDGMENT ON THE PLEADINGS AND "SUPPLEMENTAL" MOTION FOR
## SUMMARY JUDGMENT AND DISMISS WITH PREJUDICE ALL REMAINING
## COUNTS AGAINST DONDERO

Pursuant to FEDERAL RULE OF BANKRUPTCY PROCEDURE 7056, Plaintiffs Acis Capital

Management, L.P. ("Acis LP" or "the Partnership") and Acis Capital Management GP, LLC

("Acis GP") (collectively, "Acis") file this Appendix in Support of Plaintiff's Objection to Report

and Recommendation to the District Court that it Grant Defendant James Dondero's Motion for

Judgment on the Pleadings and "Supplemental" Motion for Summary Judgment and Dismiss with

Prejudice all Remaining Counts against Dondero.


Respectfully submitted,

*/s/ Thomas Cooke*
AHMAD, ZAVITSANOS & MENSING, PLLC
Joseph Y. Ahmad
Texas Bar No. 00941100
Federal Bar No. 11604
Shawn M. Bates
Texas Bar No. 24027287
Federal Bar No. 30758
Thomas Cooke
Texas Bar No. 24124818
Federal Bar No. 3837479
1221 McKinney St. Suite 2500
Houston, Texas 77010
(713) 655-1101 Telephone
(713) 655-0062 Facsimile
joeahmad@azalaw.com
sbates@azalaw.com
tcooke@azalaw.com

**COUNSEL FOR ACIS CAPITAL
MANAGEMENT, L.P.**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 10, 2025, a true and correct copy of the

foregoing document was served by electronic transmission via the Court's CM/ECF system upon

all parties registered to receive electronic notice in this adversary proceeding.


*/s/ Thomas Cooke*
Thomas Cooke

## I.    EVIDENCE

| No. | Description | Beginning App'x Page |
|-----|-------------|---------------------|
| 1 | October 14, 2024 Deposition of James Dondero | APP001 |
| 2 | Settlement Agreement | APP019 |
| 3 | Declaration of Thomas Cooke | APP046 |

# EXHIBIT 1

## Page 147

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION
 3   In re:
 4   ACIS CAPITAL MANAGEMENT,  *  Case No. 18-30264-SGJ-11
     L.P.,                     *
 5                             *
     ACIS CAPITAL MANAGEMENT GP,*  Case No. 18-30265-SGJ-11
 6   LLC,                      *
                               *  (Jointly Administered Under
 7        Debtors.             *  Case No. 18-30264-SGJ-11)
                               *
 8                             *  Chapter 11
 9
10   ACIS CAPITAL MANAGEMENT,  *
     L.P.,                     *
11                             *
     ACIS CAPITAL MANAGEMENT GP,*
12   LLC, Reorganized Debtors, *
                               *
13        Plaintiffs,          *
                               *
14   vs.                       *  Adversary No. 20-03060-SGJ
                               *
15   JAMES DONDERO, FRANK      *
     WATERHOUSE, SCOTT         *
16   ELLINGTON, HUNTER COVITZ, *
     ISAAC LEVENTON, JEAN PAUL *
17   SEVILLA, THOMAS SURGENT   *
     GRANT SCOTT, HEATHER      *
18   BESTWICK, WILLIAM SCOTT,  *
     AND CLO HOLDCO, LTD.,     *
19                             *
          Defendants.          *
20
21   *********************************
22       ORAL AND VIDEOTAPED DEPOSITION OF
                  JAMES DONDERO
23                  VOLUME 2
               OCTOBER 14, 2024
24
25   *********************************
```

## Page 148

```
 1       ORAL AND VIDEOTAPED DEPOSITION OF JAMES DONDERO,
 2   VOLUME 2, produced as a witness at the instance of the
 3   Plaintiffs, and duly sworn, was taken in the
 4   above-styled and -numbered cause on the 14th day of
 5   October, 2024, from 10:59 a.m. to 1:03 p.m., before Leah
 6   K. Osteen Dow, CSR in and for the State of Texas,
 7   reported by machine shorthand, at the offices of
 8   Crawford, Wishnew & Lang PLLC, 1700 Pacific Avenue,
 9   Suite 2390, Dallas, Dallas County, Texas, pursuant to
10   the Federal Rules of Civil Procedure and any agreements
11   stated on the record.
```

## Page 149

```
 1             A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3       Mr. Joseph Y. Ahmad
         Mr. Thomas Cooke
 4       Mr. Shawn Bates (via Zoom)
         AHMAD, ZAVITSANOS & MENSING, PLLC
 5       1221 McKinney Street
         Suite 2500
 6       Houston, Texas  77010
         (713) 655-1101
 7       joeahmad@azalaw.com
         tcooke@azalaw.com
 8       sbates@azalaw.com
 9
10   FOR THE DEFENDANT JAMES DONDERO:
11       Mr. Michael Lang
         CRAWFORD WISHNEW LANG PLLC
12       1700 Pacific Avenue
         Suite 2390
13       Dallas, Texas  75201
         (214) 817-4500
14       mlang@cwl.law
15
16   FOR THE DEFENDANT CLO HOLDCO, LTD.:
17       Mr. Joseph D. Austin
         KELLY HART
18       201 Main Street
         Suite 2500
19       Fort Worth, Texas  76102
         (817) 332-2500
20       joseph.austin@kellyhart.com
21
22   ALSO PRESENT:
23       Mr. Bryan Cohn, Videographer
         bryan@aplusvideollc.com
24
25
```

## Page 150

```
 1                  I N D E X
 2                                              PAGE
 3   JAMES DONDERO
 4       Examination by Mr. Ahmad ..................... 152
 5   Errata ........................................ 208 - 209
 6   Reporter's Certification .................... 210 - 213
 7
                      EXHIBITS
 8
     EXHIBIT NO.       DESCRIPTION              PAGE
 9
10   Exhibit 35   Letter to investors, 7/19/16, from    152
                  Dondero  (KIR-ACIS00568893)
11   Exhibit 36   Rescission Agreement                  152
                  (KIR-ACIS00568869 - 0568877)
12
     Exhibit 37   Written Consent of the General        165
13                Partner of Acis CLO Value Fund II,
                  L.P., Acis CLO Value Fund II
14                (Cayman), L.P., Acis CLO Value
                  Master Fund II, L.P., 6/30/16
15                (KIR-ACIS00568878 - 0568892)
16   Exhibit 38   Acis CLO Value Master Fund II,        169
                  L.P., Third Amended and Restated
17                Exempted Limited Partnership
                  Agreement  (ACIS JD-551848 -
18                551895)
19   Exhibit 39   Assignment and Transfer Agreement     171
                  (KIR-ACIS00296411 - 0296420)
20
     Exhibit 40   Register of Members of Highland CLO   176
21                Holdings, Ltd.  (KIR-ACIS00296518)
22   Exhibit 41   Email from Cournoyer to Surgent,      179
                  12/18/17, Subject:  RE: Privileged
23                (KIR-ACIS00157718 - 0157735)
24   Exhibit 42   Dugaboy Investment Trust             182
                  (KIR-ACIS00264609 - 0264644)
25
```

Osteen & Associates Reporting Services
osteenreporting@gmail.com

## Page 151

EXHIBITS
(Continued)

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 43 | Secured Promissory Note (KIR-ACIS00502262 - 0502268) | 188 |
| Exhibit 44 | Contribution Agreement between Highland Capital Management, L.P. and Hunter Mountain Investment Trust, 12/21/15 (KIR-ACIS00502044 - 0502070) | 190 |
| Exhibit 45 | Second Amended and Restated Buy-Sell and Redemption Agreement, 12/21/15 (KIR-ACIS00501946 - 0502043) | 192 |
| Exhibit 46 | Secured Promissory Note, 12/23/15 (KIR-ACIS00501914 - 0501920) | 194 |
| Exhibit 47 | Memo regarding Terry arbitration and claims (KIR-ACIS00196257 - 0196281) | 196 |
| Exhibit 48 | Bankruptcy court opinion | 202 |

REPORTER'S NOTE:
Quotations marks are used for reading clarity only and may not necessarily reflect the exact wording on a document being read or an exact conversation being referenced.

## Page 152

P R O C E E D I N G S
(Exhibits 35, 36 marked.)
THE VIDEOGRAPHER:  We are now on the record at 10:59 a.m. on October 14th, 2024.  This is the continued video-recorded deposition of James Dondero.
Would the court reporter please swear in the witness.
THE STENOGRAPHER:  Sir, if you'll raise your right hand, please.
(Witness placed under oath.)
JAMES DONDERO,
having been first duly sworn, testified as follows:
CONTINUED EXAMINATION
BY MR. AHMAD:
Q.  Okay.  Can you state your name, please, for the record.
A.  James David Dondero.
Q.  And, Mr. Dondero, you understand we are here to continue the deposition that was taken a little while ago?
A.  Yes.
Q.  I'm going to hand you what has been marked as Exhibits 35 and 36 to your deposition.
First question is about Exhibit 35.  This is concerning the liquidation and dissolution of the

## Page 153

Acis CLO Value Funds.  Do you see that?
A.  Yes.
Q.  And you were signing off on behalf of the general partner, Acis Capital Management GP, correct?
A.  Looks like I'm signing off for two parties, right?
Q.  Yes, you are, actually.  Acis Capital Management, L.P., and Acis Capital Management GP, correct?
A.  Yes.
Q.  Okay.  And here you are notifying the investors of the Acis CLO Value Fund of the liquidation and dissolution of the fund, correct?
A.  Terminate, wind up, and dissolve.
Q.  Yes.
A.  Yeah.  Okay.
Q.  And if you -- if you look on the second paragraph, in the first sentence, it says, "The General Partner hereby notifies you" -- and the general partner -- you're the president of the general partner, correct?
A.  Yes.
Q.  Which is Acis Capital Management GP, correct?
A.  Yes.
Q.  And you, the general partner, are notifying

## Page 154

that it has elected to terminate, wind up, and dissolve the fund.  Do you see that?
A.  Yes.
Q.  And why did you make the decision to terminate, wind up, and dissolve the fund?
A.  I believe this was after Josh Terry left the firm.
Q.  Okay.  And was Josh Terry leaving Acis the reason that you decided to terminate, wind up, and dissolve the fund?
A.  I believe so.
Q.  Any other reason?
A.  It depends on when it was, but it wasn't -- once litigation began, Acis wasn't a viable entity.  So it depends on when the date of this was.
Q.  Well, the date, as you can see, is July 19th, 2016, correct?
A.  Yes.
Q.  And that's before any litigation -- arbitration -- you remember --
A.  Yes.
Q.  -- that Mr. Terry filed for arbitration, correct?
A.  Yes.
Q.  And that the arbitration hearing itself didn't

Osteen & Associates Reporting Services
osteenreporting@gmail.com

Page 155

1  commence until the following year, correct?
2      A.  I -- okay.  I don't remember.
3      Q.  Okay.  Well, I'm just asking, when you say, for
4  example, that you elected to wind up, terminate, and
5  dissolve the fund, was the reason that you did so
6  because Josh Terry left, or was it because of the
7  arbitration award?
8      A.  No, it -- if you start a restaurant with a
9  couple of partners, one of them -- three partners, and
10  one of them is the chef, and the other two aren't
11  directly involved in the business, and the chef leaves,
12  you have to reconstitute the partnership.  I mean,
13  that's a -- excuse me -- an example.
14          But as far as I know, the reason was, was
15  because he left.  I don't know anything beyond that.
16      Q.  Okay.  Well, were you the one that decided to
17  terminate, wind up, and dissolve the fund?
18      A.  I mean, no.  We -- well, we were highly advised
19  by counsel, and it was how we handled it.  And these
20  kinds of letters were all put together by counsel.
21      Q.  Well, this seems like a business decision.  Was
22  it not, or was it a legal decision?
23          MR. LANG:  Objection, form.
24      A.  I believe it was more of a legal decision in
25  terms of timing and how to do it and when to do it and

Page 156

1  why to do it.
2      Q.  Okay.  And I'm asking solely about the "why."
3  Is it your testimony that the "why" was a legal decision
4  that was made by the lawyers?
5      A.  My recollection, it was something that had to
6  be done because he was no longer with the firm or at
7  Acis.
8      Q.  Okay.  And I'm asking why it had to be done
9  because Josh Terry wasn't there.  In other words,
10  what -- what about Josh Terry's departure required
11  dissolving and terminating the Acis CLO Value Fund?
12      A.  That's my understanding or recollection.  You
13  know, I -- I don't remember if the investors were
14  involved and the investors wanted -- I just remember --
15  my recollection is that it had to do with Josh being
16  gone, and it was the recommendation of counsel.  But I'm
17  willing to be refreshed if there's any other details.
18      Q.  Okay.  Well, let me start with this:  Do you
19  know who the counsel was that was involved in the
20  recommendation, as you said?
21      A.  No.  I don't know what -- I don't remember what
22  counsel we were using at that time.
23      Q.  Okay.  Is there anything beyond Josh Terry that
24  you can tell me formed the reason that the general
25  partner elected to terminate, wind up, or dissolve the

Page 157

1  fund?
2          MR. LANG:  Objection, form.
3      Q.  Anything beyond Josh Terry leaving?
4      A.  There was an unwillingness of HarbourVest and
5  an unwillingness of investment bankers to go forward
6  with Acis once they were aware of the conflict.  I don't
7  know if that was before or after the launch of
8  arbitration or mediation or if it was due to key-man
9  provisions in their contracts.
10          I don't know -- I don't know or remember
11  if their unwillingness to go forward with Acis was part
12  of it regarding -- I don't remember the timing exactly.
13  I know it was a major issue, but I don't know if it was
14  before or after this.  And I don't know if this was
15  triggered by key-man provisions in the agreement or if
16  it was elective, but it was put forward by counsel as
17  the best way to handle it.
18      Q.  Okay.  Well, the document says "elected," does
19  it not?  That's -- that's the word that is in the letter
20  that you've signed, correct?
21      A.  I'm looking for the word "elected," but --
22      Q.  It's in the first -- it's in the sentence that
23  I read.  The first sentence of the second paragraph.
24      A.  Okay.  "Elected," right.
25      Q.  Okay.  So you described a conflict.  What

Page 158

1  conflict are you referring to?
2      A.  Josh Terry's departure.
3      Q.  Okay.  And how was that a conflict?
4      A.  It ultimately became a conflict over money.  It
5  was -- my recollection is it was staged, you know, to
6  appear to be a termination when it was really a
7  resignation.  But a resignation would have entitled him
8  to zero.  That's my recollection.
9      Q.  When you say "staged," staged by who?
10  Mr. Terry?
11      A.  Yes.
12      Q.  He staged his resignation as a termination?
13      A.  Yes.
14      Q.  You mentioned that HarbourVest and the
15  investors were calling or possibly calling for the
16  dissolution and termination of the fund.
17          Who at HarbourVest called for it or may
18  have called for it?
19      A.  I never spoke with the HarbourVest guys.
20      Q.  Okay.  Which of the investors called for it or
21  may have called for the dissolution or termination of
22  the fund?
23      A.  HarbourVest.
24      Q.  Okay.  And how did you learn that HarbourVest
25  called for the termination or dissolution, wind up of

3  (Pages 155 to 158)

Page 159

1  the fund?
2          MR. LANG:  Objection, form.
3      A.  Just from the lawyers.
4      Q.  Which lawyers?
5      A.  I don't recall.
6      Q.  I have in front of you Exhibit 35 as well.  Do
7  you see that?  It's a -- at the top, it's entitled
8  "Rescission Agreement," effective June 30th, 2016.
9      A.  That's 36.
10     Q.  Oh, I'm sorry.  I think we started with 35.
11 You're right.
12     A.  Yes.
13     Q.  It is 36.  So you see that document in front of
14 you?
15     A.  Yes.
16     Q.  And if you look, there is a description -- and
17 by the way, this is a document that has your signature
18 on it in several places, correct?
19     A.  Yes.
20     Q.  Okay.  In fact, on page 6 of the document, I
21 see your signature clearly on two places, under "The
22 Master Fund" and "The General Partner."  Do you see
23 that?
24     A.  Yep.
25     Q.  And the signature for CLO Holdco looks -- looks

Page 160

1  partially and primarily black- -- blacked out.  Do you
2  see that?
3      A.  Yes.
4      Q.  Was that your signature being blacked out?
5      A.  I don't know.
6      Q.  Did you have signing authority for Grant Scott?
7      A.  No.
8      Q.  Is there any reason why you would have signed
9  in Grant Scott's place?
10     A.  No.
11     Q.  Okay.  If you go to the first page of this
12 document, there is referenced a shortfall.  You'll see
13 it.  I'm not sure if it's called "shortfall" in this
14 sentence, but if you go to about five lines down, after
15 kind of -- (ii), in parentheses, it refers to a
16 difference of 780,377.  Do you see that?
17     A.  I'm sorry.  Which paragraph?
18     Q.  I'm sorry.  It's paragraph -- I guess it
19 appears to be the sixth "whereas" on the first page.
20     A.  Sixth "whereas."  One, two, three --
21     Q.  If you go about halfway down.
22     A.  Yep, got it.
23     Q.  And it says the difference of 780,000
24 represents the amount which CLO Holdco's capital account
25 must be increased pursuant to the governing doctor [sic]

Page 161

1  for the purpose of making CLO Holdco whole as if the
2  contribution had never taken place.  And it goes on, but
3  do you see that?
4      A.  Yes.
5      Q.  Okay.  Do you know who determined that the
6  amount to make CLO Holdco whole was $780,377?
7      A.  One of the accountants, but I don't know who.
8      Q.  Okay.  And do you see up above where it says,
9  after capital A, that same paragraph, "the aggregate Net
10 Profit attributable to the Contributed Assets was
11 $2,713,690"?  Do you see that?
12     A.  Yes.
13     Q.  Was that calculation also done by some
14 accountant?
15     A.  Yes.
16     Q.  That you can't identify here today?
17     A.  Correct.
18     Q.  The same with the number after B, the net
19 profit allocated to CLO Holdco's capital account in the
20 amount of $1,933,313?  Was that made by some accountant
21 that you can't identify here today?
22     A.  Yes.
23     Q.  Did you have any influence or determination of
24 any of the amounts on this sixth "whereas" paragraph?
25     A.  I did not.

Page 162

1      Q.  When I talked about Grant Scott earlier, do you
2  have any type of business relationship with Grant Scott?
3      A.  I do not.
4      Q.  Any personal relationship with him?
5      A.  Not at this point.
6      Q.  When you say "not at this point," did you
7  earlier?
8      A.  Yes.
9      Q.  And what was that relationship?
10     A.  We were longtime friends.
11     Q.  Are you no longer friends?
12     A.  No.
13     Q.  Is there a reason for that?
14     A.  Some of his behavior in the bankruptcy.
15     Q.  Does he have any ownership interest in any
16 entities that you control, direct, or also have an
17 ownership interest in?
18         MR. LANG:  Objection, form.
19     A.  Not that I'm aware of.
20     Q.  Back in June of 2016, did you -- were you still
21 friends with Grant Scott?
22     A.  Yes.
23     Q.  Did you have a business relationship with him
24 then?
25     A.  No.

4  (Pages 159 to 162)

Page 163

1    Q.  Okay.  Well, it appears that there may have
2 been some affiliation or relationship because it looks
3 like he was the director of CLO Holdco.  Correct?
4    A.  I have -- I don't believe I had a business
5 relationship with him.  I believe he was independent.
6    Q.  Okay.  Well, you were certainly determined --
7 determining that CLO Holdco -- or at least you were
8 signing off on a document that was allowing CLO Holdco
9 some allocation of funds as a result of the rescission
10 agreement, correct?
11    A.  Can you repeat that question?
12    Q.  Sure.  I mean, the -- the effect of the
13 rescission agreement was to allocate funds to CLO
14 Holdco, among other effects; is that correct?
15    A.  I don't know.
16    Q.  Were you aware that this rescission agreement
17 allocated an amount to CLO Holdco to make them whole?
18    A.  Can you repeat the question again?
19    Q.  Sure.  Do you understand that one of the effects
20 of the rescission agreement was to allocate funds to CLO
21 Holdco to make them whole?
22    A.  One, two, three -- yeah, yeah, that appears --
23 in that -- one, two -- sixth "whereas" paragraph, that
24 appears to be one of the objectives.
25    Q.  Okay.  And if you look at the next "whereas,"

Page 164

1 the seventh "whereas" at the end of page 1, going on to
2 page 2, it appears that -- it says -- and I'll just read
3 it in the seventh "whereas."
4       "Whereas, for the purpose of making CLO
5 Holdco whole as if the Contribution had never taken
6 place, the Parties desire to cause (a) the return,
7 transfer and conveyance of the Contributed Assets to CLO
8 Holdco, (b) the transfer and conveyance of the assets
9 set forth on Schedule 2 attached hereto (collectively,
10 the 'PIK Assets') to CLO Holdco as a payment in kind,
11 which PIK Assets have an aggregate market value as of
12 the Effective Date of $902,720, and (c) the cash payment
13 of $389,662 to CLO Holdco," and then it goes on, "in
14 each case, on the terms and subject to the conditions
15 set forth in this Agreement."
16       So my question is about the (c), the cash
17 payment of 389,662 to CLO Holdco.  Do you know who was
18 designated to make that payment, that cash payment?
19    A.  I do not.
20    Q.  Do you know who did make that cash payment?
21    A.  I do not.
22    Q.  By the way, when you earlier mentioned that
23 HarbourVest may have wanted the fund dissolved and you
24 said you didn't talk to HarbourVest, did you ever get
25 anything in writing from HarbourVest indicating that

Page 165

1 they wanted the fund dissolved?
2    A.  I don't know.
3       (Exhibit 37 marked.)
4    Q.  You have in front of you Exhibit 37, and that
5 is the Written Consent of the General Partner of Acis
6 CLO Value Fund II, Acis CLO Value Fund II (Cayman), Acis
7 CLO Value Master Fund II, and that's effective June
8 30th, 2016.  Do you see that?
9    A.  Yes.
10    Q.  And, again, you -- you will see your signature
11 at the end of this document, signing on behalf of Acis
12 Capital Management, L.P., and Acis Capital Management
13 GP, the general partner, correct?  That's your signature
14 signing on behalf of those two entities, correct?
15    A.  Yes.
16    Q.  And if you look again on the seventh "whereas"
17 at the bottom of page 1, it's the final "whereas" on the
18 bottom of page 1, it goes through some of those amounts
19 that we talked about on the previous document.  And in
20 the section where there's a parenthetical (ii), it says
21 "the difference of $780,377 represents the amount by
22 which CLO Holdco's Capital Account must be increased
23 pursuant to the Governing Documents."
24       Do you see that?
25    A.  Yes.

Page 166

1    Q.  Okay.  And do you know how it was determined
2 that that was the amount by which CLO Holdco's capital
3 account must be increased pursuant to the governing
4 documents?
5    A.  These are the same numbers as the last exhibit,
6 right?
7    Q.  Correct.
8    A.  The same paragraph?
9    Q.  Correct.
10    A.  The same everything?
11    Q.  Looks like it, yes.
12    A.  Yeah, so my answer is the same.  By somebody in
13 accounting.
14    Q.  If you go to the next page, you will see a
15 third "whereas," and it says "pursuant to the Governing
16 Documents, any expenditures payable by the Funds, to the
17 extent determined by the General Partner to have been
18 paid or withheld on behalf of, or by reason of
19 particular circumstances applicable to, one or more but
20 fewer than all of the Partners, shall be -- shall be
21 specifically allocated only to the Capital Accounts of
22 those Partners on whose behalf such payments are made or
23 whose particular circumstances gave rise to such
24 payments."
25       Do you see that on the third "whereas" of

5 (Pages 163 to 166)

Page 167

1  page 2 of Exhibit 37?
2      A.  Yes.
3      Q.  And as the person signing this document, was it
4  determined that one or more of the partners gave rise to
5  such payments as indicated here?
6      A.  I don't recall.
7      Q.  Do you remember determining that these
8  expenditures were caused because of the particular
9  circumstances of one or more, but fewer than all of the
10 partners?
11     A.  I don't recall.
12     Q.  If you go to the fourth "whereas," the
13 paragraph right below that, it says, "Whereas, in
14 contemplation of the transaction to be effected by the
15 Rescission Agreement, the General Partner has determined
16 that it is appropriate to reallocate the Capital
17 Accounts of the Limited Partners of the Offshore Fund
18 (other than the Withdrawing Limited Partners) and the
19 Special Limited Partner, effective as of the Effective
20 Date, as set forth on Exhibit B hereto."  And I believe
21 if you go to Exhibit B, you will see a reallocation.
22         And are you generally familiar with the
23 notion that the amounts in Exhibit B, the numerical
24 dollar amounts, it appears, that are enclosed by
25 parentheses are a deduction, and those that are not are

Page 168

1  additions?  Are you generally familiar with that notion?
2      A.  Generally.
3      Q.  Okay.  Do you know who determined, for example,
4  that the special limited partner -- if you look at that
5  amount, which is $332,284.34, that there would be a
6  reallocation of the special limited partner's capital
7  account by reduction of $332,284.34?
8      A.  I do not know.
9      Q.  Did you have any role in determining that
10 amount?
11     A.  I did not.
12     Q.  Do you know who did?
13     A.  One of the accountants.
14     Q.  Would the same be true with respect to all
15 these reallocations on Exhibit B?
16     A.  Would what be true?
17     Q.  Would all of the amounts in Exhibit B, all of
18 these reallocated amounts, would these have all been due
19 to what the accountants determined or accountant
20 determined?
21     A.  Yes.  They would have done the calculation and
22 true-up of the capital accounts governed by the
23 governing documents.  And if they had any questions
24 regarding the specific implementation, the lawyers would
25 have answered it for them.

Page 169

1      Q.  Did you have any role whatsoever in determining
2  these amounts?
3      A.  I did not.
4      Q.  And you didn't have any assessment as to
5  whether any of the partners were at fault or had
6  circumstances that gave rise to the need to reallocate
7  the accounts?
8          MR. LANG:  Objection, form.
9      A.  I was not involved.  I'd depend on the lawyers
10 and the accountants for this kind of stuff.
11     Q.  You just weren't involved at all?
12     A.  Correct.
13     Q.  Do you know who -- we talked about the special
14 limited partner, which is -- appears to be a defined
15 term, certainly a capitalized term in this consent.  Do
16 you know who that is?
17     A.  I do not.
18         (Exhibit 38 marked.)
19     Q.  Okay.  Mr. Dondero, I have in front of you the
20 Third Amended and Restated Exempted Limited Partnership
21 Agreement regarding the Acis CLO Value Fund II, L.P.
22         Do you see that?
23     A.  Uh-huh.
24     Q.  Yes?
25     A.  I see it, yes.

Page 170

1      Q.  If you go to page 16 of this document, section
2  (c), you'll see a paragraph similar to something you
3  wrote before, which says that except as otherwise
4  provided in this agreement, any expenditure payable to
5  [sic] the partnership, to the extent determined by the
6  general partner to have been paid or withheld on behalf
7  of, or by reason of particular circumstances applicable
8  to, one or more but fewer than all the partners.
9          Do you see that --
10     A.  Uh-huh.
11     Q.  -- paragraph?  Yes?
12     A.  Yes, I do.
13     Q.  Did you ever make any kind of determination
14 that any expenditure was -- should be allocated to one
15 or more, but not all of the partners?
16         MR. LANG:  Objection, form.
17     A.  I did not specifically.  I wasn't involved.  If
18 the accountants and lawyers provided the summary, any
19 allocation or reallocation regarding the capital
20 accounts, I would appropriately sign it as the GP.
21     Q.  Do you remember any such reallocation?
22     A.  I do not, but what we just went over appears to
23 be one.
24     Q.  And I --
25     A.  Other than that, I don't remember.

6  (Pages 167 to 170)

Page 171

1    Q.  Yes.  I mean, the documents that you have seen
2  reflect a reallocation, but my question, and I think you
3  answered it, is do you remember those reallocations
4  occurring.
5    A.  Not specifically, no.
6    Q.  Do you remember any reallocation because of any
7  particular circumstances relevant to Acis Capital
8  Management, L.P.?
9    A.  I do not.
10        (Exhibit 39 marked.)
11    Q.  I've handed you what has been marked as
12  Exhibit 39 to your deposition, which I believe is an
13  Assignment and Transfer Agreement dated December 19th,
14  2017.  Do you see that document?
15    A.  Yes.
16    Q.  It appears, likewise, that you are a signatory
17  to this document, correct?
18    A.  Yes.
19    Q.  It looked like you signed on behalf of the
20  general partner, Acis Capital Management GP, correct?
21    A.  Yes.
22    Q.  And then it looks like you signed on behalf of
23  various Acis entities.  Acis CLO Management, L.P., Acis
24  CLO Management GP, Acis Capital Management, L.P., and
25  Acis Capital Management GP.

Page 172

1        Do you see that?
2    A.  Yes.
3    Q.  And it looks like on the next page you will see
4  somebody signing on behalf of Highland CLO Holdings,
5  Ltd.  Specifically, it says "for and on behalf of Summit
6  Management," apparently.
7        Do you see that?
8    A.  Yes.
9    Q.  Do you know who that is?
10        MR. LANG:  Objection, form.  The entity or
11  the individual?
12        MR. AHMAD:  The individual.
13    A.  It appears to be a Cayman director, but I -- I
14  don't want to speculate.
15    Q.  Okay.  Does the name John Cullinane mean
16  anything to you?
17    A.  John who?
18    Q.  Cullinane?
19    A.  Not off the top of my head.
20    Q.  Do you know if you've ever met or spoken with
21  or communicated in any way with a John Cullinane?
22    A.  Not that I recall at the moment.
23    Q.  If you look at the first page of this document,
24  you will see it is effectively transferring some rights
25  from an Acis entity to Highland CLO Holdings, Ltd.

Page 173

1        Do you see that?
2    A.  I want to be careful.  I don't want to answer a
3  general question.  If you have a specific question, I'll
4  answer it.
5    Q.  Sure.  I'm happy to.  It is -- it says -- if
6  you go to, like, the fifth "whereas" on page 1, it
7  appears that -- and I'll just quote it.  It says,
8  "Whereas, as a result of the Interest Transfer," I
9  believe noted above, "and in connection with HCM having
10  notified Acis that HCM is unwilling to continue to
11  provide support personnel and other critical services to
12  Acis in each case with respect to Acis CLO 2017-7,
13  Ltd.," which is defined as Acis CLO-7, "and in order to
14  ensure the continued management of Acis CLO-7, Acis
15  desires to transfer to HCLOH, simultaneous with the
16  Interest Transfer, all of Acis' right, title and
17  interest in each of the Master Sub-Advisory Agreement
18  and Staff and Services Agreement; in each case dated" --
19  I assume that's March 17th, 2017.
20        Do you see that?
21    A.  That's what it says.
22    Q.  Okay.  First of all, do you know whose idea it
23  was for Acis to transfer these interests as I just read
24  to HCLOH?
25    A.  I do not.

Page 174

1    Q.  And do you know who on behalf of Highland
2  Capital Management, HCM, determined that it was
3  unwilling to continue to provide support personnel and
4  other critical services as outlined in this assignment
5  and transfer agreement to Acis?  Do you know who on
6  behalf of HCM made that decision?
7    A.  I do not.
8    Q.  Were you involved in that decision?
9    A.  Not that I recall.
10    Q.  Do you know why -- Highland CLO Holdings, or
11  HCLOH, do you know why it was formed?
12    A.  I -- I do not, but I'm willing to be refreshed.
13    Q.  Well, do you know whose idea it was to form the
14  entity?
15    A.  I do not.
16    Q.  Do you know who owned or owns HCLOH?
17    A.  If it's a Highland-named entity, I assume
18  Highland, but I don't know.
19    Q.  If you look in the second and third "whereases"
20  on page 1, and I'll specifically go to the second
21  "whereas," it says, "Whereas, pursuant to the Shared
22  Services Agreement and the Sub-Advisory Agreement, there
23  is a total of $3,814,186 in outstanding and unreimbursed
24  amounts owing from Acis to HCM."
25        Do you see that?

7 (Pages 171 to 174)

Page 175

1    A. Uh-huh.
2    Q. Yes?
3    A. Yes, I see the second "whereas" bullet point.
4    Q. And do you know how Acis come to owe that
5  amount, other than what it says right here, to HCM?
6    A. It appears to be an accurate calculation, very
7  specific, down to the dollar, according to governing
8  documents.
9    Q. Okay. Do you know if this had anything to do
10 with -- for example, the sub-advisory rates being
11 raised, you know, from, let's say, five basis points to
12 20 basis points or anything like that, that that charge
13 being raised to Acis had anything to do with that debt?
14   A. I have no idea.
15   Q. And then if you look below at the third
16 "whereas," it says, "Whereas, in connection with HCM and
17 HCLOH entering into a shared services agreement and
18 sub-advisor agreement, attached hereto as Exhibits A and
19 B, respectively, HCM has transferred and assigned to
20 HCLOH 2.8 million" -- to be exact, "$2,804,870 of the
21 outstanding receivable."
22        Do you see that?
23   A. Yes.
24   Q. And do you know who determined that the fair
25 value of that, entering into the shared service

Page 176

1  agreement and sub-advisor agreement, was valued at 2.8
2  million?
3    A. We had a separate valuation team at that point
4  at Highland that would have valued all assets, and they
5  probably would have used third parties for transfers
6  between different entities.
7    Q. And do you know that that third-party
8  evaluation was done here?
9    A. I do not specifically.
10   Q. Have you seen any document that reflects that
11 third-party evaluation?
12   A. No, I have not.
13   Q. Do you know who was used as a third-party
14 evaluator?
15   A. Typically we use Houlihan, but it could have
16 been somebody else.
17   Q. And who is on the internal evaluation team?
18   A. I don't know.
19   Q. Don't know any of the individuals?
20   A. It's -- no. It's generally a couple of
21 midlevel people that rotate through.
22   Q. Can you identify any of them?
23   A. No. They're independent. I don't -- I don't
24 have contact with them.
25        (Exhibit 40 marked.)

Page 177

1    Q. Okay. I'm going to hand you Exhibit 40 to your
2  deposition. You'll see that's a -- it looks to be a
3  register of members of HCLOH, or Highland CLO Holdings,
4  Ltd. Do you see that?
5    A. Yes.
6    Q. And you'll see that one member is Maple
7  Corporate Services, Limited. Do you know who they are?
8    A. Yes.
9    Q. And who are they?
10   A. They're one of the larger corporate services
11 firms in the Caymans.
12   Q. Okay. Do you have any relationship, or did you
13 have any relationship with them?
14   A. I believe most of our offshore entities use
15 them.
16   Q. Do you know who owned Maple Corporate Services,
17 Limited?
18   A. I believe it was a law firm or a spinoff of a
19 law firm, but it was -- we didn't have any ownership
20 interest in it.
21   Q. Did you have any management in Maple Corporate
22 Services?
23   A. No.
24   Q. And it looks like they transferred some shares
25 to an entity called Neutra, Ltd. Do you see that?

Page 178

1    A. Yes.
2    Q. And who is Neutra?
3    A. I don't recall. I know it came up in the
4  Highland bankruptcy. I can't remember if it's an entity
5  Mark Okada and I own some of or if we don't. I just
6  remember it was an issue in the Highland bankruptcy, but
7  I can't remember the details.
8    Q. So you think you may have owned --
9    A. No. I think Jernigan alleged that we did, but
10 I don't know if we did or not. I -- I don't recall the
11 details.
12   Q. Okay. So you're not saying you didn't have any
13 ownership interest. You just don't know whether you had
14 any ownership interest?
15   A. Correct.
16   Q. Okay. Did you have any -- I think you said you
17 didn't have any ownership interest in Highland CLO
18 Holdings. I'm not sure I got that right, so let me just
19 ask. Did you have any ownership in Highland CLO
20 Holdings, whether it's through Neutra or any -- any
21 other way?
22        MR. LANG: Objection, form.
23   A. I don't remember. Yeah, I don't remember.
24 Like I said, most Highland entities that use the name
25 "Highland" are owned by Highland. Sometimes there were

8 (Pages 175 to 178)

Page 179

1  minority investors indirectly -- I mean, I'm sorry,
2  minority directors -- minority investors in as LP
3  investors.  But, generally, if it had a "Highland" name
4  to it, it was owned majoritywise by Highland.
5          (Exhibit 41 marked.)
6      Q.  I've handed you what's been marked as
7  Exhibit 42 to your deposition.  And this is -- on the
8  first page, this is a couple of emails from --
9          MR. LANG:  It's 41.
10         MR. AHMAD:  Oh, I'm sorry.  You're right.
11  It is 41.  Okay.
12     Q.  You have Exhibit 41 in front of you.  The first
13  page has two emails from a Tim Cournoyer.
14         And you know who that is, do you not?
15     A.  Yes.
16     Q.  Okay.  And Cournoyer is a lawyer, correct?
17     A.  Yes.
18     Q.  For Highland Capital Management?
19     A.  Yes.
20     Q.  And you will see in the following pages he
21  attached some -- appear to be -- I'll call them
22  ownership charts.  Do you see them?
23     A.  Yes.
24     Q.  Okay.  And if you go to the second of the
25  charts, which has a Bates stamp starting with LST --

Page 180

1  LST00708700, you'll see a chart on the upper half of the
2  page.  And at the top, it has you as "Jim," correct?
3      A.  Yes.
4      Q.  And it has you with a hundred percent of the
5  voting shares of Highland Capital Management, correct?
6      A.  Correct.
7      Q.  And then it shows a line as voting non-economic
8  interest to Highland CLO Holdings.  Do you see that?
9      A.  Yes.
10     Q.  And do you know what is meant by "voting
11  non-economic interest"?
12     A.  I think it's self-explanatory.
13     Q.  Okay.  What does that mean to you?  You have a
14  voting interest, correct?
15     A.  Right.
16     Q.  And "non-economic" --
17     A.  Right.
18     Q.  -- means?
19     A.  No economic interest.
20     Q.  You don't get any distributions?
21     A.  I think the 75 and 25 account for the hundred
22  percent off to your left there.
23     Q.  Oh, of course.
24         And Dugaboy, by the way, has 75 percent of
25  the economic interest, correct?

Page 181

1      A.  Correct.
2      Q.  And you're the primary beneficiary of Dugaboy,
3  correct?
4      A.  Correct.
5      Q.  And Mark is Mark Okada?
6      A.  Yes.
7      Q.  Okay.  And I'm just asking, how would you
8  distinguish a non-economic interest from an economic
9  interest?
10     A.  An economic interest has the consequence or
11  benefit of ownership or distributions.
12     Q.  And if you look below, it has -- when I said
13  there's a line from Highland Capital Management, LP, to
14  Highland CLO Holdings, you know, technically that is
15  Highland CLO Holdings BVI.
16         Do you see that?
17     A.  Yes.
18     Q.  Is that British Virgin Islands?
19     A.  I believe so.
20     Q.  And then a hundred percent ownership to Neutra,
21  and then a line directly to Highland CLO Holdings, Ltd.,
22  correct?
23     A.  Yes.
24     Q.  And there's other parts on this chart, but
25  that's what's written here, correct?

Page 182

1      A.  Yes.
2      Q.  Do you see anything about this chart that
3  Mr. Cournoyer attached as being inaccurate?
4      A.  Only to the extent that you're looking at it
5  going down, and you should be looking at it going up.
6      Q.  Okay.  Fair enough.
7      A.  But other than that, I -- I don't have a
8  recollection of this being incorrect.
9      Q.  Okay.  And so when we look at -- you're saying
10  we should start with Acis CLO-7, correct?
11     A.  Correct.
12     Q.  And then going to C-MOA, which I guess is
13  majority ownership?  Help me out.  What does the "A"
14  stand for?
15     A.  I don't know.
16     Q.  Okay.  Affiliate.  Okay.  Does that -- does
17  that ring a bell at all?
18     A.  No.
19     Q.  All right.  Fair enough.
20         (Exhibit 42 marked.)
21     Q.  I have in front of you Exhibit 42 to your
22  deposition.  And this is the Dugaboy trust agreement; is
23  that correct?
24     A.  Appears to be.
25         (Mr. Austin leaves the proceedings.)

9  (Pages 179 to 182)

Page 183

1    Q.  And it says for the settlor, it's Dana Scott
2  Breault, if I'm pronouncing that correct?
3    A.  Yes.
4    Q.  And who is that?
5    A.  She's a single woman.  She's a girlfriend.
6    Q.  Current girlfriend?
7    A.  Yes.
8    Q.  Was she your girlfriend as of the time of this
9  document, which -- you know, I'm just looking at your
10  signature, which is dated at the very end on October 28,
11  2010.  Her signature is dated October 23rd, 2010.
12       As of that time, was she your girlfriend?
13    A.  No.  We knew each other for years before we
14  started dating, but started dating more recently.
15    Q.  And, roughly, when did you start dating?
16    A.  Five years ago, seven years ago.  Something
17  like that.
18    Q.  There's another name mentioned in here as well,
19  a John Honis, if I'm saying that right.
20       Do you recognize that name?
21    A.  Yes.
22    Q.  And who is John Honis?
23    A.  He's a longtime friend also.  He's still a
24  friend, but he's a board member on our retail mutual
25  funds.

Page 184

1    Q.  I'm sorry.  Board member --
2    A.  He's a board member on our retail mutual funds.
3    Q.  Does that have an entity name?
4    A.  It's changed over the years, but it's something
5  like Highland Fund Group or something.
6    Q.  And I take it he's still a friend?
7    A.  Yes.
8    Q.  And he was a friend at the time he was -- I
9  believe he's named in the trust agreement as a successor
10  trustee?
11    A.  Okay.
12    Q.  Were you familiar with that?
13    A.  I don't remember.  Yes.
14    Q.  But you would have been friends with him from
15  2010 and before, correct?
16    A.  Yes.
17    Q.  How long have you known him?
18    A.  About 40 years, 30- -- 35.
19       THE WITNESS:  Can we take a coffee break
20  for a little while?
21       MR. AHMAD:  Sure.
22       THE WITNESS:  Thanks.
23       THE VIDEOGRAPHER:  Off the record at 11:59
24  a.m.
25       (Recess taken from 11:59 to 12:13.)

Page 185

1       THE VIDEOGRAPHER:  We are back on the
2  record at 12:13 p.m.
3    Q.  Okay.  Mr. Dondero, I believe in the beginning
4  Highland Capital Management was originally owned, I
5  believe, 75/25 by you and Mark Okada.
6       Is that correct?
7    A.  Yes.
8    Q.  And then you sold Highland to I think what you
9  have described as a charitable remainder trust?
10    A.  I believe that's the case.
11    Q.  Okay.  Is that charitable remainder trust that
12  you sold Highland to -- is it Hunter Mountain Investment
13  Trust?
14    A.  I don't remember.  I don't remember the name of
15  the structure exactly at this point.
16    Q.  Okay.  Do you remember it being a Hunter
17  Mountain entity?
18    A.  I remember Hunter Mountain's involved -- was
19  involved in the transaction.  I don't know if it's the
20  remainder trust or not.  I don't remember its role.
21    Q.  Okay.  Well, do you remember selling Highland
22  to Hunter Mountain Investment Trust?
23    A.  I don't recall if that's the name.  I recall
24  selling it to a remainder trust.  I don't remember if
25  Hunter Mountain was the name of the remainder trust or

Page 186

1  the management entity.  I don't remember.
2    Q.  Okay.  But it was involved?
3    A.  Yes.
4    Q.  Whether it was the manager or the actual owner
5  of Highland, you don't know?
6    A.  I don't remember.
7    Q.  You also got a note from Highland to pay back
8  you and Mark Okada; is that correct?
9    A.  Yes.  I believe the notes were determined by
10  the valuation at the time.
11    Q.  Okay.  And do you remember how much, roughly,
12  per year you were getting from Highland for that note?
13    A.  No.
14    Q.  Are you still receiving payments from Highland
15  on the note?
16    A.  No.
17    Q.  Did it stop when Highland became bankrupt?
18    A.  Yes.
19    Q.  And do you remember how much the note paid you
20  total at all?
21    A.  No.
22    Q.  You have no idea how much the note paid you?
23    A.  No.
24       MR. LANG:  Objection, form.
25    Q.  Since you sold your interest in Highland to

Osteen & Associates Reporting Services
osteenreporting@gmail.com

Page 187

1    this trust, have you received any distributions from
2    Highland?
3        A.  No.
4        Q.  Any income from Highland whatsoever other than
5    on the note?
6        A.  No.
7        Q.  Earlier I think you mentioned maybe that
8    HarbourVest may have told Highland's attorneys that they
9    wanted the CLO Value Fund dissolved.
10           Do you remember if that's -- is that
11   accurate that they communicated possibly to Highland's
12   attorneys?
13            MR. LANG:  Objection, form.
14       A.  I -- I remember saying something to that
15   effect, yes.
16       Q.  Do you know whether that communication about
17   wanting to dissolve the CLO Value Fund was made orally
18   or in writing?
19            MR. LANG:  Objection, form.
20       A.  I don't know.  I wasn't involved.  There were
21   literally weekly or biweekly -- every two-week calls
22   with HarbourVest professionals and just the investment
23   team and the HarbourVest professionals with just the
24   legal team regarding the update on legal activities.
25       Q.  So you don't know whether HarbourVest

Page 188

1    communicated anything in writing to Highland's
2    attorneys, correct?
3            MR. LANG:  Objection, form.
4        A.  I -- I don't have firsthand knowledge.
5        Q.  Okay.  Well, whether it's firsthand or
6    secondhand, do you know whether HarbourVest communicated
7    its desires to Highland attorneys in writing?
8        A.  I don't know.
9        Q.  And do you know whether Highland communicated
10   to you in writing that HarbourVest wanted the CLO Value
11   Fund to be dissolved?  Do you know if that communication
12   from Highland's attorneys was in writing?
13            MR. LANG:  Objection, form.
14       A.  I don't know.
15           (Exhibit 43 marked.)
16       Q.  I'm going to hand you what's been marked as
17   Exhibit 43 to your deposition.  I think in this document
18   you'll see this is a promissory note in the amount of 63
19   million.  Do you see that?
20       A.  Yes.
21       Q.  And do you know why this promissory note was
22   entered into?
23       A.  I think this was for the sale of my Highland
24   interest to the remainder trust.
25       Q.  And here it would appear to be the Hunter

Page 189

1    Mountain Investment Trust is the remainder trust,
2    correct?
3        A.  It appears, yes.
4        Q.  And on page 6 of this document, it appears that
5    John Honis is signing on behalf of the Hunter Mountain
6    Investment Trust?
7        A.  Yes.
8        Q.  And it says "By: Beacon Mountain, LLC, its
9    Administrator."  Do you see that?
10       A.  Yep.
11       Q.  And did you know that John Honis was the
12   president of Hunter Mountain Investment Trust by way --
13       A.  Yes.
14       Q.  Yes?  I'm sorry.  Yes?
15       A.  Yes.  I was aware he was.
16       Q.  Did you have any involvement in forming Hunter
17   Mountain?
18       A.  No.
19       Q.  Do you know why it was formed?
20       A.  To effect this transaction.
21       Q.  And so would it have been formed shortly before
22   this transaction in 2015, December of 2015?
23       A.  Yes.
24       Q.  Do you know how Honis came to be the president
25   of Hunter Mountain?

Page 190

1        A.  I -- no.
2        Q.  Do you know what Hunter Mountain got in
3    exchange for making this payment?  Was it the ownership
4    of Highland?
5        A.  Yes.
6        Q.  Do you know whether Honis is still president of
7    Hunter Mountain?
8        A.  I don't know.  I don't -- I don't know.
9        Q.  Do you know whether Mark Patrick -- and do you
10   know who Mark Patrick is?
11       A.  Yes.
12       Q.  Do you know if Mark Patrick is now Hunter
13   Mountain's president?
14            MR. LANG:  Objection, form.
15       A.  I don't know.  I know he effectuated the
16   transaction.  I don't know if he took over as president.
17   I don't -- I don't remember.
18           (Exhibit 44 marked.)
19       Q.  I've handed you what has been marked as
20   Exhibit 44 to your deposition.  That is a contribution
21   agreement dated December 21st, 2015, between Highland
22   Capital Management, L.P., and Hunter Mountain Investment
23   Trust.  Do you see that?
24       A.  Yes.
25       Q.  And if you go to page -- it's essentially page

Osteen & Associates Reporting Services
osteenreporting@gmail.com

Page 191

1    1, after you get through the table of contents.  At the
2    very top "whereas," you will see that it says, "Whereas,
3    pursuant to the terms and conditions of this Agreement,
4    Contributor," which is Hunter Mountain, "desires to
5    contribute capital to the Partnership," which is
6    Highland Capital Management, "in exchange for a 55%
7    limited partnership interest in the partnership."
8         Do you see that?
9    A.   What page was that?
10   Q.   Page 1, on the first "whereas."
11   A.   Yes.
12   Q.   And if you go towards the end, on page -- well,
13   I'll just say towards the end, you see some signature
14   lines.  And it looks like you are signing on behalf of
15   Strand Advisors, the general partner of Highland Capital
16   Management.  Is that correct?
17   A.   Yes.
18   Q.   And then John Honis signs as president of
19   Hunter Mountain Investment Trust?
20   A.   Yep.
21   Q.   Why was this transaction being entered into?
22   A.   I believe it had some tax advantages.
23   Q.   So this was a -- motivated by tax
24   considerations?
25   A.   I remember that was one of the reasons.  I

Page 192

1    don't remember what else.
2    Q.   Was there an attorney involved in drafting up
3    this agreement?
4    A.   The Hunter Mountain agreement?
5    Q.   This contribution agreement between Highland
6    and Hunter Mountain, Exhibit 43 -- or 44, rather.
7    A.   I don't remember.  I assume -- yeah, I assume
8    there was, but I don't recall.
9    Q.   You don't remember who the attorney was?
10   A.   No.
11   Q.   Do you know whose idea it was to enter into the
12   contribution agreement?
13   A.   I think the original idea was brought forward
14   by Mark Patrick.
15   Q.   The tax lawyer?
16   A.   Correct.
17   Q.   And he worked for Highland at the time?
18   A.   Yes.
19        (Exhibit 45 marked.)
20   Q.   I have in front of you Exhibit 45 to your
21   deposition, which I believe is the Second Amended and
22   Restated Buy-Sell and Redemption Agreement of Highland
23   Capital Management, L.P.
24        Do you see that?
25   A.   Yes.

Page 193

1    Q.   And it appears, if you go to -- I think it's --
2    well, first of all, if we go to the signature lines,
3    which is after 25, I see you signed twice, once on
4    behalf of Strand Advisors, Inc., and once on behalf of,
5    again, Strand Advisors, Inc., as general partner of
6    Highland Capital Management, L.P.  Correct?
7    A.   Yes.
8    Q.   And then Nancy Dondero signed as trustee of The
9    Dugaboy Investment Trust; is that right?
10   A.   Yes.
11   Q.   Is Nancy Dondero your sister?
12   A.   Yes.
13   Q.   If you go after the signature lines to an
14   Exhibit A, it appears that Hunter Mountain -- I'm sorry,
15   you're not there yet.
16   A.   Hold on.  Went too far.  Exhibit A.  Got it.
17   Q.   Okay.  So it appears that Hunter Mountain owns
18   a hundred percent of the Class B limited partners and 55
19   percent -- it says effective percent.  Do you see that?
20   A.   Yes.
21   Q.   And the effective interest of 55 percent, is
22   that because, as that line below, in the profit and loss
23   among classes, 55 percent is for Class B partners?
24   A.   I -- I don't know.
25   Q.   Okay.  Well, when you say you sold your

Page 194

1    interest in Highland, does that really mean you've sold
2    Dugaboy's interest in Highland or you sold your own
3    personal interest in Highland?
4    A.   I believe largely Dugaboy's interest.
5    Q.   Okay.  And when you sold your interest, did you
6    sell all of your interest in the Highland Capital
7    Management partnership --
8         MR. LANG:  Objection, form.
9    Q.   -- or did you retain any interest?
10        MR. LANG:  Sorry.  Objection, form.
11   A.   I believe there was some interest retained, but
12   it was small, I believe.
13   Q.   And was that interest held on behalf of you
14   personally or on behalf of being a beneficiary of The
15   Dugaboy Investment -- excuse me, Dugaboy trust?
16   A.   I don't remember.
17   Q.   You don't know if you held it through the
18   Dugaboy trust or through yourself personally?
19   A.   I don't remember.
20        MR. LANG:  Objection, form.
21   Q.   Do you remember if there were any amendments to
22   this agreement, Exhibit 45, that would have altered
23   these partnership interest percentages?
24   A.   I do not.
25        (Exhibit 46 marked.)

Osteen & Associates Reporting Services
osteenreporting@gmail.com

Page 195

1    Q.  I have in front of you what has been marked as
2  Exhibit 46, which is a secured promissory note dated
3  December 24, 2015, and that is a promise being made by
4  Hunter Mountain Investment Trust to The Dugaboy
5  Investment Trust.
6        Do you see that?
7    A.  Yes.
8    Q.  And it looks like the principal sum is
9  approximately 62 million, correct?
10   A.  Yes.
11   Q.  And under -- under "Payments," if you -- do you
12  see that section entitled "Payments" towards the top of
13  the first page?
14   A.  Yep.
15   Q.  Okay.  It looks like, if you go to the second
16  sentence, starting with "notwithstanding," it says,
17  "Notwithstanding the foregoing sentence, so long as this
18  note is outstanding, maker," which is Hunter Mountain
19  Investment Trust, "covenants not to make any
20  distributions to its beneficial owner without the prior
21  written consent of payee," period.  "Maker agrees to pay
22  payee, until this note is satisfied, any amounts that
23  would otherwise be available for distributions to
24  maker's beneficial owner," parentheses, quote, excess
25  cash, end quote, end parentheses, "and further consents

Page 196

1  to Highland Capital Management, L.P., ('HCM') paying
2  distributions otherwise payable to maker, to the extent
3  such distribution represents excess cash, directly to
4  payee."
5        Do you see that?
6    A.  Yes.
7    Q.  And so is this the -- is this the note whereby
8  when your interest in Highland was sold, you got a note
9  back in exchange for that?
10   A.  I believe this is that note.
11       (Exhibit 47 marked.)
12   Q.  Okay.  Here you'll see a, I believe, privileged
13  and confidential, at least at the time, memo dated
14  August 23rd, 2017, appears to be regarding Josh Terry's
15  arbitration and claims against various entities.
16       Do you see that?
17   A.  Yes.
18   Q.  And it says below that Strand Advisors -- if
19  you look under A1 -- in its capacity of general partner
20  of HCMLP.  And we've seen where Strand Partners and you
21  will sign on behalf of Strand Partners, the general
22  partner.
23       And so I guess my question is, to the
24  extent you know, is Strand Advisors still Highland's
25  general partner?

Page 197

1    A.  I don't know.
2    Q.  Are you still an owner or director of Strand
3  Advisors?
4    A.  I believe so.
5    Q.  So if you look below, on Exhibit 47, you'll see
6  the partnership percentage interests.  Do you see that?
7    A.  Yes.
8    Q.  And here it looks like between Class B and
9  Class C, Hunter Mountain owns 99 percent effective
10  interest in Highland Capital Management.  Is that
11  correct?
12   A.  Yes.
13       MR. LANG:  99.5.
14       MR. AHMAD:  You're right.  I'm sorry.
15       MR. LANG:  Just wanted to make sure.
16       MR. AHMAD:  No, that -- want to be
17  precise.  Thank you.
18   Q.  But it is 99 -- as your counsel says, 99.5
19  percent that Hunter Mountain owns of Highland Capital
20  Management, L.P., correct?
21   A.  Correct.
22   Q.  And it looks like -- if you go to the next
23  page, on the structure chart, it appears that the -- the
24  voting interest is held by the Class A limited partners.
25  Do you see that?

Page 198

1    A.  Uh-huh.
2    Q.  Yes?
3    A.  Yes.
4    Q.  And The Dugaboy Investment Trust is one of
5  those partners, correct?
6    A.  Yes.
7    Q.  And then it looks like Mr. Okada and some
8  family trusts are also partners.  Is that right?
9    A.  Yes.
10   Q.  And then below, it says 99 percent of the
11  economic ownership of Hunter Mountain Investment Trust
12  flows up to charitable foundations that Dondero and
13  Okada direct.  Do you see that?
14   A.  Yes.
15   Q.  And 1 percent of the economic ownership of
16  Hunter Mountain Investment Trust is held indirectly by
17  Dondero and Okada through their ownership of Dolomiti,
18  Dolomiti, LLC, and Hakusan, LLC, respectively.
19       Do you see that?
20   A.  Yes.
21   Q.  Is Dolomiti -- am I saying that right?
22   A.  Those are names that Okada picked.  I don't
23  know what they mean.  I can't pronounce them either.
24   Q.  Okay.  Okay.  So he picked the name Dolomiti
25  and Hakusan both?

Page 199

```
1    A.  Yes.
2    Q.  Okay.  And do you have ownership in both
3  entities or just one of these entities?
4    A.  I don't have ownership in any of Mark Okada's
5  entities.  I don't have ownership either in Dugaboy.
6    Q.  Okay.
7    A.  But it's my family trust.
8    Q.  Sure.  You're the primary beneficiary, right?
9    A.  Until I pass.
10    Q.  Correct.  So currently you're the primary
11  beneficiary, correct?
12    A.  I don't know if "beneficiary" is the right
13  word.  I can't take money out of it.  I know that.
14  But --
15    Q.  Okay.  I thought you said earlier you're the
16  primary beneficiary.
17    A.  I don't know if -- okay.  I don't -- I don't
18  know.  Sorry.
19    Q.  Okay.  Do any of these entities -- whether it's
20  Hunter Mountain Investment Trust, Dugaboy Investment
21  Trust, Dolomiti, Hakusan, do any of these entities have
22  any affiliation with the donor-advised fund?
23    A.  I -- like I said, I know there was a
24  transaction consummated between Honis and Mark Patrick.
25  I don't know if the entity is inside the DAF or not.  I
```

Page 200

```
1  don't know.
2    Q.  Well, it's -- I think you indicated or had
3  testified previously that Hunter Mountain is owned by
4  the donor-advised fund.  Is that -- is that correct?
5    A.  I -- I don't know.  Or I -- I might have spoken
6  too quickly.  I know a transaction was consummated
7  between Honis and Mark Patrick.  I don't know whether
8  Hunter Mountain was put inside the DAF or separate from
9  the DAF.  I don't know.
10    Q.  Do you control the DAF?
11    A.  I do not control the DAF.
12    Q.  Did you ever control the DAF?
13    A.  I never controlled the DAF.
14    Q.  Who does?
15    A.  Mark Patrick at this point.
16    Q.  Anybody else?
17    A.  Not that I'm aware of.
18    Q.  And has he always, as far as you know?
19    A.  He took over from Grant Scott.
20    Q.  When did he take over?
21    A.  2020-ish.
22    Q.  And prior to that, how long had Grant Scott
23  controlled the DAF?
24    A.  A number of years.  I -- a number of years.  I
25  don't know.
```

Page 201

```
1    Q.  You mentioned earlier a transaction between
2  John Honis and Mark Patrick.  What was that transaction?
3    A.  We just went over it.  It was a transaction you
4  were asking about when you said does the DAF own Hunter
5  Mountain.
6    Q.  Okay.  So the transaction whereby DAF obtained
7  its ownership of Hunter Mountain, there was a
8  transaction between John Honis and Mark Patrick,
9  correct?
10    A.  Those were the two business people, yes.
11    Q.  Okay.  If we go to page 5 here, you'll see
12  letter D, and it's -- next to it you see "Dugaboy."  Do
13  you see that?
14    A.  Yeah.
15    Q.  And under management, it says Grant James Scott
16  has been appointed as independent trustee of Dugaboy.
17  Nancy Marie Dondero has been appointed family trustee of
18  Dugaboy, and Commonwealth Trust Company has been
19  appointed administrative trustee.  Do you see that?
20    A.  Yes.
21    Q.  Did -- and it appears, as mentioned here,
22  Dondero has the power to remove any trustee and to
23  appoint any successor of Dugaboy, correct?
24    A.  Yes.
25    Q.  And that's correct?
```

Page 202

```
1    A.  I believe that's correct.
2    Q.  And here again it mentions that Dondero -- when
3  you go under membership interest, that Dondero is the
4  primary beneficiary of Dugaboy?
5    A.  Yes.
6    Q.  Any reason to doubt that statement's accuracy?
7      MR. LANG:  Objection, form.
8    A.  No.
9      (Exhibit 48 marked.)
10    Q.  Now I'm going to hand you what has been marked
11  as Exhibit 48 to your deposition.  Let me just ask
12  you -- this is an opinion the bankruptcy court issued
13  last year, August 25th of 2023.  Have you read any of
14  the bankruptcy court's orders and opinions in the
15  Highland Capital Management bankruptcy?
16    A.  Very few.
17    Q.  Well, let me just ask you about some
18  statements.  So if you look under the -- the first page
19  you'll see an A, capital A.  "Who is the Movant, HMIT?"
20  Do you see that?
21    A.  Yeah, that looks like Hunter Mountain.
22    Q.  Okay.  And if you look at the bottom of that
23  paragraph, before the sentence starting "HMIT vehemently
24  disputes the suggestion that it is controlled by
25  Dondero," you'll see the statement that Dugaboy also is
```

Page 203

1  paying Hunter Mountain's legal fees.
2         Do you see that?
3     A.  Yes.
4     Q.  Is that accurate?  Are they paying -- is
5  Dugaboy paying Hunter Mountain's legal fees?
6     A.  If this is our filing and it says it, it's
7  accurate.
8     Q.  Okay.  I mean, do you --
9         MR. LANG:  Objection, form.
10    Q.  Do you know?
11    A.  I don't know.
12    Q.  If you go to page 4, the very bottom on the
13  right-hand side, I believe it's the last sentence, says
14  "the plan provides."  Do you see that?
15    A.  On the bottom of page 4?
16    Q.  Correct.
17        MR. LANG:  Right-hand column.
18    A.  Claimant oversees --
19    Q.  Look at the last sentence.
20    A.  Serious compensation?
21    Q.  I think it's -- yeah, after serious
22  compensation, there's a sentence starts --
23    A.  Yeah.  The plan provides.
24    Q.  Yeah.  The plan provides for cancellation of
25  limited partnership in Highland held by HMIT, Dugaboy,

Page 204

1  and Okada?
2     A.  Yes.
3     Q.  Okay.  And his family trust in exchange for
4  each holder's pro rata share of a contingent interest in
5  the claimant trust, as holders of allowed interest in
6  Class 10 or Class 11 -- I'm cutting out the
7  parentheses -- under the plan.
8         Do you see that?
9     A.  Yes.
10    Q.  Is that accurate?
11        MR. LANG:  Objection, form.
12    A.  I don't know.
13    Q.  Well, let me ask you this:  Did you oppose the
14  bankruptcy plan?
15    A.  I believe so.
16    Q.  And why did you oppose the plan?
17        MR. LANG:  Objection, form.
18    A.  There were many reasons.
19    Q.  Okay.  Just tell me what -- what they were.
20    A.  The valuations in the plan were contrived.  You
21  know, it said the estate was worth $160 million.  The
22  estate was liquidated for over 800 million within 24
23  months.  That was number one.
24        The -- yeah.  I mean, there was all kinds
25  of collusion between the creditors, all kinds of trading

Page 205

1  on material nonpublic information and insider trading.
2     Q.  Okay.  And when you say collusion between
3  creditors, which creditors were colluding?
4     A.  {sp?} Grosvenor, Farallon, Stonehill,
5  HarbourVest, primarily, as a group.  And -- yeah,
6  primarily.
7     Q.  And who traded on inside nonpublic information?
8     A.  Stonehill, first and foremost.  Farallon,
9  secondly.
10    Q.  Okay.  If you go to page 16, and if you go to
11  the right-hand side, you'll see a sentence that starts
12  off with "Patrick testified."  It's probably about 12 to
13  13 lines down.  Patrick testified that HMIT does not owe
14  any money to Dondero personally.
15        Do you see that?
16    A.  No.  Right side or left side?
17    Q.  Right side.
18        MR. LANG:  I think it's about right here
19  (pointing).
20        THE WITNESS:  Okay.
21        MR. LANG:  Is that --
22        MR. AHMAD:  Yes.
23    A.  I'm sorry.  Page 17?
24        MR. LANG:  16.
25        THE WITNESS:  Oh, 16.  Fuck.

Page 206

1     Q.  Right -- right side.
2         MR. LANG:  Strike that.
3     A.  All right.  Okay.  "Patrick testified."
4     Q.  Yes.  HMIT does not own any -- owe any money to
5  Dondero personally but acknowledged they had issued a
6  second promissory note.  And then the next sentence
7  says, Patrick admitted that if HMIT's Class 10 interest
8  has no value, HMIT would have no ability to pay the
9  Dugaboy note.
10        Do you see that?
11    A.  Yes.
12    Q.  Is that -- is that true, to your knowledge?
13    A.  I don't know what other assets were in there.
14    Q.  Okay.  Do you know how much it would cost you
15  if Dugaboy's note wasn't paid; in other words, how much
16  is remaining on that note?
17        MR. LANG:  Objection, form.
18    A.  No.
19    Q.  It would be tens of millions of dollars?
20        MR. LANG:  Objection, form.
21    A.  I don't understand the question.
22    Q.  Well, if Dugaboy's note wasn't paid, what would
23  you lose?
24        MR. LANG:  Objection, form.
25    Q.  If you know.

Osteen & Associates Reporting Services
osteenreporting@gmail.com

Page 207

1       A. The note's been canceled by the bankruptcy,
2   right? So the note's not going to be paid, right, or --
3       Q. Yeah.
4       A. Okay. What's your question?
5       Q. Well, I guess let me just ask you this: How
6   much did the cancellation cost you, if you know?
7           MR. LANG: Objection, form.
8       A. 60 million bucks, the number we've been going
9   over.
10          MR. AHMAD: Let me take a break and see
11   what I have left. Okay?
12          THE WITNESS: Okay.
13          THE VIDEOGRAPHER: Off the record at 12:55
14   p.m.
15          (Recess taken from 12:55 to 1:02.)
16          THE VIDEOGRAPHER: We are back on the
17   record at 1:02 p.m.
18       Q. Mr. Dondero, do you have any ability to control
19   Hunter Mountain Investment Trust, or influence their
20   decisions in any way?
21       A. Not that I'm aware of.
22       Q. Have you ever had the ability to control or
23   influence the decisions of Hunter Mountain Investment
24   Trust?
25       A. No that -- not that I'm aware of.

Page 208

1          MR. AHMAD: Thank you, sir.
2   I will pass the witness.
3          MR. LANG: All right. We'll reserve.
4          MR. AHMAD: Perfect.
5          THE VIDEOGRAPHER: Off the record at 1:03
6   p.m.
7          (Proceedings concluded at 1:03 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 209

1                        ERRATA
2   WITNESS: JAMES DONDERO              DATE: OCTOBER 14, 2024
3   PAGE NO. / LINE NO.        CHANGE        REASON FOR CHANGE
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25

Page 210

1             ACKNOWLEDGMENT OF DEPONENT
2       I,_____, do hereby certify that I
3   have read the foregoing pages, and that the same is a
4   correct transcription of the answers given by me to the
5   questions therein propounded, except for the corrections
6   or changes in form or substance, if any, noted on the
7   attached Errata.
8
9   _____
10      JAMES DONDERO                    DATE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 211

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION
 3   In re:
 4   ACIS CAPITAL MANAGEMENT,   *  Case No. 18-30264-SGJ-11
     L.P.,                      *
 5                              *
     ACIS CAPITAL MANAGEMENT GP,*  Case No. 18-30265-SGJ-11
 6   LLC,                       *
                                *  (Jointly Administered Under
 7        Debtors.              *  Case No. 18-30264-SGJ-11)
                                *
 8                              *  Chapter 11
 9                              _____
10   ACIS CAPITAL MANAGEMENT,   *
     L.P.,                      *
11                              *
     ACIS CAPITAL MANAGEMENT GP,*
12   LLC, Reorganized Debtors,  *
                                *
13        Plaintiffs,           *
                                *
14   vs.                        *  Adversary No. 20-03060-SGJ
                                *
15   JAMES DONDERO, FRANK       *
     WATERHOUSE, SCOTT          *
16   ELLINGTON, HUNTER COVITZ,  *
     ISAAC LEVENTON, JEAN PAUL  *
17   SEVILLA, THOMAS SURGENT    *
     GRANT SCOTT, HEATHER       *
18   BESTWICK, WILLIAM SCOTT,   *
     AND CLO HOLDCO, LTD.,      *
19                              *
          Defendants.           *
20
21   *********************************************
             REPORTER'S CERTIFICATION
22             ORAL DEPOSITION OF
                 JAMES DONDERO
23                  VOLUME 2
                OCTOBER 14, 2024
24   *********************************************
25        I, LEAH K. OSTEEN DOW, Certified Shorthand
```

## Page 213

```
 1   Certification expires:  4/30/2025
     Firm Registration No. 392
 2   Osteen & Associates Reporting Services
     313 Northglen Dr.
 3   Hurst, Texas  76054-3024
     (817) 498-9990
 4   osteenreporting@gmail.com
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 212

```
 1   Reporter in and for the State of Texas, hereby certify
 2   to the following:
 3           That the witness, JAMES DONDERO, was duly
 4   sworn by me and that the transcript of the oral
 5   deposition is a true record of the testimony given by
 6   the witness;
 7           I further certify that pursuant to FRCP Rule
 8   30(f)(1) that the signature of the deponent:
 9           _XX__ was requested by the deponent or a party
10   before the completion of the deposition and is to be
11   returned within 30 days from date of receipt of the
12   transcript.  If returned, the attached Errata contain
13   any changes and the reasons therefor;
14           ____ was not requested by the deponent or a
15   party before the completion of the deposition.
16           I further certify that I am neither counsel
17   for, related to, nor employed by any of the parties or
18   attorneys to the action in which this proceeding was
19   taken.  Further, I am not a relative or employee of any
20   attorney of record in this cause, nor am I financially
21   or otherwise interested in the outcome of the action.
22           Subscribed and sworn to on this the 3rd day of
23   November, 2024.
24
25   _____
     LEAH K. OSTEEN DOW, Texas CSR #3916
```

Osteen & Associates Reporting Services
osteenreporting@gmail.com

Case 20-03060-sgj   Doc 246   Filed 02/10/25   Entered 02/26/25 10:36:11   Desc Main
Document      Page 48 of 90
James Dondero, Vol. 2 - 10/14/2024

Page 214

**A**

**a.m** 148:5 152:4
  184:24
**A1** 196:19
**ability** 206:8
  207:18,22
**above-styled**
  148:4
**account** 160:24
  161:19 165:22
  166:3 168:7
  180:21
**accountant**
  161:14,20
  168:19
**accountants**
  161:7 168:13
  168:19 169:10
  170:18
**accounting**
  166:13
**accounts** 166:21
  167:17 168:22
  169:7 170:20
**accuracy** 202:6
**accurate** 175:6
  187:11 203:4,7
  204:10
**Acis** 147:4,5,10
  147:11 150:13
  150:13,14,16
  150:17 153:1,4
  153:7,8,12,23
  154:8,14 156:7
  156:11 157:6
  157:11 165:5,6
  165:6,11,12
  169:21 171:7
  171:20,23,23
  171:23,24,25
  172:25 173:10
  173:12,12,13
  173:14,14,23
  174:5,24 175:4
  175:13 182:10

211:4,5,10,11
**Acis'** 173:16
**acknowledged**
  206:5
**ACKNOWLE...**
  210:1
**action** 212:18,21
**activities** 187:24
**actual** 186:4
**additions** 168:1
**Administered**
  147:6 211:6
**administrative**
  201:19
**Administrator**
  189:9
**admitted** 206:7
**advantages**
  191:22
**Adversary**
  147:14 211:14
**advised** 155:18
**Advisors** 191:15
  193:4,5 196:18
  196:24 197:3
**Affiliate** 182:16
**affiliation** 163:2
  199:22
**aggregate** 161:9
  164:11
**ago** 152:20
  183:16,16
**agreement**
  150:11,17,19
  151:5,8 157:15
  159:8 163:10
  163:13,16,20
  164:15 167:15
  169:21 170:4
  171:13 173:17
  173:18 174:5
  174:22,22
  175:17,18
  176:1,1 182:22
  184:9 190:21

191:3 192:3,4
  192:5,12,22
  194:22
**agreements**
  148:10
**agrees** 195:21
**Ahmad** 149:3,4
  150:4 152:14
  172:12 179:10
  184:21 197:14
  197:16 205:22
  207:10 208:1,4
**alleged** 178:9
**allocate** 163:13
  163:20
**allocated** 161:19
  163:17 166:21
  170:14
**allocation** 163:9
  170:19
**allowed** 204:5
**allowing** 163:8
**altered** 194:22
**Amended**
  150:16 151:8
  169:20 192:21
**amendments**
  194:21
**amount** 160:24
  161:6,20
  163:17 165:21
  166:2 168:5,10
  175:5 188:18
**amounts** 161:24
  165:18 167:23
  167:24 168:17
  168:18 169:2
  174:24 195:22
**answer** 166:12
  173:2,4
**answered**
  168:25 171:3
**answers** 210:4
**Anybody** 200:16
**apparently**

172:6
**appear** 158:6
  179:21 188:25
**appears** 160:19
  163:1,22,24
  164:2 167:24
  169:14 170:22
  171:16 172:13
  173:7 175:6
  182:24 189:3,4
  193:1,14,17
  196:14 197:23
  201:21
**applicable**
  166:19 170:7
**appoint** 201:23
**appointed**
  201:16,17,19
**appropriate**
  167:16
**appropriately**
  170:20
**approximately**
  195:9
**arbitration**
  151:12 154:20
  154:22,25
  155:7 157:8
  196:15
**asking** 155:3
  156:2,8 181:7
  201:4
**assessment**
  169:4
**assets** 161:10
  164:7,8,11
  176:4 206:13
**Assets'** 164:10
**assigned** 175:19
**assignment**
  150:19 171:13
  174:4
**Associates** 213:2
**assume** 173:19
  174:17 192:7,7

**attached** 164:9
  175:18 179:21
  182:3 210:7
  212:12
**attorney** 192:2,9
  212:20
**attorneys** 187:8
  187:12 188:2,7
  188:12 212:18
**attributable**
  161:10
**August** 196:14
  202:13
**Austin** 149:17
  182:25
**authority** 160:6
**available** 195:23
**Avenue** 148:8
  149:12
**award** 155:7
**aware** 157:6
  162:19 163:16
  189:15 200:17
  207:21,25

**B**

**b** 161:18 164:8
  167:20,21,23
  168:15,17
  175:19 193:18
  193:23 197:8
**back** 162:20
  185:1 186:7
  196:9 207:16
**bankers** 157:5
**bankrupt**
  186:17
**bankruptcy**
  151:14 162:14
  178:4,6 202:12
  202:14,15
  204:14 207:1
**basis** 175:11,12
**Bates** 149:4
  179:25

Case 20-03060-sgj   Doc 246   Filed 02/10/25   Entered 02/26/25 10:36:11   Desc Main
Document     Page 49 of 90
James Dondero, Vol. 2 - 10/14/2024

Page 215

**Beacon** 189:8
**began** 154:14
**beginning** 185:3
**behalf** 153:3
  165:11,14
  166:18,22
  170:6 171:19
  171:22 172:4,5
  174:1,6 189:5
  191:14 193:4,4
  194:13,14
  196:21
**behavior** 162:14
**believe** 154:6,11
  155:24 163:4,5
  167:20 171:12
  173:9 177:14
  177:18 181:19
  184:9 185:3,5
  185:10 186:9
  191:22 192:21
  194:4,11,12
  196:10,12
  197:4 202:1
  203:13 204:15
**bell** 182:17
**beneficial**
  195:20,24
**beneficiary**
  181:2 194:14
  199:8,11,12,16
  202:4
**benefit** 181:11
**best** 157:17
**BESTWICK**
  147:18 211:18
**beyond** 155:15
  156:23 157:3
**biweekly** 187:21
**black-** 160:1
**blacked** 160:1,4
**board** 183:24
  184:1,2
**bottom** 165:17
  165:18 202:22

203:12,15
**break** 184:19
  207:10
**Breault** 183:2
**British** 181:18
**brought** 192:13
**Bryan** 149:23
**bryan@aplus...**
  149:23
**bucks** 207:8
**bullet** 175:3
**business** 155:11
  155:21 162:2
  162:23 163:4
  201:10
**Buy-Sell** 151:8
  192:22
**BVI** 181:15

---

**C**

**c** 149:1 152:1
  164:12,16
  170:2 197:9
**C-MOA** 182:12
**calculation**
  161:13 168:21
  175:6
**call** 179:21
**called** 158:17,18
  158:20,21,25
  160:13 177:25
**calling** 158:15
  158:15
**calls** 187:21
**canceled** 207:1
**cancellation**
  203:24 207:6
**capacity** 196:19
**capital** 147:4,5
  147:10,11
  151:5 153:4,7
  153:8,23
  160:24 161:9
  161:19 165:12
  165:12,22

166:2,21
  167:16 168:6
  168:22 170:19
  171:7,20,24,25
  174:2 179:18
  180:5 181:13
  185:4 190:22
  191:5,6,15
  192:23 193:6
  194:6 196:1
  197:10,19
  202:15,19
  211:4,5,10,11
**capitalized**
  169:15
**careful** 173:2
**case** 147:4,5,7
  164:14 173:12
  173:18 185:10
  211:4,5,7
**cash** 164:12,16
  164:18,20
  195:25 196:3
**cause** 148:4
  164:6 212:20
**caused** 167:8
**Cayman** 150:14
  165:6 172:13
**Caymans**
  177:11
**certainly** 163:6
  169:15
**Certification**
  150:6 211:21
  213:1
**Certified** 211:25
**certify** 210:2
  212:1,7,16
**CHANGE** 209:3
  209:3
**changed** 184:4
**changes** 210:6
  212:13
**Chapter** 147:8
  211:8

**charge** 175:12
**charitable** 185:9
  185:11 198:12
**chart** 180:1
  181:24 182:2
  197:23
**charts** 179:22,25
**chef** 155:10,11
**circumstances**
  166:19,23
  167:9 169:6
  170:7 171:7
**Civil** 148:10
**claimant** 203:18
  204:5
**claims** 151:12
  196:15
**clarity** 151:19
**Class** 193:18,23
  197:8,9,24
  204:6,6 206:7
**classes** 193:23
**clearly** 159:21
**CLO** 147:18
  149:16 150:13
  150:13,14,16
  150:20 153:1
  153:12 156:11
  159:25 160:24
  161:1,6,19
  163:3,7,8,13
  163:17,20
  164:4,7,10,13
  164:17 165:6,6
  165:7,22 166:2
  169:21 171:23
  171:24 172:4
  172:25 173:12
  174:10 177:3
  178:17,19
  180:8 181:14
  181:15,21
  187:9,17
  188:10 211:18
**CLO-7** 173:13

173:14 182:10
**coffee** 184:19
**Cohn** 149:23
**collectively**
  164:9
**colluding** 205:3
**collusion** 204:25
  205:2
**column** 203:17
**come** 175:4
**commence**
  155:1
**Commonwealth**
  201:18
**communicated**
  172:21 187:11
  188:1,6,9
**communication**
  187:16 188:11
**Company**
  201:18
**compensation**
  203:20,22
**completion**
  212:10,15
**concerning**
  152:25
**concluded** 208:7
**conditions**
  164:14 191:3
**confidential**
  196:13
**conflict** 157:6,25
  158:1,3,4
**connection**
  173:9 175:16
**consent** 150:12
  165:5 169:15
  195:21
**consents** 195:25
**consequence**
  181:10
**considerations**
  191:24
**consummated**

Case 20-03060-sgj   Doc 246   Filed 02/10/25   Entered 02/26/25 10:36:11   Desc Main
Document   Page 50 of 90
James Dondero, Vol. 2 – 10/14/2024

Page 216

199:24 200:6
**contact** 176:24
**contain** 212:12
**contemplation**
167:14
**contents** 191:1
**contingent**
204:4
**continue** 152:19
173:10 174:3
**continued** 151:1
152:5,13
173:14
**contracts** 157:9
**contribute** 191:5
**Contributed**
161:10 164:7
**contribution**
151:5 161:2
164:5 190:20
192:5,12
**Contributor**
191:4
**contrived**
204:20
**control** 162:16
200:10,11,12
207:18,22
**controlled**
200:13,23
202:24
**conversation**
151:20
**conveyance**
164:7,8
**Cooke** 149:3
**corporate** 177:7
177:10,16,21
**correct** 153:4,9
153:13,21,23
154:17,23
155:1 157:20
159:18 161:17
163:3,10,14
165:13,14

166:7,9 169:12
171:17,20
178:15 179:16
180:2,5,6,14
180:25 181:1,3
181:4,22,25
182:10,11,23
183:2 184:15
185:6 186:8
188:2 189:2
191:16 192:16
193:6 195:9
197:11,20,21
198:5 199:10
199:11 200:4
201:9,23,25
202:1 203:16
210:4
**corrections**
210:5
**cost** 206:14
207:6
**counsel** 155:19
155:20 156:16
156:19,22
157:16 197:18
212:16
**County** 148:9
**couple** 155:9
176:20 179:8
**Cournoyer**
150:22 179:13
179:16 182:3
**course** 180:23
**court** 147:1
151:14 152:6
202:12 211:1
**court's** 202:14
**covenants**
195:19
**COVITZ** 147:16
211:16
**Crawford** 148:8
149:11
**creditors** 204:25

205:3,3
**critical** 173:11
174:4
**CSR** 148:6
212:25
**Cullinane**
172:15,18,21
**Current** 183:6
**currently**
199:10
**cutting** 204:6

---
## D

**D** 149:17 150:1
152:1 201:12
**DAF** 199:25
200:8,9,10,11
200:12,13,23
201:4,6
**Dallas** 147:2
148:9,9 149:13
211:2
**Dana** 183:1
**date** 154:15,16
164:12 167:20
209:2 210:10
212:11
**dated** 171:13
173:18 183:10
183:11 190:21
195:2 196:13
**dating** 183:14
183:14,15
**David** 152:17
**day** 148:4
212:22
**days** 212:11
**debt** 175:13
**Debtors** 147:7
147:12 211:7
211:12
**December**
171:13 189:22
190:21 195:3
**decided** 154:9

155:16
**decision** 154:4
155:21,22,24
156:3 174:6,8
**decisions** 207:20
207:23
**deduction**
167:25
**DEFENDANT**
149:10,16
**Defendants**
147:19 211:19
**defined** 169:14
173:13
**departure**
156:10 158:2
**depend** 169:9
**depends** 154:13
154:15
**deponent** 210:1
212:8,9,14
**deposition**
147:22 148:1
152:5,19,23
171:12 177:2
179:7 182:22
188:17 190:20
192:21 202:11
211:22 212:5
212:10,15
**described**
157:25 185:9
**description**
150:8 151:2
159:16
**designated**
164:18
**desire** 164:6
**desires** 173:15
188:7 191:4
**details** 156:17
178:7,11
**determination**
161:23 170:13
**determined**

161:5 163:6
166:1,17 167:4
167:15 168:3
168:19,20
170:5 174:2
175:24 186:9
**determining**
163:7 167:7
168:9 169:1
**difference**
160:16,23
165:21
**different** 176:6
**direct** 162:16
198:13
**directly** 155:11
181:21 196:3
**director** 163:3
172:13 197:2
**directors** 179:2
**disputes** 202:24
**dissolution**
152:25 153:13
158:16,21,25
**dissolve** 153:14
154:1,5,10
155:5,17
156:25 187:17
**dissolved** 164:23
165:1 187:9
188:11
**dissolving**
156:11
**distinguish**
181:8
**distribution**
196:3
**distributions**
180:20 181:11
187:1 195:20
195:23 196:2
**DISTRICT**
147:1,1 211:1
211:1
**DIVISION**

Case 20-03060-sgj    Doc 246    Filed 02/10/25    Entered 02/26/25 10:36:11    Desc Main
Document        Page 51 of 90
James Dondero, Vol. 2 - 10/14/2024

Page 217

147:2 211:2
doctor 160:25
document
    151:20 157:18
    159:13,17,20
    160:12 163:8
    165:11,19
    167:3 170:1
    171:14,17
    172:23 176:10
    183:9 188:17
    189:4
documents
    165:23 166:4
    166:16 168:23
    171:1 175:8
dollar 167:24
    175:7
dollars 206:19
Dolomiti 198:17
    198:18,21,24
    199:21
Dondero 147:15
    147:22 148:1
    149:10 150:3
    150:10 152:5
    152:11,17,18
    169:19 185:3
    193:8,11
    198:12,17
    201:17,22
    202:2,3,25
    205:14 206:5
    207:18 209:2
    210:10 211:15
    211:22 212:3
donor-advised
    199:22 200:4
doubt 202:6
Dow 148:6
    211:25 212:25
Dr 213:2
drafting 192:2
due 157:8
    168:18

Dugaboy 150:24
    180:24 181:2
    182:22 193:9
    194:15,15,18
    195:4 198:4
    199:5,20
    201:12,16,18
    201:23 202:4
    202:25 203:5
    203:25 206:9
Dugaboy's
    194:2,4 206:15
    206:22
duly 148:3
    152:12 212:3

_____

**E**

E 149:1,1 150:1
    152:1,1
earlier 162:1,7
    164:22 187:7
    199:15 201:1
economic
    180:19,25
    181:8,10
    198:11,15
effect 163:12
    187:15 189:20
effected 167:14
effective 159:8
    164:12 165:7
    167:19,19
    193:19,21
    197:9
effectively
    172:24
effects 163:14
    163:19
effectuated
    190:15
either 198:23
    199:5
elected 154:1
    155:4 156:25
    157:18,21,24

elective 157:16
ELLINGTON
    147:16 211:16
Email 150:22
emails 179:8,13
employed
    212:17
employee
    212:19
enclosed 167:24
ensure 173:14
enter 192:11
entered 188:22
    191:21
entering 175:17
    175:25
entities 162:16
    165:14 171:23
    176:6 177:14
    178:24 196:15
    199:3,3,5,19
    199:21
entitled 158:7
    159:7 195:12
entity 154:14
    172:10,25
    174:14,17
    177:25 178:4
    184:3 185:17
    186:1 199:25
Errata 150:5
    209:1 210:7
    212:12
essentially
    190:25
estate 204:21,22
evaluation 176:8
    176:11,17
evaluator
    176:14
exact 151:19,20
    175:20
exactly 157:12
    185:15
Examination

150:4 152:13
example 155:4
    155:13 168:3
    175:10
excess 195:24
    196:3
exchange 190:3
    191:6 196:9
    204:3
excuse 155:13
    194:15
Exempted
    150:17 169:20
exhibit 150:8,9
    150:11,12,16
    150:19,20,22
    150:24 151:2,3
    151:5,8,10,12
    151:14 152:24
    159:6 165:3,4
    166:5 167:1,20
    167:21,23
    168:15,17
    169:18 171:10
    171:12 176:25
    177:1 179:5,7
    179:12 182:20
    182:21 188:15
    188:17 190:18
    190:20 192:6
    192:19,20
    193:14,16
    194:22,25
    195:2 196:11
    197:5 202:9,11
Exhibits 150:7
    151:1 152:2,23
    175:18
expenditure
    170:4,14
expenditures
    166:16 167:8
expires 213:1
extent 166:17
    170:5 182:4

196:2,24

_____

**F**

fact 159:20
fair 175:24
    182:6,19
familiar 167:22
    168:1 184:12
family 198:8
    199:7 201:17
    204:3
far 155:14
    193:16 200:18
Farallon 205:4,8
fault 169:5
Federal 148:10
fees 203:1,5
fewer 166:20
    167:9 170:8
fifth 173:6
filed 154:22
filing 203:6
final 165:17
financially
    212:20
firm 154:7 156:6
    177:18,19
    213:1
firms 177:11
first 152:12,24
    153:18 157:22
    157:23 160:11
    160:19 172:23
    173:22 179:8
    179:12 191:10
    193:2 195:13
    202:18 205:8
firsthand 188:4
    188:5
five 160:14
    175:11 183:16
flows 198:12
following 155:1
    179:20 212:2
follows 152:12

Case 20-03060-sgj   Doc 246   Filed 02/10/25   Entered 02/26/25 10:36:11   Desc Main
Document   Page 52 of 90
James Dondero, Vol. 2 – 10/14/2024

Page 218

foregoing
195:17 210:3
foremost 205:8
form 155:23
157:2 159:2
162:18 169:8
170:16 172:10
174:13 178:22
186:24 187:13
187:19 188:3
188:13 190:14
194:8,10,20
202:7 203:9
204:11,17
206:17,20,24
207:7 210:6
formed 156:24
174:11 189:19
189:21
forming 189:16
Fort 149:19
forth 164:9,15
167:20
forward 157:5
157:11,16
192:13
foundations
198:12
fourth 167:12
FRANK 147:15
211:15
FRCP 212:7
friend 183:23,24
184:6,8
friends 162:10
162:11,21
184:14
front 159:6,13
165:4 169:19
179:12 182:21
192:20 195:1
Fuck 205:25
fund 150:13,13
150:14,16
153:12,13

154:2,5,10
155:5,17
156:11 157:1
158:16,22
159:1,22
164:23 165:1,6
165:6,7 167:17
169:21 184:5
187:9,17
188:11 199:22
200:4
funds 153:1
163:9,13,20
166:16 183:25
184:2
further 195:25
212:7,16,19

———————
**G**
G 152:1
general 150:12
153:4,18,19,20
153:25 156:24
159:22 165:5
165:13 166:17
167:15 170:6
171:20 173:3
191:15 193:5
196:19,21,25
generally 167:22
168:1,2 176:20
179:3
getting 186:12
girlfriend 183:5
183:6,8,12
given 210:4
212:5
go 157:5,11
160:11,14,21
166:14 167:12
167:21 170:1
173:6 174:20
179:24 190:25
191:12 193:1,2
193:13 195:15

197:22 201:11
202:3 203:12
205:10,10
goes 161:2
164:13 165:18
going 152:22
164:1 177:1
182:5,5,12
188:16 202:10
207:2,8
governed 168:22
governing
160:25 165:23
166:3,15
168:23 175:7
GP 147:5,11
153:4,8,23
165:13 170:20
171:20,24,25
211:5,11
Grant 147:17
160:6,9 162:1
162:2,21
200:19,22
201:15 211:17
Grosvenor
205:4
group 184:5
205:5
guess 160:18
182:12 196:23
207:5
guys 158:19

———————
**H**
Hakusan 198:18
198:25 199:21
half 180:1
halfway 160:21
hand 152:9,22
177:1 188:16
202:10
handed 171:11
179:6 190:19
handle 157:17

handled 155:19
happy 173:5
HarbourVest
157:4 158:14
158:17,19,23
158:24 164:23
164:24,25
187:8,22,23,25
188:6,10 205:5
HART 149:17
HCLOH 173:15
173:24 174:11
174:16 175:17
175:20 177:3
HCM 173:9,10
174:2,6,24
175:5,16,19
HCM' 196:1
HCMLP 196:20
head 172:19
hearing 154:25
HEATHER
147:17 211:17
held 194:13,17
197:24 198:16
203:25
Help 182:13
hereto 164:9
167:20 175:18
Highland
150:20 151:5
172:4,25 174:1
174:10,18
176:4 177:3
178:4,6,17,19
178:24,25,25
179:3,4,18
180:5,8 181:13
181:14,15,21
184:5 185:4,8
185:12,21
186:5,7,12,14
186:17,25
187:2,4 188:7
188:9,23 190:4

190:21 191:6
191:15 192:5
192:17,22
193:6 194:1,2
194:3,6 196:1
196:8 197:10
197:19 202:15
203:25
Highland's
187:8,11 188:1
188:12 196:24
Highland-na...
174:17
highly 155:18
HMIT 202:19
202:23 203:25
205:13 206:4,8
HMIT's 206:7
Hold 193:16
Holdco 147:18
149:16 159:25
161:1,6 163:3
163:7,8,14,17
163:21 164:5,8
164:10,13,17
211:18
Holdco's 160:24
161:19 165:22
166:2
holder's 204:4
holders 204:5
Holdings 150:21
172:4,25
174:10 177:3
178:18,20
180:8 181:14
181:15,21
Honis 183:19,22
189:5,11,24
190:6 191:18
199:24 200:7
201:2,8
Houlihan
176:15
Houston 149:6

Case 20-03060-sgj   Doc 246   Filed 02/10/25   Entered 02/26/25 10:36:11   Desc Main
Document     Page 53 of 90
James Dondero, Vol. 2 - 10/14/2024

Page 219

hundred 180:4
   180:21 181:20
   193:18
Hunter 147:16
   151:6 185:12
   185:16,18,22
   185:25 188:25
   189:5,12,16,25
   190:2,7,12,22
   191:4,19 192:4
   192:6 193:14
   193:17 195:4
   195:18 197:9
   197:19 198:11
   198:16 199:20
   200:3,8 201:4
   201:7 202:21
   203:1,5 207:19
   207:23 211:16
Hurst 213:3

——————
   I
——————
idea 173:22
   174:13 175:14
   186:22 192:11
   192:13
identify 161:16
   161:21 176:22
ii 150:13,13,14
   150:16 160:15
   165:6,6,7,20
   169:21
implementation
   168:24
inaccurate
   182:3
income 187:4
incorrect 182:8
increased
   160:25 165:22
   166:3
independent
   163:5 176:23
   201:16
indicated 167:5

200:2
indicating
   164:25
indirectly 179:1
   198:16
individual
   172:11,12
individuals
   176:19
influence 161:23
   207:19,23
information
   205:1,7
inside 199:25
   200:8 205:7
insider 205:1
instance 148:2
interest 162:15
   162:17 173:8
   173:16,17
   177:20 178:13
   178:14,17
   180:8,11,14,19
   180:25 181:8,9
   181:10 186:25
   188:24 191:7
   193:21 194:1,2
   194:3,4,5,6,9
   194:11,13,23
   196:8 197:10
   197:24 202:3
   204:4,5 206:7
interested
   212:21
interests 173:23
   197:6
internal 176:17
investment
   150:24 151:6
   157:5 185:12
   185:22 187:22
   189:1,6,12
   190:22 191:19
   193:9 194:15
   195:4,5,19

198:4,11,16
199:20,20
207:19,23
investors 150:9
   153:11 156:13
   156:14 158:15
   158:20 179:1,2
   179:3
involved 155:11
   156:14,19
   169:9,11
   170:17 174:8
   185:18,19
   186:2 187:20
   192:2
involvement
   189:16
ISAAC 147:16
   211:16
Islands 181:18
issue 157:13
   178:6
issued 202:12
   206:5

——————
   J
——————
James 147:15,22
   148:1 149:10
   150:3 152:5,11
   152:17 201:15
   209:2 210:10
   211:15,22
   212:3
JD-551848
   150:17
JEAN 147:16
   211:16
Jernigan 178:9
Jim 180:2
joeahmad@az...
   149:7
John 172:15,17
   172:21 183:19
   183:22 189:5
   189:11 191:18

201:2,8
Jointly 147:6
   211:6
Joseph 149:3,17
joseph.austin...
   149:20
Josh 154:6,8
   155:6 156:9,10
   156:15,23
   157:3 158:2
   196:14
July 154:16
June 159:8
   162:20 165:7

——————
   K
——————
K 148:6 211:25
   212:25
KELLY 149:17
key-man 157:8
   157:15
kind 160:15
   164:10 169:10
   170:13
kinds 155:20
   204:24,25
KIR-ACIS001...
   150:23
KIR-ACIS001...
   151:12
KIR-ACIS002...
   150:24
KIR-ACIS002...
   150:19
KIR-ACIS002...
   150:21
KIR-ACIS005...
   151:11
KIR-ACIS005...
   151:9
KIR-ACIS005...
   151:6
KIR-ACIS005...
   151:4
KIR-ACIS005...

150:11
KIR-ACIS005...
   150:15
KIR-ACIS005...
   150:10
knew 183:13
know 155:14,15
   156:13,19,21
   157:7,10,10,13
   157:13,14
   158:5 160:5
   161:5,7 163:15
   164:17,20
   165:2 166:1
   168:3,8,12
   169:13,16
   172:9,20
   173:22 174:1,5
   174:10,11,13
   174:16,18
   175:4,9,11,24
   176:7,13,18,19
   177:7,16 178:3
   178:10,13
   179:14 180:10
   181:14 182:15
   183:9 185:19
   186:5 187:16
   187:20,25
   188:6,8,9,11
   188:14,21
   189:11,19,24
   190:2,6,8,8,9
   190:10,12,15
   190:15,16
   192:11 193:24
   194:17 196:24
   197:1 198:23
   199:12,13,17
   199:18,23,25
   200:1,5,6,7,9
   200:18,25
   203:10,11
   204:12,21
   206:13,14,25

207:6
**knowledge**
188:4 206:12
**known** 184:17

**L**

**L.P** 147:4,10
150:13,14,14
150:16 151:5
153:8 165:12
169:21 171:8
171:23,24
190:22 192:23
193:6 196:1
197:20 211:4
211:10
**Lang** 148:8
149:11,11
155:23 157:2
159:2 162:18
169:8 170:16
172:10 178:22
179:9 186:24
187:13,19
188:3,13
190:14 194:8
194:10,20
197:13,15
202:7 203:9,17
204:11,17
205:18,21,24
206:2,17,20,24
207:7 208:3
**largely** 194:4
**larger** 177:10
**launch** 157:7
**law** 177:18,19
**lawyer** 179:16
192:15
**lawyers** 156:4
159:3,4 168:24
169:9 170:18
**Leah** 148:5
211:25 212:25
**learn** 158:24

**leaves** 155:11
182:25
**leaving** 154:8
157:3
**left** 154:6 155:6
155:15 180:22
205:16 207:11
**legal** 155:22,24
156:3 187:24
187:24 203:1,5
**let's** 175:11
**letter** 150:9
157:19 201:12
**letters** 155:20
**LEVENTON**
147:16 211:16
**likewise** 171:16
**limited** 150:17
167:17,18,19
168:4,6 169:14
169:20 177:7
177:17 191:7
193:18 197:24
203:25
**line** 180:7
181:13,21
193:22 209:3
**lines** 160:14
191:14 193:2
193:13 205:13
**liquidated**
204:22
**liquidation**
152:25 153:12
**literally** 187:21
**litigation** 154:14
154:19
**little** 152:19
184:20
**LLC** 147:6,12
189:8 198:18
198:18 211:6
211:12
**long** 184:17
195:17 200:22

**longer** 156:6
162:11
**longtime** 162:10
183:23
**look** 153:17
159:16 163:25
165:16 168:4
172:23 174:19
175:15 181:12
182:9 196:19
197:5 202:18
202:22 203:19
**looked** 171:19
**looking** 157:21
182:4,5 183:9
**looks** 153:5
159:25,25
163:2 166:11
171:22 172:3
177:2,24
191:14 195:8
195:15 197:8
197:22 198:7
202:21
**lose** 206:23
**loss** 193:22
**LP** 179:2 181:13
**LST** 179:25
**LST00708700**
180:1

**M**

**machine** 148:7
**Main** 149:18
**major** 157:13
**majority** 182:13
**majoritywise**
179:4
**maker** 195:18
195:21 196:2
**maker's** 195:24
**making** 161:1
164:4 190:3
**management**
147:4,5,10,11

151:5 153:4,8
153:8,23
165:12,12
171:8,20,23,24
171:24,25
172:6 173:14
174:2 177:21
179:18 180:5
181:13 185:4
186:1 190:22
191:6,16
192:23 193:6
194:7 196:1
197:10,20
201:15 202:15
211:4,5,10,11
**manager** 186:4
**Maple** 177:6,16
177:21
**March** 173:19
**Marie** 201:17
**Mark** 178:5
181:5,5 185:5
186:8 190:9,10
190:12 192:14
199:4,24 200:7
200:15 201:2,8
**marked** 152:2
152:22 165:3
169:18 171:10
171:11 176:25
179:5,6 182:20
188:15,16
190:18,19
192:19 194:25
195:1 196:11
202:9,10
**market** 164:11
**marks** 151:19
**Master** 150:14
150:16 159:22
165:7 173:17
**material** 205:1
**McKinney**
149:5

**mean** 155:12,18
163:12 171:1
172:15 179:1
180:13 194:1
198:23 203:8
204:24
**means** 180:18
**meant** 180:10
**mediation** 157:8
**member** 177:6
183:24 184:1,2
**members** 150:20
177:3
**membership**
202:3
**memo** 151:12
196:13
**MENSING**
149:4
**mentioned**
158:14 164:22
183:18 187:7
201:1,21
**mentions** 202:2
**met** 172:20
**Michael** 149:11
**midlevel** 176:21
**million** 175:20
176:2 188:19
195:9 204:21
204:22 207:8
**millions** 206:19
**minority** 179:1
179:2,2
**mlang@cwl.law**
149:14
**moment** 172:22
**money** 158:4
199:13 205:14
206:4
**months** 204:23
**motivated**
191:23
**Mountain** 151:6
185:12,17,22

Case 20-03060-sgj    Doc 246    Filed 02/10/25    Entered 02/26/25 10:36:11    Desc Main
Document        Page 55 of 90
James Dondero, Vol. 2 - 10/14/2024

Page 221

185:25 189:1,5
189:8,12,17,25
190:2,7,22
191:4,19 192:4
192:6 193:14
193:17 195:4
195:18 197:9
197:19 198:11
198:16 199:20
200:3,8 201:5
201:7 202:21
207:19,23
**Mountain's**
185:18 190:13
203:1,5
**Movant** 202:19
**mutual** 183:24
184:2

**N**
N 149:1 150:1
152:1
**name** 152:15
172:15 178:24
179:3 183:18
183:20 184:3
185:14,23,25
198:24
**named** 184:9
**names** 198:22
**Nancy** 193:8,11
201:17
**necessarily**
151:19
**need** 169:6
**neither** 212:16
**net** 161:9,18
**Neutra** 177:25
178:2,20
181:20
**never** 158:19
161:2 164:5
200:13
**non-economic**
180:7,11,16

181:8
**nonpublic** 205:1
205:7
**NORTHERN**
147:1 211:1
**Northglen** 213:2
**note** 151:3,10,18
186:7,12,15,19
186:22 187:5
188:18,21
195:2,18,22
196:7,8,10
206:6,9,15,16
206:22
**note's** 207:1,2
**noted** 173:9
210:6
**notes** 186:9
**notified** 173:10
**notifies** 153:19
**notifying** 153:11
153:25
**notion** 167:23
168:1
**notwithstandi...**
195:16,17
**November**
212:23
**number** 161:18
200:24,24
204:23 207:8
**numbered** 148:4
**numbers** 166:5
**numerical**
167:23

**O**
O 152:1
**oath** 152:10
**Objection**
155:23 157:2
159:2 162:18
169:8 170:16
172:10 178:22
186:24 187:13

187:19 188:3
188:13 190:14
194:8,10,20
202:7 203:9
204:11,17
206:17,20,24
207:7
**objectives**
163:24
**obtained** 201:6
**occurring** 171:4
**October** 147:23
148:5 152:4
183:10,11
209:2 211:23
**offices** 148:7
**offshore** 167:17
177:14
**Oh** 159:10
179:10 180:23
205:25
**Okada** 178:5
181:5 185:5
186:8 198:7,13
198:17,22
204:1
**Okada's** 199:4
**okay** 152:15
153:11,16
154:8 155:2,3
155:16 156:2,8
156:18,23
157:18,24,25
158:3,20,24
159:20 160:11
161:5,8 163:1
163:6,25 166:1
168:3 169:19
172:15 173:22
175:9 177:1,12
178:12,16
179:11,16,24
180:13 181:7
182:6,9,16,16
184:11 185:3

185:11,16,21
186:2,11 188:5
193:17,25
194:5 195:15
196:12 198:24
198:24 199:2,6
199:15,17,19
201:6,11
202:22 203:8
204:3,19 205:2
205:10,20
206:3,14 207:4
207:11,12
**once** 154:14
157:6 193:3,4
**opinion** 151:14
202:12
**opinions** 202:14
**oppose** 204:13
204:16
**oral** 147:22
148:1 211:22
212:4
**orally** 187:17
**order** 173:13
**orders** 202:14
**original** 192:13
**originally** 185:4
**Osteen** 148:6
211:25 212:25
213:2
**osteenreporti...**
213:4
**outcome** 212:21
**outlined** 174:4
**outstanding**
174:23 175:21
195:18
**oversees** 203:18
**owe** 175:4
205:13 206:4
**owing** 174:24
**owned** 174:16
177:16 178:8
178:25 179:4

185:4 200:3
**owner** 186:4
195:20,24
197:2
**ownership**
162:15,17
177:19 178:13
178:14,17,19
179:22 181:11
181:20 182:13
190:3 198:11
198:15,17
199:2,4,5
201:7
**owns** 174:16
193:17 197:9
197:19

**P**
P 149:1,1 152:1
**p.m** 148:5 185:2
207:14,17
208:6,7
**Pacific** 148:8
149:12
**page** 150:2,8
151:2 159:20
160:11,19
164:1,2 165:17
165:18 166:14
167:1 170:1
172:3,23 173:6
174:20 179:8
179:13 180:2
189:4 190:25
190:25 191:9
191:10,12
195:13 197:23
201:11 202:18
203:12,15
205:10,23
209:3
**pages** 179:20
210:3
**paid** 166:18

170:6 186:19
186:22 206:15
206:22 207:2
**paragraph**
153:18 157:23
160:17,18
161:9,24
163:23 166:8
167:13 170:2
170:11 202:23
**parentheses**
160:15 167:25
195:24,25
204:7
**parenthetical**
165:20
**part** 157:11
**partially** 160:1
**particular**
166:19,23
167:8 170:7
171:7
**parties** 153:5
164:6 176:5
212:17
**partner** 150:13
153:4,19,20,20
153:25 156:25
159:22 165:5
165:13 166:17
167:15,19
168:4 169:14
170:6 171:20
191:15 193:5
196:19,22,25
**partner's** 168:6
**partners** 155:9,9
166:20,22
167:4,10,17,18
169:5 170:8,15
193:18,23
196:20,21
197:24 198:5,8
**partnership**
150:17 155:12

169:20 170:5
191:5,7,7
194:7,23 197:6
203:25
**parts** 181:24
**party** 212:9,15
**pass** 199:9 208:2
**Patrick** 190:9,10
190:12 192:14
199:24 200:7
200:15 201:2,8
205:12,13
206:3,7
**PAUL** 147:16
211:16
**pay** 186:7
195:21 206:8
**payable** 166:16
170:4 196:2
**payee** 195:21,22
196:4
**paying** 196:1
203:1,4,5
**payment** 164:10
164:12,17,18
164:18,20
190:3
**payments**
166:22,24
167:5 186:14
195:11,12
**people** 176:21
201:10
**percent** 180:4
180:22,24
181:20 193:18
193:19,19,21
193:23 197:9
197:19 198:10
198:15
**percentage**
197:6
**percentages**
194:23
**Perfect** 208:4

**period** 195:21
**person** 167:3
**personal** 162:4
194:3
**personally**
194:14,18
205:14 206:5
**personnel**
173:11 174:3
**picked** 198:22
198:24
**PIK** 164:10,11
**place** 160:9
161:2 164:6
**placed** 152:10
**places** 159:18,21
**Plaintiffs** 147:13
148:3 149:2
211:13
**plan** 203:14,23
203:24 204:7
204:14,16,20
**please** 152:6,9
152:15
**PLLC** 148:8
149:4,11
**point** 162:5,6
175:3 176:3
185:15 200:15
**pointing** 205:19
**points** 175:11,12
**possibly** 158:15
187:11
**power** 201:22
**precise** 197:17
**PRESENT**
149:22
**president**
153:20 189:12
189:24 190:6
190:13,16
191:18
**previous** 165:19
**previously** 200:3
**primarily** 160:1

205:5,6
**primary** 181:2
199:8,10,16
202:4
**principal** 195:8
**prior** 195:20
200:22
**privileged**
150:22 196:12
**pro** 204:4
**probably** 176:5
205:12
**Procedure**
148:10
**proceeding**
212:18
**proceedings**
182:25 208:7
**produced** 148:2
**professionals**
187:22,23
**profit** 161:10,19
193:22
**promise** 195:3
**promissory**
151:3,10
188:18,21
195:2 206:6
**pronounce**
198:23
**pronouncing**
183:2
**propounded**
210:5
**provide** 173:11
174:3
**provided** 170:4
170:18
**provides** 203:14
203:23,24
**provisions** 157:9
157:15
**purpose** 161:1
164:4
**pursuant** 148:9

160:25 165:23
166:3,15
174:21 191:3
212:7
**put** 155:20
157:16 200:8

───────
**Q**
**question** 152:24
163:11,18
164:16 171:2
173:3,3 196:23
206:21 207:4
**questions**
168:23 210:5
**quickly** 200:6
**Quotations**
151:19
**quote** 173:7
195:24,25

───────
**R**
**R** 149:1 152:1
**raise** 152:8
**raised** 175:11,13
**rata** 204:4
**rates** 175:10
**read** 151:20
157:23 164:2
173:23 202:13
210:3
**reading** 151:19
**reallocate**
167:16 169:6
**reallocated**
168:18
**reallocation**
167:21 168:6
170:19,21
171:2,6
**reallocations**
168:15 171:3
**really** 158:6
194:1
**reason** 154:9,12

Case 20-03060-sgj   Doc 246   Filed 02/10/25   Entered 02/26/25 10:36:11   Desc Main
Document      Page 57 of 90
James Dondero, Vol. 2 - 10/14/2024

Page 223

155:5,14
156:24 160:8
162:13 166:18
170:7 202:6
209:3
**reasons** 191:25
204:18 212:13
**recall** 159:5
167:6,11
172:22 174:9
178:3,10
185:23,23
192:8
**receipt** 212:11
**receivable**
175:21
**received** 187:1
**receiving** 186:14
**Recess** 184:25
207:15
**recognize**
183:20
**recollection**
156:5,12,15
158:5,8 182:8
**recommendati...**
156:16,20
**reconstitute**
155:12
**record** 148:11
152:4,16
184:23 185:2
207:13,17
208:5 212:5,20
**Redemption**
151:8 192:22
**reduction** 168:7
**referenced**
151:20 160:12
**referring** 158:1
**refers** 160:15
**reflect** 151:19
171:2
**reflects** 176:10
**refreshed**

156:17 174:12
**regarding**
151:12 157:12
168:24 169:21
170:19 187:24
196:14
**register** 150:20
177:3
**Registration**
213:1
**related** 212:17
**relationship**
162:2,4,9,23
163:2,5 177:12
177:13
**relative** 212:19
**relevant** 171:7
**remainder**
185:9,11,20,24
185:25 188:24
189:1
**remaining**
206:16
**remember**
154:20 155:2
156:13,14,21
157:10,12
163:19 167:7
170:21,25
171:3,6 178:4
178:6,7,23,23
184:13 185:14
185:14,16,18
185:20,21,24
186:1,6,11,19
187:10,14
190:17 191:25
192:1,7,9
194:16,19,21
**remove** 201:22
**Reorganized**
147:12 211:12
**repeat** 163:11
163:18
**reported** 148:7

**reporter** 152:6
212:1
**Reporter's**
150:6 151:18
211:21
**Reporting** 213:2
**represents**
160:24 165:21
196:3
**requested** 212:9
212:14
**required** 156:10
**rescission**
150:11 159:8
163:9,13,16,20
167:15
**reserve** 208:3
**resignation**
158:7,7,12
**respect** 168:14
173:12
**respectively**
175:19 198:18
**Restated** 150:16
151:8 169:20
192:22
**restaurant**
155:8
**result** 163:9
173:8
**retail** 183:24
184:2
**retain** 194:9
**retained** 194:11
**return** 164:6
**returned** 212:11
212:12
**right** 152:9
153:6 157:24
159:11 166:6
167:13 173:16
175:5 178:18
179:10 180:15
180:17 182:19
183:19 193:9

197:14 198:8
198:21 199:8
199:12 205:16
205:17,18
206:1,1,3
207:2,2 208:3
**right-hand**
203:13,17
205:11
**rights** 172:24
**ring** 182:17
**rise** 166:23
167:4 169:6
**role** 168:9 169:1
185:20
**rotate** 176:21
**roughly** 183:15
186:11
**Rule** 212:7
**Rules** 148:10

**S**

**S** 149:1 152:1
**sale** 188:23
**satisfied** 195:22
**saying** 178:12
182:9 183:19
187:14 198:21
**says** 153:18
157:18 160:23
161:8 164:2
165:20 166:15
167:13 170:3
172:5 173:5,7
173:21 174:21
175:5,16 183:1
189:8 191:2
193:19 195:16
196:18 197:18
198:10 201:15
203:6,13 206:7
**sbates@azala...**
149:8
**Schedule** 164:9
**Scott** 147:15,17

147:18 160:6
162:1,2,21
183:1 200:19
200:22 201:15
211:15,17,18
**Scott's** 160:9
**second** 151:8
153:17 157:23
174:19,20
175:3 179:24
192:21 195:15
206:6
**secondhand**
188:6
**secondly** 205:9
**section** 165:20
170:1 195:12
**secured** 151:3
151:10 195:2
**see** 153:1 154:2
154:16 159:7
159:13,21,22
160:2,12,16
161:3,8,11
165:8,10,24
166:14,25
167:21 169:22
169:25 170:2,9
171:14 172:1,3
172:7,24 173:1
173:20 174:25
175:3,22 177:2
177:4,6,25
179:20,22
180:1,8 181:16
182:2 188:18
188:19 189:9
190:23 191:2,8
191:13 192:24
193:3,19 195:6
195:12 196:5
197:5,6,25
198:13,19
201:11,12,13

Case 20-03060-sgj   Doc 246   Filed 02/10/25   Entered 02/26/25 10:36:11   Desc Main
Document      Page 58 of 90
James Dondero, Vol. 2 – 10/14/2024

Page 224

201:19 202:19
202:20,25
203:2,14 204:8
205:11,15
206:10 207:10
seen 171:1
176:10 196:20
self-explanatory
180:12
sell 194:6
selling 185:21
185:24
sentence 153:18
157:22,23
160:14 195:16
195:17 202:23
203:13,19,22
205:11 206:6
separate 176:3
200:8
serious 203:20
203:21
service 175:25
services 173:11
173:18 174:4
174:22 175:17
177:7,10,16,22
213:2
set 164:9,15
167:20
settlor 183:1
seven 183:16
seventh 164:1,3
165:16
SEVILLA
147:17 211:17
share 204:4
shared 174:21
175:17,25
shares 177:24
180:5
Shawn 149:4
shortfall 160:12
160:13
shorthand 148:7

211:25
shortly 189:21
shows 180:7
sic 160:25 170:5
side 203:13
205:11,16,16
205:17 206:1
sign 170:20
196:21
signatory
171:16
signature
159:17,21,25
160:4 165:10
165:13 183:10
183:11 191:13
193:2,13 212:8
signed 157:20
160:8 171:19
171:22 193:3,8
signing 153:3,5
160:6 163:8
165:11,14
167:3 172:4
189:5 191:14
signs 191:18
similar 170:2
simultaneous
173:15
single 183:5
sir 152:8 208:1
sister 193:11
sixth 160:19,20
161:24 163:23
small 194:12
sold 185:8,12
186:25 193:25
194:1,2,5
196:8
solely 156:2
somebody
166:12 172:4
176:16
sorry 159:10
160:17,18

179:1,10 184:1
189:14 193:14
194:10 197:14
199:18 205:23
sp 205:4
special 167:19
168:4,6 169:13
specific 168:24
173:3 175:7
specifically
166:21 170:17
171:5 172:5
174:20 176:9
speculate 172:14
spinoff 177:18
spoke 158:19
spoken 172:20
200:5
Staff 173:18
staged 158:5,9,9
158:12
stamp 179:25
stand 182:14
start 155:8
156:18 182:10
183:15
started 159:10
183:14,14
starting 179:25
195:16 202:23
starts 203:22
205:11
state 148:6
152:15 212:1
stated 148:11
statement
202:25
statement's
202:6
statements
202:18
STATES 147:1
211:1
STENOGRA...
152:8

Stonehill 205:4
205:8
stop 186:17
Strand 191:15
193:4,5 196:18
196:20,21,24
197:2
Street 149:5,18
Strike 206:2
structure 185:15
197:23
stuff 169:10
sub-advisor
175:18 176:1
sub-advisory
173:17 174:22
175:10
subject 150:22
164:14
Subscribed
212:22
substance 210:6
successor 184:9
201:23
suggestion
202:24
Suite 148:9
149:5,12,18
sum 195:8
summary
170:18
Summit 172:5
support 173:11
174:3
sure 160:13
163:12,19
173:5 178:18
184:21 197:15
199:8
Surgent 147:17
150:22 211:17
swear 152:6
sworn 148:3
152:12 212:4
212:22

| T |
| --- |
table 191:1
take 184:6,19
199:13 200:20
207:10
taken 148:3
152:19 161:2
164:5 184:25
207:15 212:19
talk 164:24
talked 162:1
165:19 169:13
tax 191:22,23
192:15
tcooke@azala...
149:7
team 176:3,17
187:23,24
technically
181:14
tell 156:24
204:19
tens 206:19
term 169:15,15
terminate
153:14 154:1,4
154:9 155:4,17
156:25
terminating
156:11
termination
158:6,12,16,21
158:25
terms 155:25
164:14 191:3
Terry 151:12
154:6,8,22
155:6 156:9,23
157:3 158:10
Terry's 156:10
158:2 196:14
testified 152:12
200:3 205:12
205:13 206:3
testimony 156:3

Case 20-03060-sgj Doc 246 Filed 02/10/25 Entered 02/26/25 10:36:11 Desc Main
Document Page 59 of 90
James Dondero, Vol. 2 - 10/14/2024

Page 225

212:5
Texas 147:1
  148:6,9 149:6
  149:13,19
  211:1 212:1,25
  213:3
Thank 197:17
  208:1
Thanks 184:22
therefor 212:13
think 159:10
  171:2 178:8,9
  178:16 180:12
  180:21 185:8
  187:7 188:17
  188:23 192:13
  193:1 200:2
  203:21 205:18
third 150:16
  166:15,25
  169:20 174:19
  175:15 176:5
third-party
  176:7,11,13
Thomas 147:17
  149:3 211:17
thought 199:15
three 155:9
  160:20 163:22
Tim 179:13
time 156:22
  183:8,12 184:8
  186:10 192:17
  196:13
timing 155:25
  157:12
title 173:16
today 161:16,21
told 187:8
top 159:7 172:19
  180:2 191:2
  195:12
total 174:23
  186:20
traded 205:7

trading 204:25
  205:1
transaction
  167:14 185:19
  189:20,22
  190:16 191:21
  199:24 200:6
  201:1,2,3,6,8
transcript 212:4
  212:12
transcription
  210:4
transfer 150:19
  164:7,8 171:13
  173:8,15,16,23
  174:5
transferred
  175:19 177:24
transferring
  172:24
transfers 176:5
triggered 157:15
true 168:14,16
  206:12 212:5
true-up 168:22
trust 150:24
  151:6 182:22
  184:9 185:9,11
  185:13,20,22
  185:24,25
  187:1 188:24
  189:1,1,6,12
  190:23 191:19
  193:9 194:15
  194:18 195:4,5
  195:19 198:4
  198:11,16
  199:7,20,21
  201:18 204:3,5
  207:19,24
trustee 184:10
  193:8 201:16
  201:17,19,22
trusts 198:8
twice 193:3

two 153:5
  155:10 159:21
  160:20 163:22
  163:23 165:14
  179:13 201:10
two-week
  187:21
type 162:2
Typically
  176:15

___
### U
Uh-huh 169:23
  170:10 175:1
  198:1
ultimately 158:4
understand
  152:18 206:21
understanding
  156:12
UNITED 147:1
  211:1
unreimbursed
  174:23
unwilling
  173:10 174:3
unwillingness
  157:4,5,11
update 187:24
upper 180:1
use 176:15
  177:14 178:24

___
### V
valuation 176:3
  186:10
valuations
  204:20
value 150:13,13
  150:14,16
  153:1,12
  156:11 164:11
  165:6,6,7
  169:21 175:25
  187:9,17

188:10 206:8
valued 176:1,4
various 171:23
  196:15
vehemently
  202:23
viable 154:14
video-recorded
  152:5
Videographer
  149:23 152:3
  184:23 185:1
  207:13,16
  208:5
VIDEOTAPED
  147:22 148:1
Virgin 181:18
VOLUME
  147:23 148:2
  211:23
voting 180:5,7
  180:10,14
  197:24
vs 147:14 211:14

___
### W
want 172:14
  173:2,2 197:16
wanted 156:14
  164:23 165:1
  187:9 188:10
  197:15
wanting 187:17
wasn't 154:13
  154:14 156:9
  170:17 187:20
  206:15,22
WATERHOU...
  147:15 211:15
way 157:17
  159:17 164:22
  172:21 178:21
  180:24 189:12
  207:20
We'll 208:3

we've 196:20
  207:8
weekly 187:21
went 170:22
  193:16 201:3
weren't 169:11
whatsoever
  169:1 187:4
whereases
  174:19
WILLIAM
  147:18 211:18
willing 156:17
  174:12
wind 153:14
  154:1,5,9
  155:4,17
  156:25 158:25
Wishnew 148:8
  149:11
Withdrawing
  167:18
withheld 166:18
  170:6
witness 148:2
  152:7,10
  184:19,22
  205:20,25
  207:12 208:2
  209:2 212:3,6
woman 183:5
word 157:19,21
  199:13
wording 151:19
words 156:9
  206:15
worked 192:17
worth 149:19
  204:21
writing 164:25
  187:18 188:1,7
  188:10,12
written 150:12
  165:5 181:25
  195:21

Case 20-03060-sgj    Doc 246    Filed 02/10/25    Entered 02/26/25 10:36:11    Desc Main
Document      Page 60 of 90
James Dondero, Vol. 2 – 10/14/2024

Page 226

**wrote** 170:3

**X**

**X** 150:1
**XX** 212:9

**Y**

**Y** 149:3
**yeah** 153:16
163:22,22
166:12 178:23
192:7 201:14
202:21 203:21
203:23,24
204:24 205:5
207:3
**year** 155:1
186:12 202:13
**years** 183:13,16
183:16 184:3
184:18 200:24
200:24
**Yep** 159:24
160:22 189:10
191:20 195:14

**Z**

**ZAVITSANOS**
149:4
**zero** 158:8
**Zoom** 149:4

**0**

**0157735** 150:23
**0196281** 151:13
**0264644** 150:24
**0296420** 150:19
**0501920** 151:11
**0502043** 151:9
**0502070** 151:7
**0502268** 151:4
**0568877** 150:11
**0568892** 150:15

**1**

**1** 164:1 165:17

165:18 173:6
174:20 191:1
191:10 198:15
**1,933,313**
161:20
**1:02** 207:15,17
**1:03** 148:5 208:5
208:7
**10** 204:6 206:7
**10:59** 148:5
152:4
**11** 147:8 204:6
211:8
**11:59** 184:23,25
**12** 205:12
**12/18/17** 150:22
**12/21/15** 151:6,9
**12/23/15** 151:10
**12:13** 184:25
185:2
**12:55** 207:13,15
**1221** 149:5
**13** 205:13
**14** 147:23 209:2
211:23
**14th** 148:4 152:4
**152** 150:4,9,11
**16** 170:1 205:10
205:24,25
**160** 204:21
**165** 150:12
**169** 150:16
**17** 205:23
**1700** 148:8
149:12
**171** 150:19
**176** 150:20
**179** 150:22
**17th** 173:19
**18-30264-SGJ...**
147:4,7 211:4
211:7
**18-30265-SGJ...**
147:5 211:5
**182** 150:24

**188** 151:3
**190** 151:5
**192** 151:8
**194** 151:10
**196** 151:12
**19th** 154:16
171:13

**2**

**2** 147:23 148:2
164:2,9 167:1
211:23
**2,713,690**
161:11
**2,804,870**
175:20
**2.8** 175:20 176:1
**20** 175:12
**20-03060-SGJ**
147:14 211:14
**201** 149:18
**2010** 183:11,11
184:15
**2015** 189:22,22
190:21 195:3
**2016** 154:17
159:8 162:20
165:8
**2017** 171:14
173:19 196:14
**2017-7** 173:12
**202** 151:14
**2020-ish** 200:21
**2023** 202:13
**2024** 147:23
148:5 152:4
209:2 211:23
212:23
**208** 150:5
**209** 150:5
**210** 150:6
**213** 150:6
**214** 149:13
**21st** 190:21
**2390** 148:9

149:12
**23rd** 183:11
196:14
**24** 195:3 204:22
**25** 180:21 193:3
**2500** 149:5,18
**25th** 202:13
**28** 183:10

**3**

**3,814,186**
174:23
**30** 212:11
**30-** 184:18
**30(f)(1)** 212:8
**30th** 159:8 165:8
**313** 213:2
**332-2500** 149:19
**332,284.34**
168:5,7
**35** 150:9 152:2
152:23,24
159:6,10
184:18
**36** 150:11 152:2
152:23 159:9
159:13
**37** 150:12 165:3
165:4 167:1
**38** 150:16
169:18
**389,662** 164:13
164:17
**39** 150:19
171:10,12
**3916** 212:25
**392** 213:1
**3rd** 212:22

**4**

**4** 203:12,15
**4/30/2025** 213:1
**40** 150:20
176:25 177:1
184:18

**41** 150:22 179:5
179:9,11,12
**42** 150:24 179:7
182:20,21
**43** 151:3 188:15
188:17 192:6
**44** 151:5 190:18
190:20 192:6
**45** 151:8 192:19
192:20 194:22
**46** 151:10
194:25 195:2
**47** 151:12
196:11 197:5
**48** 151:14 202:9
202:11
**498-9990** 213:3

**5**

**5** 201:11
**55** 193:18,21,23
**55%** 191:6
**551895** 150:18

**6**

**6** 159:20 189:4
**6/30/16** 150:14
**60** 207:8
**62** 195:9
**63** 188:18
**655-1101** 149:6

**7**

**7/19/16** 150:9
**713** 149:6
**75** 180:21,24
**75/25** 185:5
**75201** 149:13
**76054-3024**
213:3
**76102** 149:19
**77010** 149:6
**780,000** 160:23
**780,377** 160:16
161:6 165:21

Case 20-03060-sgj   Doc 246   Filed 02/10/25   Entered 02/26/25 10:36:11   Desc Main
Document    Page 61 of 90
James Dondero, Vol. 2 - 10/14/2024

Page 227

**8**
**800** 204:22
**817** 149:19
  213:3
**817-4500** 149:13

**9**
**902,720** 164:12
**99** 197:9,18
  198:10
**99.5** 197:13,18

# EXHIBIT 2

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of April 28, 2021 (the "Effective Date"), by and among (i) Highland CLO Funding, Ltd. ("HCLOF"), (ii) Acis Capital Management, L.P. ("Acis LP"), (iii) Acis Capital Management GP, LLC ("Acis GP," and with Acis LP, collectively, "Acis"); and (iv) Joshua Terry ("Terry," and with HCLOF and Acis, collectively, the "Parties").

WHEREAS, Acis GP and Acis LP are reorganized debtors in the chapter 11 bankruptcy cases *In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC,* Case Nos. 18-30264 and 18-30265 (the "Bankruptcy Cases"), filed in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"); and

WHEREAS, section 14.03 of the Third Amended Plan of Reorganization filed in the Bankruptcy Cases on October 25, 2018 and confirmed by the Bankruptcy Court (the "Plan") provides for an injunction generally prohibiting the redemption or liquidation of certain Collateralized Loan Obligations or "CLOs" managed by Acis, defined in Plan section 1.01 (collectively, the "Acis CLOs") until, among terminating events, all allowed claims against the Debtors, as defined in the Plan, in the Bankruptcy Cases are paid in full (the "Injunction"); and

WHEREAS, the Parties agree that upon full payment of all allowed claims against the Debtors, as defined in the Plan, the Injunction shall automatically dissolve; and

WHEREAS, the Parties agree that in the absence of the Injunction, HCLOF may, among other things, direct Acis to redeem or liquidate some or all of the Acis CLOs as more specifically provided for in the CLO governing documents, including, without limitation, the PMAs, as the term PMAs is defined in section 1.88 of the Plan (collectively, the "PMAs"); and

WHEREAS, on July 26, 2019, HCLOF filed a notice of appeal from the judgment of the United States District Court for the Northern District of Texas affirming Bankruptcy Court's order confirming the Plan, which appeal is pending before the United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit") under Docket No. 19-10847 (the "Fifth Circuit Appeal"); and

WHEREAS, on June 20, 2019, Acis filed a second amended complaint in an adversary proceeding styled *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.,* Adv. Pro. No. 18-03078, in Bankruptcy Cases No. 18-30264 and 18-30265, in the United States Bankruptcy Court for the Northern District of Texas (the "First Lawsuit"); and

WHEREAS, on April 11, 2020, Acis filed an original complaint in an adversary proceeding styled *Acis Capital Management, L.P. and Acis Capital Management GP, LLC, Reorganized Debtors v. James Dondero et al.,* Adv. Pro. No. 20-03060, in Bankruptcy Cases No. 18-30264 and 18-30265, in the United States Bankruptcy Court for the Northern District of Texas (the "Second Lawsuit"); and

WHEREAS, the Parties desire to enter into this Agreement which, as set forth in more detail herein, provides for, among other things, the satisfaction of conditions necessary to lift the Injunction by its terms under the Plan, the optional redemption of certain Acis CLOs on terms directed by HCLOF and in accordance with the terms of the governing documents of the Acis CLOs (the "Redemption"), the dismissal with prejudice of the First Lawsuit;  the dismissal of the Second Lawsuit with prejudice against defendants William Scott and Heather Bestwick (the "HCLOF Director Defendants"), the dismissal of the Fifth Circuit Appeal, and mutual full and complete releases of all claims and causes of action that the Parties have, or may have, against each other, as more fully set forth below.

NOW THEREFORE, in consideration of the above recitals, the covenants, conditions, and promises made herein, the Parties agree as follows:

1.   **Representations and Warranties Regarding Acis CLO Fees and Expenses.** Acis and Terry represent and warrant as follows: (a) Acis has provided certain confidential information, consisting of an analysis by a well-known international law firm with expertise in CLO documentation and the rights and remedies of parties who manage CLOs, and an analysis of well-known financial advisory firm, with regard to fees and expense submitted to and paid by the Acis CLOs  (the "Confidential Professional Analyses"); (b) in the preparation of the Confidential Professional Analyses, Acis provided all requested information to the aforementioned law firm and the financial advisory firm in good faith, and all such information was accurate and complete to the best of Acis's and Terry's knowledge; and (c) Acis and Terry have no reason to believe that the conclusions contained in the Confidential Professional Analyses are incorrect.

2.   **Representations and Warranties Regarding HCLOF's Ownership of Subordinated Notes of the Acis CLOs.**  HCLOF represents and warrants it is currently, and has been since February 15, 2019, the owner of $39,750,000 subordinated notes issued by Acis CLO 2014-3 Ltd., $50,750,000 subordinated notes issued by Acis CLO 2014-4 Ltd., $53,000,000 subordinated notes issued by Acis CLO 2014-5 Ltd., and $51,850,000 subordinated notes issued by Acis CLO 2015-6 Ltd (the "HCLOF Subordinated Notes").  HCLOF further agrees that: (i) it will not sell, transfer or assign the HCLOF Subordinated Notes to any third party for a period of one hundred eighty (180) days  following the Effective Date, (ii) any sale, transfer or assignment of the HCLOF Subordinated Notes to a third party following the expiration of this 180-day period shall provide that such third party transferee, assignee or successor (and any transferees, assignees or successors of an initial third party transferee, assignee or successor) shall be subject to, and bound by, the terms of this Agreement, and (iii) any third party transferees, assignees, or successors shall not be affiliated in any way with James Dondero, CLO Holdco, Ltd., The Charitable DAF Fund, L.P., or any other entities owned or controlled by James Dondero, including but not limited to any funds or entities managed by an affiliate of James Dondero.

3.   **Stipulation, Representation and Warranty Regarding Payment of Claims against Acis.** As of the Effective Date, Acis and Terry stipulate, represent and warrant that all Allowed Claims against the Debtors, as that term is defined in section 1.48 of the Plan, have been paid in full and that the Injunction has expired by its terms under the Plan.  Acis and Terry agree to provide notice and verification that the Injunction has expired by its terms to all parties required

to be notified, including the issuers and the indenture trustees for each of the Acis CLOs, so as to ensure that HCLOF may exercise all rights that have been restricted or impaired by the Injunction.

4. **Cooperation and Further Efforts to Extinguish Injunction.** Although the Parties agree that no order of the Bankruptcy Court or any other court is required for this Agreement and all its terms and provisions to be fully effective, Acis agrees to cooperate with HCLOF and take any further action reasonably requested by HCLOF to confirm the dissolution of the Injunction, including, without limitation, filing appropriate motions to reopen the Bankruptcy Cases and to obtain entry of an order of the Bankruptcy Court dissolving or confirming the dissolution of the Injunction.

5. **Redemption of the Acis CLOs.** In the event that Acis receives a notice of redemption or refinancing related to the Acis CLOs, Acis agrees to act in good faith and in accordance with its responsibilities and duties under the PMAs and consistent with the terms of the respective Acis CLO indentures. In exercising such duties, Acis shall discharge its duty of best execution consistent with the terms of the PMAs, and, if requested by HCLOF, shall provide HCLOF with the price and counterparty of any bids received on any Acis CLO collateral in the event of an optional redemption of any Acis CLO. Attached as Exhibit A to this Agreement are form redemption notices for each of the Acis CLOs which the Parties have approved as sufficient and acceptable in all respects to initiate the redemption of the Acis CLOs. Acis agrees that, provided it is not prohibited from doing so under the terms of the respective Acis CLO indentures, Acis will execute in good faith the redemptions of the Acis CLOs. Acis further agrees to accept and comply with HCLOF's reasonable requests for information related to daily reporting (if requested) on the execution of any trades or other activity to effectuate HCLOF's requested optional redemption of the Acis CLOs, and (if requested) act in good faith to facilitate direct communications between HCLOF and Acis's sub-adviser, Brigade Capital Management, LP related to the execution of any trades. The Parties further agree to cooperate in good faith to enjoin any third parties from interfering with any Redemption of the Acis CLOs (if requested), and shall not cooperate, encourage or voluntarily assist any third party from interfering with the Redemption of the Acis CLOs. Notwithstanding anything contained herein to the contrary, to the extent this agreement requires any action to be taken with respect to any matter and the PMAs or indentures of the Acis CLOs require(s) that a different action be taken with respect to such matter, the provisions of the PMAs and/or Acis CLO indenture in respect thereof shall control.

6. **Abstention From Further Portfolio Management.** Acis and Terry agree to refrain from acting or proposing to act as portfolio manager of HCLOF or any CLOs managed by Highland Capital Management, LP.

7. **Dismissal of the First and Second Lawsuits.** Acis agrees to file a motion to dismiss or a stipulation of dismissal of the First Lawsuit with prejudice within three (3) business days following the occurrence of both the Effective Date and Acis' receipt of an agreed proposed order or a signed stipulation of dismissal from HCLOF. Acis further agrees to file a motion to dismiss with prejudice the Second Lawsuit as against William Scott and Heather Bestwick within three (3) business days following the occurrence of both the Effective Date and Acis' receipt of an agreed proposed order of dismissal from William Scott and Heather Bestwick. Acis agrees to use its best efforts to obtain approval of any motions to dismiss filed pursuant to this paragraph and,

regardless of the disposition of any such motion, the Acis Releasors (as defined below) agree to be bound by the covenant not to sue or sue further, as set forth below, any of the Acis Releasees (as defined below) with respect to the First Lawsuit and the Second Lawsuit.

8.  **Dismissal of the Fifth Circuit Appeal.**  Within three (3) business days of the Effective Date, HCLOF and Acis shall jointly move to dismiss the Fifth Circuit Appeal with prejudice, with each party bearing its own costs of such dismissal.  The Parties agree to act in good faith and to take all measures reasonably necessary to obtain Fifth Circuit approval of this request for dismissal.

9.  **Acis Releases.**  Effective upon the Effective Date, each of Acis GP, Acis LP, and Terry, for themselves and all their agents, representatives, officers, directors, advisors, employees, subsidiaries, successors and assigns in their capacities as such (collectively, "Acis Releasors"), with no further action required, forever agree and covenant not to sue or prosecute, or sue or prosecute further, against any Acis Releasee (as hereinafter defined) and shall forever waive, release and discharge, to the fullest extent permitted by law, each Acis Releasee from any and all claims (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever, that such Acis Releasor then has or thereafter may have, of whatsoever nature and kind, whether known or unknown, whether then existing or thereafter arising, whether arising at law or in equity, existing on or before the Effective Date (the "Acis Released Claims") against HCLOF in any capacity, HCLOF's respective successors and assigns, and each and all of the current and former officers, directors, employees, agents, attorneys, advisors and other representatives of each of the foregoing, including, without limitation, William Scott and Heather Bestwick (collectively, the "Acis Releasees"), provided, however, that Acis Released Claims do not include claims for the breach of this Agreement. In furtherance of the foregoing releases, and on and after the Effective Date, each of the Acis Releasors hereby irrevocably covenants and agrees to refrain from, directly or indirectly, asserting any claim, demand or remedy, or continuing, commencing, instituting, or causing to be commenced or instituted any proceeding, of any kind or nature whatsoever against any Acis Releasee based upon any Acis Released Claim.  This release is intended to be a general release of all claims existing on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the term Acis Releasees shall not include the Charitable Donor Advised Fund, LP (or any of its subsidiaries, including CLO Holdco, Ltd.), Grant Scott, James Dondero, David Simek, Dugaboy Investment Trust (or any trustee acting for that trust), or Mark Okada and his family trusts (and the trustees for such trusts in their representative capacities).

10.  **HCLOF Releases.**  Effective upon the Effective Date, HCLOF, for itself and all its agents, representatives, officers, directors, advisors, employees, subsidiaries, successors and assigns in their capacities as such (collectively, "HCLOF Releasors"), with no further action required, forever agrees and covenants not to sue or prosecute, or sue or prosecute further, against any HCLOF Releasee (as hereinafter defined) and shall forever waive, release and discharge, to the fullest extent permitted by law, each HCLOF Releasee from any and all claims (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential

damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever, that such HCLOF Releasor then has or thereafter may have, of whatsoever nature and kind, whether known or unknown, whether then existing or thereafter arising, whether arising at law or in equity, existing on or before the Effective Date (the "HCLOF Released Claims") against Acis GP, Acis LP, and Terry, in any capacity, Brigade Capital Management, LP, U.S. Bank National Association, Moody's Investor Services, Inc., the Acis CLOs (with respect to any claims for breach of any duties or obligations owed by Acis to the Acis CLOs under the PMAs arising prior to the Effective Date, including but not limited to any fees and expenses paid by the Acis CLOs to Acis), each of their respective successors and assigns, and each and all of the officers, directors, employees, agents, attorneys, advisors and other representatives of each of the foregoing (collectively, the "HCLOF Releasees"), provided, however, that HCLOF Released Claims do not include claims for the breach of this Agreement. In furtherance of the foregoing releases, and on and after the Effective Date, HCLOF hereby irrevocably covenants and agrees to refrain from, directly or indirectly, asserting any claim, demand or remedy, or continuing, commencing, instituting, or causing to be commenced or instituted any proceeding, of any kind or nature whatsoever against any HCLOF Releasee based upon any HCLOF Released Claim. This release is intended to be a general release of all claims existing on or before the Effective Date.

11.    **Additional Representations and Warranties**. In executing this Release, each of the Parties, on behalf of itself and each of its respective Releasors, hereby acknowledges, represents and warrants that it (i) has read and understands the terms in this Agreement, (ii) has consulted with and obtained the advice and counsel of its own attorney, (iii) has executed this Agreement and the releases therein without relying upon any statements, representations or warranties, written or oral, as to any law or fact made by any other Party, not expressly set forth herein, (iv) has executed this Agreement and the releases therein voluntarily and without any duress, coercion or undue influence of any kind, (v) is the sole owner of its Released Claims, and (vi) has not assigned, sold, or otherwise transferred its Released Claim to any other person or entity.

12.    **Remedies.** In addition to all other remedies at law or equity available to any Party with respect to any breach of any provision of this Agreement, the Parties agree that a breach of the provisions of Sections 2 through 10 of this Agreement cannot be adequately remedied at law or by money damages, that resort to legal remedies alone would impose an undue hardship on the non-breaching Party, and would frustrate the intention of the parties in entering into this Agreement, and that the non-breaching Party is entitled to specific performance and injunctive relief, in addition to any otherwise appropriate legal remedy.

13.    **Notices.**  Notices or certifications within the scope of any PMAs or indenture of the Acis CLOs shall be served in the manner required by the respective PMA or indenture. All other requirements for notices or certifications under this Agreement, including notices for Requested Discovery or service of accounting, shall be satisfied if effected by electronic mail and overnight delivery as follows:

<u>If to HCLOF</u>:

To:

Richard Burwood, Director
Highland CLO Funding Ltd.
P.O. Box 650
1st Floor, Royal Chambers
St. Julians Ave
St. Peter Port, Guernsey, GY1 3JX


With a copy to:

Mark M. Maloney
King & Spalding LLP
1180 Peachtree Street, 35th Floor
Atlanta, Georgia 30309
mmaloney@kslaw.com

<u>If to Acis</u>:

To:
Joshua N. Terry
Acis Capital Management, LP
4514 Cole Ave. Suite 600
Dallas, TX 75205
josh@aciscm.com

With a copy to:

Jeff P. Prostok
Suzanne K. Rosen
Forshey Prostok, LLP
777 Main Street, Suite 1590
Fort Worth, TX 76102
jprostok@forsheyprostok.com
srosen@forsheyprostok.com

<u>If to Terry</u>:

Joshua Terry
4514 Cole Ave. Suite 600
Dallas, TX 75205
joshuanterry@gmail.com

With a copy to:

Jeff P. Prostok
Suzanne K. Rosen
Forshey Prostok, LLP
777 Main Street, Suite 1590
Fort Worth, TX 76102
jprostok@forsheyprostok.com
srosen@forsheyprostok.com

14.   **Governing Law.**  This Release shall be governed by the laws of the State of Texas. Any claim or action arising out of or relating to this Agreement shall be brought in the United States District Court for the Northern District of Texas.

15.   **No Admission of Liability**. It is hereby understood and agreed that nothing herein, nor the acceptance or delivery of this Agreement by any Party shall be deemed or construed as an admission of liability of any nature whatsoever by any Party. This Agreement may be disclosed to the Bankruptcy Court or the Fifth Circuit by any Party for reasons other than to establish liability of any Party.

16.   **Authority to Enter Into the Agreement.** Each Party hereby represents, warrants and agrees to the others that (i) it has the requisite power and authority to enter into and perform the terms of this Agreement on behalf of itself and each of its respective Releasors, (ii) no further authority or approval is necessary, and (iii) the person executing this Agreement on his, her or its behalf, if applicable, has the full right and authority to fully commit and bind such Party.

17.   **Expenses.** Each Party shall bear its own expenses incurred in connection with the negotiation, execution and performance of this Agreement.

18.   **Entire Agreement.** This Agreement sets forth the entire understanding of the Parties with respect to the subject matter hereof, and supersedes all prior letters of intent, agreements, covenants, arrangements, communications, representations or warranties, whether oral or written, made by any officer, director, manager, member or representative of any of the Parties.

19.   **Counterparts.** This Agreement may be executed in multiple counterparts, each of which when taken together shall constitute one and the same instrument, and facsimile and PDF signatures shall be deemed originals.

*[Signatures Appear On Next Page]*

Executed and Agreed To:

**Acis Capital Management, L.P.:**

By: Shorewood GP, LLC, its general partner

Date: April __28__, 2021

By: _Joshua N. Terry_
Its: _President_


**Acis Capital Management GP, LLC:**

Date: April __28__, 2021

By: _Joshua N. Terry_
Its: _President_


**Joshua Terry:**

Date: April __28__, 2021


**Highland CLO Funding, Ltd.:**

Date: April _____, 2021


By:_____
Its:_____


By:_____
Its:_____

Executed and Agreed To:

**Acis Capital Management, L.P.:**

Date: April _____, 2021

By:_____
Its:_____

**Acis Capital Management GP, LLC:**

Date: April _____, 2021

By:_____
Its:_____

**Joshua Terry:**

Date: April _____, 2021

_____

**Highland CLO Funding, Ltd.:**

Date: April 28th, 2021

By: RICHARD BURWOOD
Its: DIRECTOR

By: Richard Boleat
Its: Director

**EXHIBIT A**

[___ __], 2021

ACIS CLO 2014-3 Ltd.
c/o FFP (Corporate Services) Limited
2nd Floor, Harbour Centre
42 North Church Street
George Town, Grand Cayman
Cayman Islands
Facsimile: 1 345 941 5855

**Re: Direction Letter – ACIS CLO 2014-3 Ltd.**

Dear Sir or Madam:

Reference is hereby made to that certain Indenture, dated as of February 25, 2014 (as amended, modified or supplemented from time to time, the "Indenture"), among ACIS CLO 2014-3 Ltd. (the "Issuer"), ACIS CLO 2014-3 LLC (the "Co-Issuer") and U.S. Bank National Association (the "Trustee"). Capitalized terms used but not defined herein shall have the meanings set forth or incorporated by reference in the Indenture.

Pursuant to Sections 9.2 and 14.3 of the Indenture, the undersigned Holders of at least a Majority of the Aggregate Outstanding Amount of the Subordinated Notes have delivered a written notice dated [___ __], 2021 to the Issuer directing the Issuer to effect an Optional Redemption of all Secured Notes and Subordinated Notes in full on [___ __], 2021.

In connection therewith, the undersigned Holders hereby direct the Issuer to deliver an Issuer Order to the Trustee to deliver a notice of redemption to the Holders in the manner required by Section 9.4 of the Indenture in the name and at the expense of the Co-Issuers pursuant to Section 9.4(b) of the Indenture.

*[Signature pages follow]*

Very truly yours,

**HIGHLAND CLO FUNDING, LTD.** (f/k/a
Acis Loan Funding, Ltd.)


By:_____
Name:
Title:

[___ __], 2021

ACIS CLO 2014-3 Ltd.
c/o MaplesFS Limited
P.O. Box 1093
Boundary Hall, Cricket Square
Grand Cayman, KY1-1102
Cayman Islands
Telephone: +1 (345) 945-7099
Facsimile: +1 (345) 945-7100

U.S. Bank National Association
190 South LaSalle Street, 8th Floor
Chicago, IL 60603
Attn: Global Corporate Trust – ACIS CLO 2014-3 Ltd.
Fax: 312-332-8030
E-mail: ACIS.CLO.2014.04@usbank.com

Acis Capital Management, L.P.
c/o Acis Capital Management GP, LLC
4514 Cole Avenue, Suite 600
Dallas, TX 75205
Attn: Joshua N. Terry, President
Email: Josh@aciscm.com

**Re: ACIS CLO 2014-3 Ltd.**

Dear Sir or Madam:

Reference is hereby made to that certain Indenture, dated as of February 25, 2014 (as amended, modified or supplemented from time to time, the "Indenture"), among ACIS  CLO 2014-3 Ltd. (the "Issuer"), ACIS CLO 2014-3 LLC (the "Co-Issuer") and U.S. Bank National Association (the "Trustee"). Capitalized terms used but not defined herein shall have the meanings set forth or incorporated by reference in the Indenture.

Pursuant to Sections 9.2 and 14.3 of the Indenture, the undersigned Holders of at least a Majority of the Aggregate Outstanding Amount of the Subordinated Notes hereby direct the Issuer to effect an Optional Redemption of all Secured Notes and Subordinated Notes in full on [___ __], 2021.

*[Signature pages follow]*

Very truly yours,

**HIGHLAND CLO FUNDING, LTD.** (f/k/a
Acis Loan Funding, Ltd.)

By:_____
Name:
Title:

By:_____
Name:
Title:

[_____], 2021

ACIS CLO 2014-4 Ltd.
c/o FFP (Corporate Services) Limited
2nd Floor, Harbour Centre
42 North Church Street
George Town, Grand Cayman
Cayman Islands
Facsimile: 1 345 941 5855

**Re: Direction Letter – ACIS CLO 2014-4 Ltd.**

Dear Sir or Madam:

Reference is hereby made to that certain Indenture, dated as of June 5, 2014 (as amended, modified or supplemented from time to time, the "Indenture"), among ACIS CLO 2014-4 Ltd. (the "Issuer"), ACIS CLO 2014-4 LLC (the "Co-Issuer") and U.S. Bank National Association (the "Trustee"). Capitalized terms used but not defined herein shall have the meanings set forth or incorporated by reference in the Indenture.

Pursuant to Sections 9.2 and 14.3 of the Indenture, the undersigned Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes have delivered a written notice dated [_____], 2021 to the Issuer directing the Issuer to effect an Optional Redemption of all Secured Notes and Subordinated Notes in full on [_____], 2021.

In connection therewith, the undersigned Holders hereby direct the Issuer to deliver an Issuer Order to the Trustee to deliver a notice of redemption to the Holders in the manner required by Section 9.3 of the Indenture in the name and at the expense of the Co-Issuers pursuant to Section 9.3(b) of the Indenture.

*[Signature pages follow]*

Very truly yours,

**HIGHLAND CLO FUNDING, LTD.** (f/k/a
Acis Loan Funding, Ltd.)


By:_____
Name:
Title:

[___ __], 2021

ACIS CLO 2014-4 Ltd.
c/o FFP (Corporate Services) Limited
2nd Floor, Harbour Centre
42 North Church Street
George Town, Grand Cayman
Cayman Islands
Facsimile: 1 345 941 5855


U.S. Bank National Association
190 South LaSalle Street, 8th Floor
Chicago, IL 60603
Attn: Corporate Trust Services – ACIS CLO 2014-4
Fax: 312-332-8030
Email: ACIS.CLO.2014.04@usbank.com


Acis Capital Management, L.P.
c/o Acis Capital Management GP, LLC
4514 Cole Avenue, Suite 600
Dallas, TX 75205
Attn: Joshua N. Terry, President
Email: Josh@aciscm.com


**Re: ACIS CLO 2014-4 Ltd.**

Dear Sir or Madam:

Reference is hereby made to that certain Indenture, dated as of June 5, 2014 (as amended, modified or supplemented from time to time, the "Indenture"), among ACIS CLO 2014-4 Ltd. (the "Issuer"), ACIS CLO 2014-4 LLC (the "Co-Issuer") and U.S. Bank National Association (the "Trustee"). Capitalized terms used but not defined herein shall have the meanings set forth or incorporated by reference in the Indenture.

Pursuant to Sections 9.2 and 14.3 of the Indenture, the undersigned Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes hereby direct the Issuer to effect an Optional Redemption of all Secured Notes and Subordinated Notes in full on [___ __], 2021.

*[Signature pages follow]*

Very truly yours,

**HIGHLAND CLO FUNDING, LTD.** (f/k/a
Acis Loan Funding, Ltd.)

By:_____
Name:
Title:

By:_____
Name:
Title:

[___ __], 2021

ACIS CLO 2014-5 Ltd.
c/o FFP (Corporate Services) Limited
2nd Floor, Harbour Centre
42 North Church Street
George Town, Grand Cayman
Cayman Islands
Facsimile: 1 345 941 5855

**Re: Direction Letter – ACIS CLO 2014-5 Ltd.**

Dear Sir or Madam:

Reference is hereby made to that certain Indenture, dated as of November 18, 2014 (as amended, modified or supplemented from time to time, the "Indenture"), among ACIS CLO 2014-5 Ltd. (the "Issuer"), ACIS CLO 2014-5 LLC (the "Co-Issuer") and U.S. Bank National Association (the "Trustee"). Capitalized terms used but not defined herein shall have the meanings set forth or incorporated by reference in the Indenture.

Pursuant to Sections 9.2 and 14.3 of the Indenture, the undersigned Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes have delivered a written notice dated [___ __], 2021 to the Issuer directing the Issuer to effect an Optional Redemption of all Secured Notes and Subordinated Notes in full on [___ __], 2021.

In connection therewith, the undersigned Holders hereby direct the Issuer to deliver an Issuer Order to the Trustee to deliver a notice of redemption to the Holders in the manner required by Section 9.3 of the Indenture in the name and at the expense of the Co-Issuers pursuant to Section 9.3(b) of the Indenture.

*[Signature pages follow]*

Very truly yours,

**HIGHLAND CLO FUNDING, LTD.** (f/k/a
Acis Loan Funding, Ltd.)


By:_____
Name:
Title:

[___ __], 2021

ACIS CLO 2014-5 Ltd.
c/o FFP (Corporate Services) Limited
2nd Floor, Harbour Centre
42 North Church Street
George Town, Grand Cayman
Cayman Islands
Facsimile: 1 345 941 5855

U.S. Bank National Association
190 South LaSalle Street, 8th Floor
Chicago, IL 60603
Attn: Corporate Trust Services – ACIS CLO 2014-5
Fax: 312-332-8030
Email: ACIS.CLO.2014.05@usbank.com

Acis Capital Management, L.P.
c/o Acis Capital Management GP, LLC
4514 Cole Avenue, Suite 600
Dallas, TX 75205
Attn: Joshua N. Terry, President
Email: Josh@aciscm.com

**Re: ACIS CLO 2014-5 Ltd.**

Dear Sir or Madam:

Reference is hereby made to that certain Indenture, dated as of November 18, 2014 (as amended, modified or supplemented from time to time, the "Indenture"), among ACIS CLO 2014-5 Ltd. (the "Issuer"), ACIS CLO 2014-5 LLC (the "Co-Issuer") and U.S. Bank National Association (the "Trustee"). Capitalized terms used but not defined herein shall have the meanings set forth or incorporated by reference in the Indenture.

Pursuant to Sections 9.2 and 14.3 of the Indenture, the undersigned Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes hereby direct the Issuer to effect an Optional Redemption of all Secured Notes and Subordinated Notes in full on [___ __], 2021.

*[Signature pages follow]*

Very truly yours,

**HIGHLAND CLO FUNDING, LTD.** (f/k/a
Acis Loan Funding, Ltd.)

By:_____
Name:
Title:


By:_____
Name:
Title:

[\_\_\_ \_\_], 2021

ACIS CLO 2015-6 Ltd.
c/o FFP (Corporate Services) Limited
2nd Floor, Harbour Centre
42 North Church Street
George Town, Grand Cayman
Cayman Islands
Facsimile: 1 345 941 5855

**Re: Direction Letter – ACIS CLO 2015-6 Ltd.**

Dear Sir or Madam:

Reference is hereby made to that certain Indenture, dated as of April 16, 2015 (as amended, modified or supplemented from time to time, the "Indenture"), among ACIS CLO 2015-6 Ltd. (the "Issuer"), ACIS CLO 2015-6 LLC (the "Co-Issuer") and U.S. Bank National Association (the "Trustee"). Capitalized terms used but not defined herein shall have the meanings set forth or incorporated by reference in the Indenture.

Pursuant to Sections 9.2 and 14.3 of the Indenture, the undersigned Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes have delivered a written notice dated [\_\_\_ \_\_], 2021 to the Issuer directing the Issuer to effect an Optional Redemption of all Secured Notes and Subordinated Notes in full on [\_\_\_ \_\_], 2021.

In connection therewith, the undersigned Holders hereby direct the Issuer to deliver an Issuer Order to the Trustee to deliver a notice of redemption to the Holders in the manner required by Section 9.3 of the Indenture in the name and at the expense of the Co-Issuers pursuant to Section 9.3(b) of the Indenture.

*[Signature pages follow]*

Very truly yours,

**HIGHLAND CLO FUNDING, LTD.** (f/k/a
Acis Loan Funding, Ltd.)


By:_____
Name:
Title:

[\_\_\_ \_\_], 2021

ACIS CLO 2015-6 Ltd.
c/o FFP (Corporate Services) Limited
2nd Floor, Harbour Centre
42 North Church Street
George Town, Grand Cayman
Cayman Islands
Facsimile: 1 345 941 5855

U.S. Bank National Association
190 South LaSalle Street, 8th Floor
Chicago, IL 60603
Attn: Corporate Trust Services – ACIS CLO 2015-6
Fax: 312-332-8030
Email: ACIS.CLO.2015.06@usbank.com

Acis Capital Management, L.P.
c/o Acis Capital Management GP, LLC
4514 Cole Avenue, Suite 600
Dallas, TX 75205
Attn: Joshua N. Terry, President
Email: Josh@aciscm.com

**Re: ACIS CLO 2015-6 Ltd.**

Dear Sir or Madam:

Reference is hereby made to that certain Indenture, dated as of April 16, 2015 (as amended, modified or supplemented from time to time, the "Indenture"), among ACIS CLO 2015-6 Ltd. (the "Issuer"), ACIS CLO 2015-6 LLC (the "Co-Issuer") and U.S. Bank National Association (the "Trustee"). Capitalized terms used but not defined herein shall have the meanings set forth or incorporated by reference in the Indenture.

Pursuant to Sections 9.2 and 14.3 of the Indenture, the undersigned Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes hereby direct the Issuer to effect an Optional Redemption of all Secured Notes and Subordinated Notes in full on [\_\_\_ \_\_], 2021.

*[Signature pages follow]*

WORKAMER\38549339.v3

Very truly yours,

**HIGHLAND CLO FUNDING, LTD.** (f/k/a
Acis Loan Funding, Ltd.)

By:_____
Name:
Title:


By:_____
Name:
Title:

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 18-30264-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | **Case No. 18-30265-SGJ-11** |
| | § | |
| Debtors. | § | **(Jointly Administered Under Case No.** |
| | § | **18-30264-SGJ-11)** |
| | § | |
| | § | **Chapter 11** |

| | | |
|---|---|---|
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | |
| **Reorganized Debtors,** | § | **Adversary No. 20-03060-SGJ** |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **JAMES DONDERO, FRANK WATERHOUSE,** | § | |
| **SCOTT ELLINGTON, HUNTER COVITZ,** | § | |
| **ISAAC LEVENTON, JEAN PAUL SEVILLA,** | § | |
| **THOMAS SURGENT, GRANT SCOTT,** | § | |
| **HEATHER BESTWICK, WILLIAM SCOTT,** | § | |
| **AND CLO HOLDCO, LTD.,** | § | |
| | § | |
| **Defendants.** | | |

**DECLARATION OF THOMAS COOKE IN SUPPORT OF PLAINTIFFS' OBJECTION TO
REPORT AND RECOMMENDATION TO THE DISTRICT COURT THAT IT GRANT
DEFENDANT JAMES DONDERO'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
"SUPPLEMENTAL" MOTION FOR SUMMARY JUDGMENT AND DISMISS WITH
PREJUDICE ALL REMAINING COUNTS AGAINST DONDERO**

1.      My name is Thomas Cooke. I am over the age of twenty-one (21) and of sound mind and have never been convicted of a felony or crime of moral turpitude. I am competent to make this declaration, have personal knowledge of the facts set for herein, and they are true and correct.

2.      I am an attorney at Ahmad, Zavitsanos & Mensing, PLLC ("AZA"). My business address is 1221 McKinney St., Suite 2500, Houston, Texas 77010. I, along with other counsel at AZA, represent the Plaintiffs, Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP") in the above-captioned case.

3.      Attached as **Exhibit 1** is a true and correct copy of a transcript of the Oral and Videotaped Deposition of James Dondero, Volume 2, dated Oct. 14, 2024.

4.     Attached as **Exhibit 2** is a true and correct copy of a settlement agreement reached between Plaintiffs and Highland CLO Funding, Ltd. ("HCLOF"), dated April 28, 2021.

5.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025.

*/s/ Thomas Cooke*
Thomas Cooke